IN THE UNITED STATES DISTRICT COURT
                   FOR THE NORTHERN DISTRICT OF GEORGIA
                            ATLANTA DIVISION

SARVINT TECHNOLOGIES, INC.,    )      CV. NO. 1:15-CV-69-72
                               )      ATLANTA, GA
              PLAINTIFF,        )      JULY 13, 2015
                               )
                               )
     VERSUS                    )
                               )
CARRE TECHNOLOGIES, INC.,      )
ET AL.,                        )
                               )
              DEFENDANT.        )
_____    )

            BEFORE THE HONORABLE TIMOTHY C. BATTEN, JR.
                 UNITED STATES DISTRICT COURT JUDGE
                          MOTIONS HEARING


APPEARANCES:
FOR THE PLAINTIFF:              ERIC MAURER, ESQ.
                               NORMAN CRAIN, ESQ.
                               PETER SCHOENTHALER, ESQ.
                               BRYAN BAYSINGER, ESQ.
                               DAN GRESHAM, ESQ.

FOR THE DEFENDANTS:
CARRE TECHNOLOGIES, INC.       ROBERT M. WARD, ESQ.

OMSIGNAL,  INC.,               CHRISTOPHER CAMPBELL, ESQ.
RALPH LAUREN CORP.             ROBERT KING, ESQ.
                               STEPHEN CRENSHAW, ESQ.

SENSORIA, INC.                 RACHAEL HARRIS, ESQ.
                               STEVEN AUVIL, ESQ.
                               JOHN HARBIN, ESQ.
                               WARREN THOMAS, ESQ.

TEXTRONICS, INC.               MITCHELL STOCKWELL, ESQ.


VICTORIA'S SECRET STORES,
LLC                            LYNN RZONCA, ESQ.
                               RAMTIN TAHERI, ESQ.
                               RICHARD MILLER, ESQ.

COURT REPORTER:                    DEBRA R. Bull, RPR, CRR
                                   UNITED STATES COURT REPORTER
                                   1949 RICHARD RUSSELL BUILDING
                                   75 SPRING STREET, SW
                                   ATLANTA, GA   30303


             STENOTYPE/COMPUTER-AIDED TRANSCRIPTION
                  *** *** *** *** ***

THE COURT:  Are we ready?  I had an email sent to everybody explaining how we are going to do this:  Thirty minutes for the Plaintiff and then 20 minutes for each Defendant, and then 20 more minutes for Sarvint for rebuttal.

So, I will hear from Sarvint.

MR. SCHOENTHALER:  Your Honor, just a quick introduction.  My name is Peter Schoenthaler.  I represent Sarvint Technologies.

THE COURT:   I remember you from somewhere.

MR. SCHOENTHALER:  I remember you as well, Your Honor.

With me is Dan Gresham, who is also cocounsel.  Sitting in the back is Brian Baysinger and Andrew Crane and Eric Maurer.  We are all attorneys at Thomas Horstemeyer and cocounsel in the case.  Also with us today is Sundaresan Jayaraman, who is the founder of Sarvint and one of the inventors on the '731 patent.  In the back is Sungmee Park, who is also a founder of Sarvint, and one of the inventors on the '731 patent.  And Mr. Palaniswamy Rajan, who is one of the founders of Sarvint and is acting CEO.

Sarvint is going to -- Dan Gresham will argue likelihood of success elements and then I will follow up with irreparable injury, balancing equities, and public interest.  And I will cede the podium.

MR. GRESHAM:  Please the Court.  May I approach the

bench? We have a handout that we would like to give you instead of -- in our presentation.  I have copies for each party.

We don't have anything really elaborate as far as the presentation.  Sarvint firmly believed that the likely success on the merits of infringement has been shown.  The '731 patent is the patent at issue, and for purposes of the preliminary injunction,  Sarvint has alleged infringement of claim one.   And claim one is shown in the handout.  And if you look at the second page, claim one essentially requires a method for monitoring the vital signs of the Subject comprising applying a fabric-based sensor to the subject and connecting the sensor to a monitor.  There are some elements that describe how the sensor is constructed.

The sensor is a fully-conductive fabric sensor with individually conductive fibers.  There is an electrical lead that connects the fabric sensor to a connector, and then there is a connector.  And each of the accused products, which you can see in the handout, is specifically designed to be worn by a subject so that the a fabric-based sensor is placed in contact with the subject skin to monitor some type of vital sign.   Each of the infringing products has -- instructs the subject to connect the SmartShirt or the bra or the garment to a connector and the connector is connected to a monitor to monitor the vital signs.

Now, each of the accused products has a fully-conductive fabric sensor, electrical lead, and a connector. Now, the declaration of Dr. Jayaraman submitted initially with the PI motion. I think several of the Defendants have raised some issues with regard to -- where the claim chart support it and they cited an interface case where this Court had previously decided that there was a claim chart that amounted to nothing but attorney arguments so it wasn't fully supported.

But in this case exhibits B and C to the preliminary injunction motion, B is the claim chart and C is the affidavit declaration of Dr. Jayaraman. Now, Dr. Jayaraman is widely recognized as an expert in this field and he is certainly a person of ordinary skill in the art. He thoroughly examined accused products, public information on the accused products, and worked hand-in-hand with counsel in developing the claim charts. He swore to the veracity of the claim charts and verified their accuracies, so the claim charts are well supported of a person of ordinary skill in the art and expert declaration of Dr. Jayaraman.

In opposition of the motion, the Defendants made several non infringement models. To briefly summarize, several of the Defendants, I think all except Victoria's Secret argued that they don't have an electrical lead, but each of their products has a fabric sensor and a connector. And the fabric sensor is in electrical communication with the connector.

The claim language, if you look at page two of the handout, says that the electrical lead is foreign from one of the fibers in the sensor.  It doesn't say that the fiber and the sensor has to go all the way to the connector,  it says it is foreign from a fiber.  So, you have got a fabric sensor made of fibers and then you have got a connector that is in electrical communication and that meets the electrical lead element, so that element is met for each of the products because that is the way they are designed, fabric sensor and electrical contact with the connector for purposes of monitoring.  So,  we don't believe that that has any merit or that it casts any doubt of the likelihood of Sarvint prevailing on the merits of the infringement.

Now,  two of the Defendants, Adidas and Sensoria, argue that their products do not meet the fully-conductive fabric element.  Now, that is in element A, a knitted or woven fully-conductive fabric, including one or more individually conductive fibers.  Now, there is nothing in the patent or in the claim that requires each fiber in the sensor to be conductive.  In fact, the patent itself talks about --

THE COURT:  What about where it says each conductor fiber being individually conductive fiber prior to incorporation into the fabric?

MR. GRESHAM:  Yes, sir.  I am talking about the element of the fully-conductive fabric.

THE COURT:  Okay.

MR. GRESHAM:  It includes one or more individually conductive fibers and the fibers must be conductive prior to incorporation into the fabric.  That doesn't preclude the fabric from also including nonconductive fibers such as spandex and that is shown in the specification for the patent. For example,  column four, line 60 to column 5, line 8, which talks about weaving conductive fibers with nonconductive fibers for purposes of form fitting and that type thing. That is basically what the original Sarvint product -- this is the original prototype that Sarvint developed back with the invention.  Sarvint didn't develop it,  Sarvint didn't exist at that time.  Dr. Jayaraman and Ms. Park developed the prototype.

THE COURT:  All right.

MR. GRESHAM:  It does include stretchy fabric.  So, fully conductive simply means that anywhere on the sensor any two points you have got electrical conductivity between them. Dr. Jayaraman tested each of the accused products with a millimeter, measured those, the conductivity of the fabric of the sensor and it was conductive at all areas.  So,  we believe that the fully-conductive fabric element has been met.

Now, what the Court was alluding to earlier, several of the Defendants have also argued that their sensors are not formed for individually-conductive fibers.  Several have

argued that their sensors are woven together first and then later coated with a conductive substance of some description.

THE COURT:    Do you disagree with that assertion?

MR. GRESHAM:    Yes, we do.    The reason that we do is detailed in Dr. Jayaraman's declaration of June 11.

THE COURT:    Are you calling Dr. Kidder a liar?

MR. GRESHAM:    No, sir.    What we are saying is that we did independent investigation of the samples that we had under a scanning electron microscope and with energy dispersive spectrometry and determined, based on that, based on Dr. Jayaraman's expert opinion, that the results of those tests indicate that there are individually conductive fibers in each of the accused products.

THE COURT:    Well, it sounds to me like Dr. Jayaraman is offering circumstantial evidence, not direct evidence, whereas in the face of that the Defendants are offering direct evidence that the fibers are not individually conductive prior to the incorporation into the fabric.

MR. GRESHAM:    I am not sure if it is direct evidence. I mean, it is testimony --

THE COURT:    It is testimony with the email chain from a German manufacturer.

MR. GRESHAM:    Right.    We believe that that has not been tested.    The samples that we tested, maybe the German manufacturer was dealing with a different type  -- probably

with a different sample.   We haven't been able to take any discovery to go behind that.   So, what we attempted --

THE COURT:   Doesn't that raise a substantial question as to infringement right there?

MR. GRESHAM:   We don't believe so on the basis of the actual examination that has gone through in great detail in Dr. Jayaraman's declaration.   We believe that that rebutted the argument that was presented in conclusory fashion.

THE COURT:   All right.

MR. GRESHAM:   Finally,  Sensoria, they argue that their socks don't measure vital signs, but they do admit that the socks measure a variety of gait-related parameters and electrically communicate that information to a monitor where it determines various parameters.   So,  we presented evidence that gait can be viewed as a vital sign and there is really a question as to whether the vital sign being in the preamble is even limiting to begin with.

So, we don't believe that there has been a rebuttal of the infringement contentions that raises a substantial issue as to infringement.

THE COURT:   All right.

MR. GRESHAM:   As to validity, there were two references submitted which were essentially cumulative of references that were presented to the patent office when the patent was issued.   And those references -- the patent went

through a thorough examination and enjoys a presumption of validity. And Dr. Jayaraman went through each of the references in his declaration and indicated why those references are different from what is claimed in claim one of the '731 patent.

And, finally, Sensoria, I believe, is the only Defendant that raised the issue of standing as to whether Sarvint as an exclusive licensee had standing to bring the suit in their own name without naming the owner of the patent, Georgia Tech research corporation. In response to that, we filed a declaration of Mr. Rajan, Sarvint's principal, along with copies of the exclusive license agreement and the amendment thereto for the Court's consideration. We believe that those conclusively show that Sarvint does have standing to bring suit on its own.

So, in sum, Sarvint believes strongly that it has satisfied its burden of showing a strong likelihood that it prevailed on the merits with respect to each Defendant.

THE COURT: All right. Thank you, sir.

MR. SCHOENTHALER: Good morning, Your Honor.

THE COURT: Good morning.

MR. SCHOENTHALER: Sarvint is entitled to preliminary injunction and we have shown through evidence, including the declaration of professor Challagalla that Sarvint is being currently irreparably harmed in the marketplace by defendant's

infringement.

THE COURT:  Let me ask you, is it even proper for an expert, a technical expert, non-legal expert to attest in an affidavit that one party or another has suffered or will suffer irreparable harm?  Isn't that a purely legal question?

MR. SCHOENTHALER:  No, I don't believe so.  I think it is a question of law and fact.  I think you have to have the facts and certainly the Court applies the law,  but I think a professor of marketing is perfectly a legitimate -- a professor of marketing to submit a declaration.  If the Court had taken testimony on the issue, Mr. Challagalla would have been here to support his declaration in person.

THE COURT:  All right.

MR. SCHOENTHALER:  Professor Challagalla identifies four particular ways in which Sarvint is being injured.  They are being injured -- Sarvint is being injured by the loss of good will in the market.  Sarvint is being injured through the reputational damage it is suffering,  through the loss of business opportunities.  It is foregoing and through price erosion.  And all of these injuries is occurring because Defendants are infringing the '731 product or 713  -- '731 patent.  And in particular because this is an early market and Defendants are ahead of Sarvint in the market and which is what is causing Sarvint the injury.  For example --

THE COURT:  They say it is sometimes better to come

late to the market.

MR. SCHOENTHALER: Well, not really. What the declaration that was submitted in opposition says, I don't think that that declaration disputes that it is better to be early, what it says is it is not -- you don't always succeed if you are the early entrant. Now, no one is claiming that the early entrants will definitely succeed. I think what Challagalla said and what the declaration in opposition did not deny which is better to be early than late. But that doesn't guarantee anything certainly.

The awards that have been obtained by the Defendants through their early market, those can't be taken away at this point. Consumers are going to see the awards of these early entrants by Defendants and they are going to say, this is a valid company, this is a valid product.

Now, Your Honor can't take away those awards, they have been granted, but Defendants continue to achieve the benefits of those awards. And only an injunction can maintain the status quo and put the parties where they should be but for the infringement.

THE COURT: Well, precisely what damage has your client suffered or is vulnerable to suffering that cannot be remedied by an award of money?

MR. SCHOENTHALER: The market conditions in this early-stage market can never be recreated.

THE COURT:  Why can't that be remedied by an award of money?

MR. SCHOENTHALER:  There is no amount of money that is going to put Sarvint back in the position of a market leader with the sole owner of the technology in the market, there is no amount of money.  If Sarvint had been first to market, they would control,  they would have achieved the awards,  they would have achieved the brand recognition. They would have achieved -- they would have been able to tie their garment to a platform for athletes.  None of that can be -- we can't go back in the past and create that.  Only Your Honor granting an injunction can put Sarvint back in the position it should be but for the infringement.

Five years from now,  Sarvint will come out with the product,  Sarvint will be in the market competing,  but it will never be -- have been given the opportunity it should have been given through practicing the '731 patent.

THE COURT:  You don't think Dr. Challagalla for a fee would be able to give us an affidavit attesting to what the monetary loss was from Sarvint being excluded from the opening market at the beginning?

MR. SCHOENTHALER:  No,  Your Honor.  Professor Challagalla in multiple parts of his declaration states unambiguously that the fact that the market cannot be recreated is irreparable injury and that monetary compensation

cannot resolve the problem.

What is happening here is barriers of the market are being created that Sarvint is not going to be able to overcome, it is absolute injunction. You have major brands here, Adidas, Ralph Lauren, those brands are already well-known. You couple that with success in a new early-stage market like this, Sarvint will never be able to recover from that, Your Honor.

Now, one item that I think needs to be addressed, the Defendants almost uniformly have argued that there is no irreparable injury because Sarvint does not have a product out. That is a false premise. The premise they take is that Sarvint doesn't have a product out so they can't lose market share and they can't suffer price erosion, that is false. The question is not whether Sarvint has a product out, there is no dispute that Sarvint is working very hard to put a product in the market -- if I may approach, Your Honor?

Your Honor, what I have handed you is a confidential, attorneys-eyes-only item that shows -- on the first two pages shows some designs that Sarvint is looking at. On the third page it shows a working prototype that Sarvint is in the process of developing and perfecting. There is a second version of that prototype on page four. And then page five shows the lease premises that Sarvint is in the process of negotiating. The purpose of showing this is obviously this

is a competitive industry, we are dealing with direct competitors, and hence it has been marked attorneys eyes only.

The fact is, Sarvint does not have a product out there, but Sarvint is working toward a product.  There is no dispute here that Sarvint is in the process of commercializing their product.  It has raised 1.25 million dollars,  it has hired ten people, eight of whom are technical, it is advertising for another ten,  it is leasing space, it is paying salaries, it is  negotiating with manufacturers, it has filed multiple trademarks covering all the products the Defendants are currently selling, and is working towards the development of a commercial product.  The arguments by Defendants that somehow Sarvint cannot be irreparably injured because it currently does not have a product out is a specious argument.  It is losing market share,  it is suffering price erosion, and when it comes into the market, those injuries are going to be exacerbated.

There is no speculation here, which is what Defendants argue.  There is no speculation as to loss in market share. Sarvint is suffering it and will suffer as it releases commercial product.

Just talk about the balance of equities for a minute. Defendants all uniformly argue that the balance of equities weigh in their favor.  There is no question here that the balance of equities weigh in Sarvint's favor.  Three of the

Defendants, Victoria's Secret, Ralph Lauren, and Adidas, each of them can obviously withstand an injunction on a product that they sell very little of at this point.  With respect to Sensoria, OMSIGNAL, and Carre,  Sarvint acknowledges an injunction will injure them.  And the question becomes, who will be injured the most?  And Sarvint believes it has shown the Court that Sarvint was the party that will be injured the most.  Sensoria isn't even selling the product in the U.S. There is no harm in entering an injunction against Sensoria. OMSignal and Carre are both international companies,  they are both based in Canada.  They can survive.  There is a whole world out there in which they can sell their products.  They just can't infringe on a U.S. patent in the U.S. market.

The public interest will also be served by granting an injunction.  There is a reason to incentivize inventors to invent things.  Granting the injunction supports that public interest,  denying the injunction obviously detracts from it.

As Defendants' experts noted, there are multiple  -- let me step back.  Defendants argue that the Court should not withdraw the product from the -- from consumers.  The argument against that is, their own expert testified how broad the wearables market is as a whole.

THE COURT:  He didn't testify to the same degree of breadth that your expert did.

MR. SCHOENTHALER:  Well, no, I disagree.  I think

that the Defendants played fast and loose with their interpretation of Challagalla's declaration.  Professor Challagalla only looked at the broader market of wearables in the context to show that this was a fast emerging market.  He did not look at the broad market in the sense of competing products or substitute products, he only used that as a backdrop to then talk about this smart apparel marketplace. But the point is that there are other wearables out there that don't infringe.  There are bracelets, there are arm bands, there are watches, there are lots of wearables that the consumers can use as a substitute or alternative to the infringing.

THE COURT:  But who says that is the right market, watches and bands and things of that nature as opposed to these shirts, these garments?

MR. SCHOENTHALER:  Well, we do have a sub market.  We have the wearable market, which would be the monitoring of vital signs and then we would have the smart apparel market, which also monitors vital signs, but in a more narrow manner through the wearing of garments with sensors on the garments. So, there are alternatives for consumers.  And the injunction will not remove those alternatives.

One of the arguments Defendants make that Sarvint disagrees with vehemently is that somehow granting an injunction would change the status quo.  I think that is

another false logical construct.   The fact of the matter is, the status quo the Court should be looking at is where would the parties be but for the infringement.

THE COURT:   How can you say it wouldn't disrupt the status quo?  I mean, I am putting them out of business in this market, that is not disturbing the status quo?

MR. SCHOENTHALER:  No.  The status quo -- the proper status quo, Your Honor,  would be, where would be the parties be but for the infringement?  That is the proper status quo. We must take a close look in detail at where the Defendants are.   As I understand it, Victoria's secret is not even selling their bra right now, it is not available on their website.   There is a status quo for Victoria's Secret. Sensoria stated in their brief on page five that they are not selling their bra or their shirt in the U.S. market.   That is the status quo for Sensoria.   Polo says they have never sold it.   There is the status quo for Polo,  for Ralph Lauren. OMSignal, who makes a great deal about the status quo,  they didn't ship their first product until after Sarvint filed for an injunction.   They were well aware that Sarvint was seeking a preliminary injunction as of January 9 when the complaint was filed.   Adidas, they are the exception to the rule here in the sense that they arguably were selling before Sarvint moved for an injunction.

But what is missing from the evidence in this case is how

long these Defendants have been selling these products.  I don't recall any of the Defendants actually putting in the record how long they have been selling the product.  We know Carre started selling in November because Sarvint bought a product.  We can only look at the Georgia sales because that is all the evidence we have.  So, we know that OMSignal didn't ship until afterwards.  Adidas is -- plays very -- the declarations that Adidas submitted is very vague as to when Adidas started selling the current infringement product.  They may have other products and I am sure we will find out in discovery.  But the fact of the matter is, The status quo of Sarvint is there is a infringement and they should be -- the Defendants should be -- should stop selling the product on this market.

THE COURT:  All right.  Thank you, sir.

MR. CAMPBELL:  Good morning, Your Honor.  Chris Campbell on behalf of OMSignal and Ralph Lauren.

I would like, with the Court's indulgence, to propose a slight modification to the schedule because I have been nominated by our group to speak on a common issue and that is irreparable harm.  And we are hopeful that this can streamline the conversation today.  If the Court will indulge me and perhaps give me a little more than 20 minutes, and I will ask my colleague, Mr. Crenshaw, will talk about some of the other factors besides irreparable harm.  If we could

please have control of the audio visual equipment, we would like to put a slide up.

May I approach, Your Honor?

THE COURT:   Yes, sir.

MR. CAMPBELL:  Okay.   Very well. Thank you very much.

So,  Your Honor,  before I get started, I just wanted to respond to a couple of points that counsel for Sarvint made. First of all,  with respect to the likelihood of success,  I think it has to be pointed out and perhaps my colleagues were going to do that,  as well,  that in the declaration of Dr. Jayaraman,  who we don't dispute is going to be by virtue of a professor in this field, very knowledgeable,  but we didn't hear anything about Dr. Jayaraman being qualified as a technical expert in this case.  Simply because one is a professor and one has been awarded patents does not mean that one is qualified to opine on the ultimate issue of patent infringement.  And, in fact,  Dr. Jayaraman skips over a very critical piece of patent infringement.  As Your Honor knows, patent infringement requires a two-step process.

THE COURT:   I am having a little bit of trouble with what you just said.   It is hard for me to understand how Dr. Jayaraman is not an expert in this field when he is the guy that invented the product.   I understand you are saying he has got holes in his affidavit, that is not the same thing,

though.

MR. CAMPBELL:  What I am saying, Your Honor,  is if this was an affidavit or an expert report as it was characterized in the rebuttal --

THE COURT:  Right.

MR. CAMPBELL:  -- that was brought to trial,  this would unquestionably be subject to Daubert.  Why?

THE COURT:  Because he hasn't established it in the record his expert qualifications.

MR. CAMPBELL:  It is not that, Your Honor.  He has omitted or skipped over a critical step in the process --

THE COURT:  Okay.

MR. CAMPBELL:  -- of determining whether or not there is an infringement.

THE COURT:  That hole in his affidavit is fatal to his testimony altogether?

MR. CAMPBELL:  It is fatal.  He has to construe the claims.  Claim construction is the first step in any infringement analysis.  Instead what we have from Dr. Jayaraman is a conclusion that there is infringement.  He is just taking the elements of the claims and pointing them to each of the Defendants' accused products.  That is fatally flawed.  He skips over entirely the first step.  No surprise --

THE COURT:  They skipped over the first step and it

was --

MR. CAMPBELL:  That's correct, Your Honor.  There is no mention of any exercise in claim construction, very well. So, I wanted to make that one point.

Second point is and it pertains to my client only, counsel suggested that OMSignal shipped its product after it filed for the preliminary injunction and that is just wrong. OMSignal was on the market prior to the filing of the preliminary injunction motion.  I just wanted to correct the record in that respect.

THE COURT:  Okay.

MR. CAMPBELL:  If we could turn now to this issue of the declarations and irreparable harm.  So, as the Court knows, injunctions are very drastic in nature.  And, in fact, on May 15th,  2005, the Supreme Court changed the law dramatically with respect to the award of injunctive relief to a prevailing patentee.  That was the eBay MercExchange case, which every lawyer in this courtroom knows about it.  And in that case, the Supreme Court found that following a finding of infringement, irreparable harm is not presumed.  Instead, what the Court is required to do is go through the traditional four factor test and come to its own independent conclusion, based upon facts that are in the record, not conclusions,  but facts, and determine whether or not that Plaintiff patentee is entitled to this extraordinary relief.

So, let's talk about the, and the Court knows, but very quickly, the patentee has to establish a likelihood of success. That there is irreparable harm that cannot be remedied by money damages in the absence of an injunction. The balance of equities tip in the patentee's favor. And then as well that the injunction is in the public interest. As well, Sarvint has a very high burden of showing the likelihood of success on validity, enforceability, and infringement. So here, and I think Your Honor was touching upon it, there appear to be very disputed issues in the record with respect to at least the issue of infringement.

So, you know, we ask ourselves on this side of the bar, you know, why now? Sarvint does not have a product on the market. They appear to be working on a product we got for the first time today. Some designs that appear to be computer generated. We had not seen that prior to those being handed out in open Court. There is obviously no direct competition between these parties. So, if there is no competition, there is no lost sales, there is no loss of market share, there is no reputational loss.

THE COURT: Okay. Are you saying in every case where the patentee contends that it has the patent and has not yet entered the marketplace, that patentee cannot claim, maintain its successful infringement action?

MR. CAMPBELL: I am not saying that at all, Your

Honor.   But in the context of our present posture,  the Federal Circuit says the following:

"The absence of direct competition between Plaintiff and Defendant weighs heavily against the finding of irreparable harm."

And that is Hi-tech Medical --

THE COURT:   It is not a uniform bar.   Give me an example where the patentee could successfully maintain a suit even though it had not entered the market.

MR. CAMPBELL:  Well, if the patentee, for example, had in the record facts to show that the features that are in the accused products drive the demand for that product,  we are going to talk about that, I am going to get to that point, as well.

THE COURT:   Right.

MR. CAMPBELL:  And those facts are completely absent. What was interesting, and I will just preview it,  you didn't hear one word from the plaintiffs about this so-called causal nexus requirement, A critical requirement.   And there is a trilogy of Apple cases that discuss this.   And we didn't hear a word about that.   So the answer to Your Honor's question, if they were able to come in here and show through record evidence that the cause of the harm is directly attributable to our use of the patented features and those patented

features are driving consumer demand, sure, I could perhaps foresee a situation where a patentee in that situation would be entitled to preliminary injunctive relief.

THE COURT: All right.

MR. CAMPBELL: So as well, why now for the injunction? There is no sales channel information. We don't hear anything from Sarvint, about -- we hear, like they leased this office space, they have hired some folks, but we don't know whether they are going to sell it. Are they going to white label for one of the bigger sports apparel companies? Are they going to sell directly to Wal-Mart? Are they going to be a distributor of this product? We have no idea. So, to say that they have irreparable harm, it would be awfully helpful if the record showed exactly where that harm was coming from.

And then, finally, there seems to be a tremendous lack of urgency here with respect to the enforcement of these patents. So, the Court read the papers that were filed and this invention was -- appears to have been conceived, according to Sarvint, sometime in the mid to late 1990's. And then at that time Georgia Tech worked with a company called Athena Ventures. And out of that came a company called Sensatex formed in 2000. Sensatex failed to commercialize a product for eight years. And what was remarkable, it is not the fact that they failed to commercialize it for eight years, but it

took four years to unwind that license to Sensatex.   So, we are from 2008 now fast forward to 2012.   Thereafter, it took two more years for Georgia Tech to identify and hook up with Sarvint.   So, there is a tremendous lack of urgency that militates against the extraordinary relief of preliminary injunction.

So, let's talk about irreparable harm.   So, this is right out of Dr. Challagalla's declaration.   This is really the framing of his charge.   He says, the guiding question for the report was, has Sarvint incurred irreparable damage as a result of the alleged patent infringement by the accused infringers? So,  that is what he is trying to figure, out whether or not Sarvint has suffered irreparable harm.   The rebuttal declaration of Douglas kidder, who we were going to put on today,  but we will talk about his testimony and the evidence he put into the record.

So, Mr. Kidder was going to talk about, among other things, some of the flaws,  if you will, in Dr. Challagalla's expert report.   First of all,  he fails to properly define a relevant marked.   So we hear that the market can be this notion of wearables, whatever that means.   It is hard to quantify what a wearable is.   But then we hear about, well, there is a submarket of wearables called, smart apparel technology.   He uses one -- the larger market and smaller market to bootstrap this whole irreparable harm analysis and

it is really hard to get your arms around it on this record exactly where the market is that Sarvint is suffering the irreparable harm.

Secondly, and I previewed this, Sarvint entirely fails to address the causal nexus requirement. That is an absolute necessity in any preliminary injunction analysis.

As well, Sarvint fails to show that it has any current harm in the absence of an injunction. Also Sarvint overstates the notion --

THE COURT: Let's go back to causal nexus. I mean, why is it that great a leap for Sarvint to assert that you stole my patent technology and now you are selling it? I mean, there is the *ipso facto* for you right there.

MR. CAMPBELL: Because there are specific proofs that are required in the causal nexus analysis and I have those in the slide presentation as examples that come out of other cases. So, the fact that there is nothing more than one statement in a reply brief from Sarvint that *ipso facto,* because I say it, there is a causal nexus, it exists, that is simply not enough, Your Honor, under the prevailing state of the law.

As well, Sarvint overstates the first mover advantage and then they define early leaders inappropriately, because, in fact, Sarvint, and we will get to this, is an early leader in this market as defined in the literature that they supplied in

the declaration.

So, let's talk first about the market.

So these are the two definitions that Dr. Challagalla provides for the market.  First of all, he talks about the product market, that is the first bullet point above.  And he says:

"A product market is the set of products that are substitutes in a given usage situation for buyers. Products are regarded as substitute when they provide the same or similar benefits."

Okay.  So, you look at that and you come down to the next bullet point,  he then talks about the product market of wearables where the usage situation is sports and fitness. And in particular, the smart apparel market, so that is how he is defining the market.  But again he goes back and forth when he describes exactly what the market is,  so it is very difficult to understand exactly where the market metes and bounds are and where that injury is coming from inside that appropriately defined market.

So let's take a closer look at it.  So,  first of all, looking at the patent itself, Sarvint describes the patent as pertaining to garments with integrated sensors that allow the garments to monitor the user.  Well, is that the market? We

are not sure, But Sarvint seems to suggest as much in its motion papers.  As well, Sarvint talks about an ecosystem. I mean,  whatever that means,  but we have smartphone apps and so forth that have nothing to do at all with the patent in suit.  I didn't see any mention about a smartphone, I didn't see any mention about an ecosystem,  no mention about apps. In fact, at the time they filed this patent, I don't believe there were even apps available.  So, to talk about an ecosystem as part of the market I think --

THE COURT:  Well, it just sounds smart.  The word has some --

MR. CAMPBELL:  That I will agree with, Your Honor.

THE COURT:  It scares me a little bit because of environmental sensitivity,  a little nervous about that.

MR. CAMPBELL:  Moving on.

So, then I think generally the issue we have is just the market is too broadly defined.  So, if you look at the market of wearables, there are a lot of different wearables out there.  So, on the upper left we looked at Fitbit and that tracks activity, including the number of footsteps you take in a day,  the number of heartbeats per minute,  sleep patterns, the Google glasses are up top as well that you can browse and navigate.  In the middle we have these heart rate monitors. Of course, we have got what can hardly be said to be pioneering the Apple watch, that was just launched this year,

but very clearly something that is an early follower to all of this.   There are socks that track cadence and the number of steps that have been taken.  At the bottom we have got sports bras and as well as pedometers.

So,  these are generally the wearable market that we believe that Dr. Challagalla was referring to,  but again it is very amorphous and it is hard to get your arms around exactly where the harm is coming from with respect to these products.

Then he talks about a smart apparel market.   And you will see if you start at the upper left and work clockwise,  we have got heart rate monitor, followed by socks, followed by shorts that sense, and followed by the sports bra.   But it is hard to imagine that these products are substitutes for one another.   I mean,  if I am going to go buy a pair of shorts, I am certainly not going to go out and buy a bra as well,  I am looking for a pair of sensing shorts.   If I am buying a pair of socks to sense cadence, I am not going to look for a heart rate monitor, so these are not substitutes.   But nevertheless, under Dr. Challagalla's definition, this is the smart apparel market.

Okay.   So, as well, what Dr. Challagalla is doing is defining a market that is completely divorced from the '731 patent claims.   These claims have very,  very limited scope. So, you think about patent claims, Your Honor has had cases

before, they are a recipe. If you have a favorite chili recipe and you might like some cayenne pepper, you might not, you might like cilantro, you might not, you might like sour cream, you might not. Patent claims require a very specific recipe or recitation of elements in order to be satisfied. Dr. Challagalla's report is devoid of any mention of how that product market is defined with respect to the patent claims.

So claim one, just very briefly because you are going to hear about this a lot later today, talks about individually conductive fibers that are individually conductive prior to weaving. So, many of the Defendants in this room have products that actually dip into a silver bath, the fabric. So, imagine my shirt, Your Honor, as one of these SmartShirts and there is a stretch of it across my torso section that is sewn in. And so it is woven from customary materials and that piece that is woven is dipped into a silver bath, pulled out dry, and sewn in. These claims require that the fibers be individually conductive prior to weaving. But nevertheless, Sarvint is talking about including those within the scope of this particular patent. And we don't hear anything from Challagalla about how these patent claims would help confine or define the market itself. So, claim one doesn't cover any conductive fabric. It is very specific. It is a recipe.

Let's talk about irreparable harm. These are the Apple

cases I was talking about.  I commend them to the Court's visiting because I think they are very, very informative how the federal circuit goes about determining whether or not there is, in fact, a causal nexus between the alleged infringement and the harm.  And specifically, every one of these cases talk about demand.  The accused feature must drive demand.  So, the portion that I have highlighted at the bottom says:

"If the patented feature does not drive the demand for the product, sales would be lost even if the offending feature were absent from the accused product."

And that is 678 F3d at 1324, that is the apple one case. We find the same thing in the apple two case.  There, at 695 F3d at 1375 it reads:

"The patentee must rather show that the infringing feature drives consumer demand for the accused product."

And then once again, Apple three talks about the causal nexus with respect to consumer demand.  In fact, I wish I had highlighted -- may I approach?

THE COURT:  Sure.

MR. CAMPBELL:  What it talks about is the evidence

requiring, so we have evidence here, evidence here, and evidence here. So evidence that the patented feature is one of the several features that causes consumers to make their purchasing decisions. There was no evidence in the record of that. They were just conclusions. Also, evidence that the inclusion of the patented feature makes a product significantly more desirable. There was no evidence in the record. It was just conclusions. And then, finally, evidence that the absence of the feature would make a product significantly less desirable. Again, no evidence in the record, just conclusions.

So, this is the sort of evidence in looking through some of the cases that have come up in the various briefing that the Federal Circuit has looked to as adequate. And first and foremost, you know it is surprising, Dr. Challagalla is an expert in marketing. You would have to believe that he understands what a survey is. You would have to believe that he would understand the significance and the power that that can bring to you in terms of the information provided. No mention whatsoever of a survey in anything he provided.

As well, the Federal Circuit has talked about documents, evidence and demand for the patented features. There were no documents from us, no documents from them. What we have in Dr. Challagalla's report were a lot of articles. I mean, it was very interesting, I was fascinated by it, I studied

engineering, so I enjoyed reading his report and some of the articles that were cited because it is a new field to me, but I didn't see any documents from them or us showing that these features are driving demand. No specific financial records showing price erosion. They could have put some documents in the record showing how we were eroding their prices, how they had made some presales. How they had made outreach to prospective customers. Nothing of that sort in the record. Again, nothing in the record on price, reputation, or loss of business opportunities. We just didn't see it.

The only thing in the record that even came remotely close was the fact that they created or were expressing concerns with respect to what they saw as infringement. But as we started this conversation, there is an element that is completely missing and that is claim construction. So, I think that, again, is nothing more than a conclusion.

And finally, there is no evidence in the record at all as we see in the Robert Bosch v Pylon case of direct competition, loss of market share, and access to customers. Again, we just have Dr. Challagalla's declaration, a lot of articles talking about platitudes and marketing, but that, we would submit, Your Honor, is not evidence, that is cognizable by the Federal Circuit as creating the causal nexus in order to establish irreparable harm.

So, what I have put up on the board here on slide 18 is

the one and only mention in Sarvint's papers that talk about demand.   Sarvint says in their reply at page six of the OMSignal briefing:

> "Finally, while a fabric-based sensor may not drive the demand for the broader wearable's market, a fabric-based sensor is plainly essential for the narrower smart apparel market considered by Dr. Challagalla."

That is it.   That is the only mention of demand in the entire record.   So, we would submit that as for the causal nexus, they have fallen far short of what is required by the Federal Circuit.

So lets talk about the harm.   Dr. Challagalla identifies four types of harm and we will go through this quickly. Difficulty in competing with established brands, loss of market share, lower prices, difficulty of access to adjacent markets.   But all of these are compensable by money damages.

So, if we go to the next slide, the first two, competition and loss of market share, this is what Dr. Challagalla said in paragraph 15:

> "In my opinion, a new entrant like Sarvint would be required to expend additional resources to gain market

share."

Well, what are additional resources? It is money.

THE COURT:   That means money.

MR. CAMPBELL:  That is money.  That is how they can be compensated if they are facing any harm whatsoever.

Lower prices.  They haven't sold a product.  So, I am confused, we are confused as to how they have had to lower prices, there is nothing to lower.  Money lost by lower prices can, of course, be compensated by money.

And, finally, adjacent markets, there is nothing at all preventing Sarvint from going into other fields besides the smart apparel market.  If they choose to go into hospital, they talk about SIDS and military applications,  you don't see the Defendant, so far as I know,  I hope I am right in that regard,  out there in those particular markets.  Maybe some of them intend to go there,  but that appears to be wide open and there is nothing stopping Sarvint from going into those adjacent markets right now.

Very quickly, let's talk about some of the other mistakes in Dr. Challagalla's report, and this is the first mover early leader advantage.  So,  a fundamental flaw in the assumptions that Dr. Challagalla makes is he assumes Sarvint will in fact succeed.  That is far from a Foregone conclusion.   In fact, as Dr. -- excuse me, Mr. Kidder put in his conclusion,  citing to  The Wall Street Journal, the probability is very high.

And according to this particular Wall Street Journal article, 75 to 90 percent that Sarvint will fail because that is just historically the numbers associated with --

THE COURT:   Well, they have had over ten years and they are yet to succeed.

MR. CAMPBELL:  Sarvint is new,  so perhaps they will fair better than Sensatex and Athena Ventures, but it has been a long road for this particular --

THE COURT:   They are on the hook of delay of their predecessor,  don't you think?

MR. CAMPBELL:  That's correct.   As well, Dr. Challagalla assumes a first mover advantage.   That is simply not the case at all.   In fact, the literature that he cites himself contradicts that there is in fact a first mover advantage.   So, what we are looking in this record is hard facts of them demonstrating irreparable harm.

So, let's talk about the second mover advantage.  So, Mr. Kidder believes and I think there is something to it, that Sarvint actually may benefit from a wait-and-see approach and that is because if they don't execute capably on their product and then an injunction is entered,  what are they left with? There is no money,  we are not making any money,  the Court has enjoined us from selling our products.   So,  it is going to reduce the use of the technology altogether.   So, Mr. Kidder opines that, in his view, it is probably better

that given what we know about Sarvint and Georgia Tech's ability to commercialize this technology in the past, perhaps we just wait and see. And if they are right and we are wrong, at the end of the day, we just cut them a check.

Dr. Challagalla, it is interesting, tends to agree that there really is an advantage to being later. So, what he says, among other things, is that technology products that enter a category later tend to evolve faster and reach their market potential in less time than earlier technologies. So, several times he agrees that there is in fact an advantage to being second to market and this, we would submit to the Court, on the evidence in the record is that case.

So, Dr. Challagalla also cited to an MIT Sloan Management review article and this was one of those articles I found pretty fascinating, it was from January 15, 1996. And what he points to is a portion of this talking about a class of firms labeled as early leaders having minimal failure rate in an average market share of almost three times that of market pioneers. What Dr. Challagalla complains about and what Sarvint complaints about is that they are not early leaders. You know, we are the early leaders, but the fact is they are, too. But they forgot to tell the Court, in this article -- I have a copy if the Court is interested, I can hand it up to the Court -- is that what it says is early leaders are those that are entering the market 13 years after pioneers. So,

we can hardly be said, the Defendants in this case, as being pioneers. Instead, we are probably fairly characterized as early leaders, but so is Sarvint. We are in within that 13-year window.

Let's talk a little bit about pioneers and early leaders. I will have my colleague go back and forth. Go back to the early leaders, we have the Simon touch screen telephone, and now we know about who the early leader is and who dominates the market. Go back, Friendster and MySpace, probably some of the younger lawyers in the courtroom don't remember these, everything is dominated, I am not sure they like Facebook, but Facebook now is obviously the market dominating social network out there. Netscape Navigator, that was the dominant navigator in the 1990s prior to the internet bubble, now we know Internet Explorer, that was after Netscape Navigator, that was the early leader, and that has dominated the market. Search engines, that is interesting. Who remembers Alta Vista and Lycos? I am not even sure they are around anymore. Scroll ahead, Google now dominates search. At the bottom, I remember this, I think I had one of these, this was a Rio MP3 player with the CDs, you know, the health clubs and people clip them on. Of course, we know the Ipod overtook all of these MP3 players and now dominates the market. And the bottom line, this was the first personal computer, it was the Altair 8800. And we know what happened to personal computers,

Mr. Jobs took over that market.  So, this just summarizes what we just talked about.

We can go to the next slide.

So,  Your Honor,  we would submit collectively, as Defendants, that on the record evidence, Sarvint has not shown irreparable harm and we would respectfully request that the Court deny Sarvint's motion.  And with that I would love to turn over to my colleague, Mr. Crenshaw, with the Court's indulgence.  He will talk specifically about OMSignal and the other aspects of injunctive relief.

THE COURT:  All right.

MR. CRENSHAW:  Thank you,  Your Honor.  Steve Crenshaw on behalf of OMSignal and Ralph Lauren.  I will ask my colleague, Mr. Campbell, to take the controls.

So we submit that Sarvint has not shown a likelihood of success on either infringement or validity.  And at this stage of the proceedings, they absolutely bear the burden on both,  coming forth and showing both where the Defendants' infringed and their patent is valid and enforceable.

On the infringement side, I will try to be brief, we look at the claim language, and as Mr. Campbell said earlier, the claim one of '731 patent doesn't cover any conductive fabric, it is very specific.  So,  for the purposes of Ralph Lauren, Lauren, and OMSignal's analysis, we are focused here on the electrical lead.  This was in our papers, but the claim one

requires that the electrical lead be formed from one of the individually conductive fibers. Those are the same fibers that are in this sensing fabric. And here is the evidence, go back one, here is the evidence that Sarvint put in. This is the claim chart. Here they have taken apart an OMSignal t-shirt, and that the OMSignal shirt is the same technology that is present in Ralph Lauren. So, when Sarvint claims that Ralph Lauren is a big brand, they have a big brand, that is true, but behind Ralph Lauren is OMSignal, which is like Sarvint, a start-up company, still fairly young, but they are having great success and the Ralph Lauren partnership is a very important part of that. So, Sarvint wants you to think the Ralph Lauren is the face here and can bear that burden, but OMSignal is really the company behind it and an injunction at this point would be devastating, it is a little bit of an aside.

But here this is the evidence they put forth. They have got pictures of the electric lead that exists between the fabric-based sensor and the connectors. Next slide. OMSignal's electrical lead is actually not formed from the same piece of fabric. So, you have electrical lead, you have a fabric-based sensor, it is not formed from -- they are sewn together at different times, they are not the same piece of fabric.

THE COURT: Why does it have to be the same piece?

MR. CRENSHAW:  So, the claim language says "formed from the individually conductive fibers."  And it says, "the individually conductive fibers,"  and they have a basis for that, it was individually conductive fibers of the fabric, the fully-conductive fabric casings.

Now, another aspect of infringement argument here is that OMSignal's electrical lead is not formed from individually conductive fibers and only individually conductive fibers, there are nonconductive fibers as well.  Now, this patent had a very long prosecution history, it was rejected seven times. There was a lot of back and forth, which we think will very much inform the claim construction proceedings in this case. And as Your Honor noted earlier,  they skipped over that first step of claim construction.  They have kind of just assumed this infringement based on undefined -- their undefined reasons and Dr. Jayaraman's opinion on that.

Here the prosecution history very clearly shows the individually conductive fibers in the entire fabric being formed by individually conductive fibers was a very important part of the invention and so they can't now disclaim it.

THE COURT:  Do you think all of the Defendants are entitled to summary judgment on that basis?

MR. CRENSHAW:  I don't believe all of them would be -- well,  I don't believe all of them would be entitled just on that basis.  I think there is -- actually yes,  Your

Honor, I would submit with the proper amount of evidence that we will put in, I think we will have a very clear claim construction that would do away with Sarvint's infringement analysis. We haven't really gotten from them a full infringement case, so I think it might be a little premature for that, but I do think at some point we will win on summary judgment phase.

THE COURT: All right.

MR. CRENSHAW: And so this gets to kind of their construction, which they haven't put this forward, this is what we got in the reply from Dr. Jayaraman, you can see the language claim one there, it says "the electrical lead." Again, there is no question there, it says "the electrical lead." The Sarvint construction, this is what they said in their reply, is that it is only a portion of the electrical lead needs to be formed from one of the integrated individually conductive fibers and that is just contrary to the claim language of the claims. So, I believe once we get into claim construction, it is going to be very clear that they are trying to rewrite the claims, we are giving the claims their true meaning. And so Dr. Jayaraman's declaration here -- reply declaration kind of torches the language of the lead that is how they are trying to rebut infringement. I think at a minimum you raised a very serious question as to their infringement allegations with respect to OMSignal and

Ralph Lauren shirts on that basis.

In terms of invalidity, Sarvint is entitled to rely on the validity of their patent and they did so on the papers.  We came forward with a new practice that not considered during prosecution.  We think it fills in the missing piece of -- the missing piece the PTO said wasn't present in the prior art.  That is Lebby 004 patent, so we have submitted claim charts on that.  We have shown exactly where the missing limitations are and how Lebby anticipates and then in combination with art of record before the PTO renders obvious the claims of '731 patent.

So,  thank you,  Your Honor.

THE COURT:  All right.  I will hear from Carre. Is it pronounced Carre?

MR. WARD:  Yes,  Your Honor,  Carre.

Good morning,  Your Honor.  Bob Ward for Carre.  I am an old line patent lawyer,  well old anyway.  And I would like to say a word or two if I could about non infringement in this case.

Incidentally I was  -- I would say amen to everything that I have heard here and I in fact took notes and came up with an almost independently identical presentation,  not nearly as articulate, but thank you.

On the subject of non infringement,  this claim is almost impossible to infringe to start with.  They say twice in the

same claim that you have got to have a nonconductive fiber that is nonconductive -- that is a conductive fiber that is conductive prior to being knitted.  And that is not the case at all in the accused structure of the Carre.  And then they say it again.  They put a disclaimer in the claim.  They say in the absence they make the same statement twice.  And, of course, the reason they did that is because of the flick patent.  If you look at the patent prosecution history, you could see that it was necessary to insert those limitations in this claim in order to get allowance of this very, very narrow and I would submit useless claim.  This is a useless patent.  Nobody has to make this structure.  Indeed, the structure that is claimed in here is not nearly as good as the non infringing structure.

THE COURT:  Why is that?

MR. WARD:  Well, that is because it is a lot easier and better to take a nylon, regular nylon thread and then knit it.  If you coat it with silver and then you try and knit it, well, you could see that is a harder thing to do, now you have got something that is stiff and so on and so forth.  So, I would respectfully submit that the so-called invention here is a step backwards in the art.  And the idea that you could somehow -- discovery was mentioned here, like that is a panacea.  Everybody always wants to file a claim in Federal Court or in this case six claims and then come in later and

say, oh, well, let me take discovery, judge, to see if I have an infringement here. Well, we would submit that that is not proper.

We also don't think it is proper to wait 15 years until somebody else has come in with an improved and non-infringing structure and then try to cut them off after 15 years and jump in.

I would thirdly submit that the idea of a preliminary injunction where you haven't even shown that you are making a product turns eBay on its head. What it says is now we should have a new rule that it is a presumption you should get a preliminary injunction. And that presumption should be based upon, well, if you can come into Court and holdup some purely speculative designs that don't even show any technology, now you should get a preliminary injunction.

Fourthly, I would submit, if that were the rule of law, every non-practicing entity violate dozens and dozens of cases, thankfully most of them not here in Georgia, most of them down in the eastern district of Texas, those people would be leaping into Court saying, well, we should get a preliminary injunction even though we are not making anything because we have got plans, we have got big plans, we have got speculative plans. So, that is what is really in front of you, Your Honor, today.

Now, I have got a tiny two-man company that I am

representing.  And we hear about the Plaintiff is a small company and the Defendants are huge megalithic forces in this marketplace.  Well, that is not true with regard to my client.  When we talk about the balance of equities here against my client, my client would be out of business.  The idea that somehow the rest of the world is available, without the United States, without the United States' market, everybody knows that the United States' market is about 50 percent.  And if you can't market here, you almost can't market anywhere.  So, we would reject, respectfully reject that argument, as well.

Your Honor, I know that there are additional people who have points to make, but those are ours respectfully.

Thank you, sir.

THE COURT:  All right.  Thank you very much.

Now I think it is OMSignal -- no, sorry, Ralph Lauren's turn.  That is included within OMSignal.

MR. CAMPBELL:  It is, Your Honor.

THE COURT:  Sensoria then.

MR. HARBIN:  Your Honor, John Harbin with Meunier, Carlin and Curfman.  I wanted to introduce Steven Auvil with Squire, Patton, Boggs.  Also With him Ms. Rachael Harris, who is with Squire, Patton, and Boggs.  And also Warren Thomas with our firm here on the case with us.  Steven will take the lead, Your Honor.

MR. AUVIL:  Good morning, Your Honor.  Your Honor, better we get started,  I also want to introduce our client representative, the CEO of Sensoria,  Davide Vigano.

THE COURT:  Good morning.

MR. AUVIL:  He is with us this morning.  He just got back off of a flight from Greece returning to the states.

THE COURT: Welcome.  Lucky you.  I guess it is worse in Greece than I thought it was to come back for this. Those reports are not exaggerated, obviously.

MR. AUVIL:  I walked into that.

So,  let's just start with an overview of our products or what is accused of infringement.  We are a little unique in the sense that we have clothing that has been accused for the torso, which is common with some of the other Defendants,  and then we also have socks.  And we will talk about each of these separately,  but let's go to the next slide.

So,  our arguments, other than Mr. Campbell and Mr. Crenshaw laid out some of the -- well, Mr. Campbell spoke for Sensoria on the irreparable harm issues.  And like Mr. Ward,  we join that presentation heartily.  We also have a similar non-infringement argument to OMSignal,  we will talk about that briefly,  but it is the same issue that they pointed to.

But the jumping off point is we have to kind of clear the underbrush with respect to what the products are that are

infringing.  We talked about the shirt and the sports bra. Those products are not being sold anymore and were taken off the market before the PI motion was filed.  So, I guess on the question of the status quo with respect to those, they are off the market.  They are not being offered for sale in the U.S. any more.  So, I will show you portions of the declaration Mr. Vigano submitted, saying, we have no intention of bringing this product to the market.  It is a legacy product that we originally started selling.  We have no intention to sell it in the U.S. anymore.  That is not an issue.

And then there is the socks, which are being offered, were developed by Sensoria over a four-year period of time recently brought to the market.  Mr. -- Dr. Jayaraman did not have those in his hands when he determined -- submitted his declaration alleging infringement because they weren't sold to him.  They tried -- Sarvint tried to buy the socks from us and we wouldn't sell it because we knew what they were going to do with them.  We didn't sell them.

THE COURT:  Well, when they serve that subpoena, you are going to have to.

MR. AUVIL:  Right.  We have since supplied some socks to them afterwards to say, you really need to analyze the actual socks.  And we think maybe you will understand our arguments a little better.  But, socks don't compete with the

products that they have now identified.  I defy, Your Honor, to try to substitute a pair of socks for a shirt.  And you will see none of their products designed are actually socks. They don't infringe, we will talk about that.  And the status quo in this case -- according to their status quo version of what the status quo should be,  you would put Sensoria out of business because they can't  -- the only product they are selling -- they are selling the socks,  they recently introduced some new T-shirts,  new products, recently introduced those,  those are not the subject of this,  but the product, the socks, were brought to the market, a four-year investment in research and development.  That is their life blood,  that is where they are making money right now.  You would put them out of business.  So,  that is, as counsel said, you wouldn't harm at all,  you would put them out of business.

So let's go to -- this is the evidence that we no longer sell the T-shirts or the sports bra.  The evidence is from the Vigano declaration paragraphs 17, 19, and 20.  The upshot of this, Your Honor, is that those products were purchased from an overseas company,  distributed in the U. S., last year the agreement with the supplier was terminated, Prior to this lawsuit being filed.  That distribution agreement was terminated, we made our last purchase of products from that supplier last year.  We have no more product to sell in the

U.S. market.  We have no intention to sell in the U.S. market.

Next slide.

In the reply brief there is some gotcha evidence, I suppose, which is, oh, we found the sports bra -- actually a couple of sizes of the sports bra on Amazon.  Those were products that were sold to Amazon.  Mr. Vigano would testify, if he were to take the stand,  they were sold to Amazon and Amazon has now one in inventory.  One sports bra in inventory.  The evidence they submitted there were three of one size and two of the other size, it is now down to one. Mr. Vigano would also testify that we asked for their inventory back,  they wouldn't,  they didn't return it to us, so that one unit is what is available to consumers in the U.S. market and our client has no control over Amazon whatsoever.

Go to the next slide.

So, it doesn't intend to sell those products and the products they are going to sell they are accused the socks are clearly not a substitute for the product they are offering. And then as Mr. Campbell pointed out that the lack of commercial activity by the patentee is a significant factor in irreparable harm calculus.

The harm is speculative, I don't think we need to go through this again.   We point to one case, The Automated Merchandise Systems case versus Crane, 357 F3d at Appx. 297, Fed circuit case,  loss market share has to be proven through

evidence.  There is no evidence of that.  And the quote that we have up here says:

"Granting preliminary injunction on the basis of speculative loss of market share would result in granting preliminary injunctions in every patent case where the patentee practices the invention."

THE COURT:  Well, I mean, are they practicing the invention?

MR. AUVIL:  They are not even practicing the invention.  So this is -- the Court is saying, even if you have a product in the market that practices the invention, it is not automatic that you will get a preliminary injunction.  This goes back to the point that Mr. Ward made that eBay kind of wiped away that whole notion of a presumption of irreparable harm.  And Sarvint is in a far worse position because they haven't even brought a product to the market.

THE COURT:  So, how could anybody ever in their position ever establish a loss market share?

MR. AUVIL:  They couldn't and not evidence of a loss of market share.  There is never a share to lose.  I think prior to -- I mean, there could be a case, you were asked the question of Mr. Campbell, could there be a case where a preliminary injunction could be issued where maybe a company

was on the cusp of bringing a product to the market?  I can see it more kind of in the TRO context, you know, rather than a belated preliminary injunction motion.  In our case, it is not our circumstances here, far from it.

Next slide.

So, you have seen the claim language and Mr. Ward had made some very valid points about this claim.  It is not simply directed to some kind of intelligent apparel that has a sensor, a connector, and a lead.  There is much, much more to this claim that is very important.  I have highlighted a number of claim terms that are going to be important for us, I will highlight a few in the next few slides that are really important for us.

Next slide.

Our socks do not monitor the vital signs of a subject. That is in the preamble, it is a requirement of the claim. We heard today earlier, well, maybe it isn't a requirement of the claim, that is a new argument.  We believe it is, we have argued in our brief, and I think the briefing is pretty clear that the parties are battling over what the meaning of vital signs is as apart to whether -- as separate from whether it is actually a limitation in claim.

Our accused pressure sensors are not comprised of fully conductive fabric.  Get into that a little bit deeper.  This is the same point that I think both Mr. Crenshaw and Mr. Ward

raised, the sensors do not include individually conductive fibers, they are individually conductive prior to incorporation into the fabric, that is not met. And then finally, the same point raised by Mr. Crenshaw, the electrical lead in the sock is not formed from one of the individually conductive fibers in the pressure sensors.

So, this is a unique issue, monitoring vital signs is a unique issue to Sensoria. So, just a little grounding in this, in the field of invention, the very beginning of the patent, there is a description of the present invention and that -- that it relates to fabric-based sensor for monitoring vital signs or other electrical impulses of the subject. That is what the field is. Later there is a discussion in what is the summary of the invention, this is before you get to the detailed description before you get to the claim, says the sensor directly contacts the skin of the subject, receiving the electrical signals and transmitting them to the data-output terminal.

Now, the step of the analysis that was skipped over is claim construction. You have to determine what is, for our case, you have to consider, well, what does monitor the vital signs of the subject mean? That is claim construction. There is a dispute about that. We have put in evidence of that, and that evidence is from a specification, the patent itself, the intrinsic evidence. What the Phillips case from

the Federal Circuit says, that is what you look at, where you start.

THE COURT:   Right.

MR. AUVIL:   In fact, The Federal Circuit says most of the time specification will resolve that issue, that is your best source, specification.   Look at the claims and specification.   Sometimes the prosecution history can come in and help you.   But one thing that is clear from that structure or the Court's analysis is the extrinsic evidence, while it is admissible where there is an issue to be resolved, there so is some ambiguity, you don't generally consider that as reliable because, you know, it is outside of the patent file that the public can rely on.

If you look at the patent, it is pretty clear what they are talking about in terms of what vital signs are.   I referred to the -- this portion before of the patent,  not this particular portion, but the fact that the patent says the fabric sensor may be used to monitor vital signs or other electrical impulses.   Some claims in the patent, Your Honor, cover just a method for monitoring vital signs,  others say a method for monitoring vital signs or electrical signals.   So, there is a distinction in the patent between vital signs and other electrical impulses, but it is clear that the vital sign has to be an electrical impulse.   That is clear from this language that we have up on the slide.

THE COURT:    From the word "other"?

MR. AUVIL:    Exactly.    The lower line:

"The sensor may be used to monitor

respiration,  pulse, temperature,

EKG,  EEG, and other electrical

impulses."

So, that is what this invention does.    It doesn't say anything about gait.    It doesn't say anything about cadence, anything like that.    It is talking about the signals that when we go see the doctor we are measured,  we have our annual checkup or whatever,  we are having our vital signs measured. So,  that is what the patent says.    It is clear on that score.    This is an intrinsic evidence and unambiguous.

Let's go to the next slide.

On likelihood of success, our client's product, Sensoria smart socks, they don't measure vital signs.    They don't even deal with gait.    Now, there is an assertion that, well,  they inform what the user's gait is.    It is not gait, it is what the cadence is.    How many steps you are taking.    How many steps per second,  per minute.    And it is just for runners, not for walkers,  it is for runners.    Where are you striking on your foot when you land.    It will tell you that.    The sensors will provide feedback to the user saying, well, you are striking too much on your ball or you are too much on your heel.    And that is correlated to certain injuries,  it can be

correlated to certain injuries.  It doesn't measure, you know, what your pulse rate is.  It doesn't tell you what your pulse rate is.  It doesn't tell you what your EKG or EEG is, none of that.  So, it is totally unrelated to this patent. The Vigano declaration says in fact that the sensors used in the smart socks -- this is in the last line of the call up here,  are not designed to and are not capable of detecting and measuring electrical impulses or vital signs.  Don't even have that capability.

So, let's go to the next slide.

Let me go back one second.  On this, the rebuttal to this is,  well,  you know, Sarvint had submitted some evidence of some articles that talk about gait as a potential vital sign. There are three articles that they submitted in response.   It is extrinsic evidence that relates at best to gait.   It doesn't even,  it doesn't even relate to what our sensors are used for in the smart socks.   Totally unrelated.

So, the other argument I want to focus on on non infringement,  smart socks are not made of fully-conductive fabric.   The fabric or the fibers that are used that are put together in the smart socks are a combination of nylon and spandex.   And those are -- those are not conductive by themselves.   The way they are used -- the way they are processed to be used to do any sensing at all is after the coating is applied,  they are first put together and then they

are coated.    Not with a conductive material, but what is called a resistant material, that is another kind of unique dispute between us.

THE COURT:    Right.

MR. AUVIL:    And we deal with this in our brief. There is a difference between resistive and conductive.    In fact, in the prosecution history of the patent,  we put a little excerpt down, here this is from our defendant's exhibit 31-9,  they actually distinguish between resistive and conductive in a way that is inconsistent with the way Sarvint briefed this issue.    So, when they are getting their patent, they say nylon is not a conductive material,  they admit that. They are distinguishing this reference that takes about nylon and they say,  well,  nylon is not conductive,  it is resistive,  but they are saying the opposite now.    So, that is a second position again unique to our client's product.

Let's go to the next slide.

Now, this is again the issue that is like both Carre and OMSignal, and that is that the fibers -- the nylon fibers, the spandex fibers are coated after they are assembled in a fabric.    Mr. Vigano addresses this issue in his declaration. He testifies that the individual fibers the fabric is woven from are not individually conductive.    Instead,  resistive properties are imparted to the individual fibers and to the woven fabric after the application of the resistive coating to

the woven fabric, I just referred to that.   Mr. Jayaraman -- Dr. Jayaraman disagrees with that.   His declaration frankly raises more questions than it answers.   There was a reference by counsel for Sarvint that, well, you know, they didn't have a chance to take any discovery to find out whether Mr. Vigano was telling the truth or what the basis of his knowledge was.   Well, they never asked to do that, they never asked for that discovery.   It was never denied to them. I want to make sure that that is clear.

And then let's go to the last point here.   This is the issue with respect to whether the lead is -- has to be different from the fibers from the sensor.

THE COURT:   Right.

MR. AUVIL:   The claim is crystal clear on that. Mr. Vigano testified that the lead is a different material. Mr. Vigano also said it is a different material from the material that forms the sensors.   You can see on this particular side -- may I approach the screen? You will see these patches down here, these are the sensors.   Those sensors are stitched into the inside of the sock.   And then if you look at the -- you see the gold thread here, that is a separate material, according to Mr. Vigano, separate material from the fabric that comprises the sensors.   That is clearly a non infringement defense and it is a summary judgment issue.

Go to the last slide.

On the question of balance of hardships, there is -- I mentioned this at the outset, Your Honor -- the harm to Sensoria of entering a preliminary injunction against the socks would be devastating. It would be a devastating event after many years of hard work bringing this product to the market and we would ask that the motion be denied.

THE COURT:  Thank you.

Next I think is Textronics. Mr. Stockwell.

MR. STOCKWELL: Good morning, Your Honor. I have some slides, too, but rather than trying to be an IT person and a lawyer, I can hand up a paper copy if that is okay with the Court.

THE COURT:  Okay.

MR. STOCKWELL: Your Honor, I am going to try to focus on some of the points that are unique to Adidas and Textronics, who I represent. With me today, as well, is my colleague Ms. Hawkins.

I want to start with sort of a defense that is unique to Adidas and Textronics, it is this equitable estoppel defense. We have briefed it. Briefly, Your Honor knows from the papers that we were contacted by Sarvint's predecessor, Textronics was just before Textronics was acquired by Adidas. There was some correspondence and meetings between those parties about the '731 patent and ultimately Sarvint's predecessor went away for a number of years until this

lawsuit.

Now, the response -- the reply that Sarvint filed, Your Honor, if we just go to page three, the briefs -- we came in and we said, look, we are like Aspex Eyewear in the Radio Systems case, both of which involved early letters from the patentee to the accused infringer followed by the accused infringer and the patentee disputing infringement, and then the patentee went away for several years and then a lawsuit was filed. We said, well, look, we are in the same situation. There was a perceived threat of enforcement, there was a discussion, we outlined why we didn't infringe, they went away for frankly almost a decade before this lawsuit.

The response was the citation to this Meyers versus Asics Corporation case. Essentially, counsel for Sarvint argues, look, this is sort of like Meyers. You know, Meyers was a case that happened right after the A. C. Auckerman *en banc* case. One of the things that the Federal Circuit found in that case is the District Court was applying an equitable estoppel standard that was not informed by the A. C. Auckerman *en banc* case. They cited some facts in that case and said, hey, we are sort of just like Meyers. You know, there were some letters exchanged, that is not enough to create the -- to satisfy the element of equitable estoppel that requires, you know, a misleading action.

I want to highlight here on page three some of the factual

postures of the Meyer's case which is different from ours. In the Meyer's case, the Federal Circuit reversed the summary judgment of equitable estoppel because they said, yeah, there really wasn't a misleading action here.  It says here:

"The Defendants have not shown that

Meyers threatened immediate and

vigorous enforcement of his patents

then by silence lulled them into the

belief that he did not intend to

enforce the patents."

Why did they find that?  It is right there in the next paragraph:

"For Asics," one of the defendants

in that case, "there is no basis for

applying equitable estoppel on

summary judgment because Meyers did

not have any contact with Asics

before the filing of the suit.

There wasn't any communication."

And then with respect to Hyde,  there were three patents at issue in the suit, the Federal Circuit says:

"Meyers did not contact Hyde after

two of the three patents, this '283

and '177 patent issued."

So Meyers couldn't have been -- couldn't have felt

threatened with an enforcement suit in those circumstances of those patents. And, in their reply brief, counsel cited to the third patent that they did talk to Meyers about with respect to that lawsuit. If you read the case, you will see that what happened is that Meyers calls up the company, talks to the secretary and says, hey, I want to have a meeting about this patent. The secretary sends a note, Meyers notes, which apparently was not necessarily communicated, it is not reflected in the secretary's note, says he said that the company infringed, that is not reflecting what the secretary communicated. The Federal Circuit says, oh, then there are some other letters, we don't know what the content of the letters are. And they make a statement in there, Your Honor, along the lines of essentially what happened here is Meyers was trying to license this patent and the company just didn't respond. They didn't have any meetings, they had some letters back and forth and some calls, that is it. So, How is that relevant to our situation?

If you flip slide four, this is the text of the email that Ms. Burr attached to her declaration. This is the December 2005 E mail from Sensatex, Sarvint's predecessor to Ms. Burr. I want to note that this email follows up on a business meeting and it is reflected in the email, and it starts out:

"I am compelled to again remind you

that Sensatex owns the rights to a number of patents.  As you will remember, we discussed this in Barcelona, both privately and in as part of this investor discussion."

Okay.  So,  one of the things we have to consider or the Court has to consider, and this is in your discretion,  you are the ultimate finder of fact on the equitable estoppel issue,  is whether this email and the coming on the heels of this business meeting as well as the subsequent discussions create the threat of enforcement that the Federal Circuit looks to as the triggering act after which years of silence can become misleading action and inaction and trigger equitable estoppel.  As we look at this, I want to focus on the Aspex case,  okay.

So the Aspex case said that the letters to clarity could fairly be understood as threats for suit of infringement for Aspex stated its quote, understanding that some of the products sold by you may be covered by the claims and Aspex has strong intention to fully and vigorously enforce our right in this very, quote, very urgent and serious matter.  There are sort of three parts to that.

First, there was the Aspex communication that some of these products are covered by the claims, how do they infringe?  Second,  the intention to enforce the rights that

was communicated.   And,  third,  the urgency of the matter. We have all three of those elements here,  Your Honor.    If you look at the sentence that says:

"We believe," it is right in the middle of the first paragraph,  "we believe that your product is interfering with Sensatex patent rights."

And he repeats that in the second sentence:

"Based on my knowledge of the products Textronics has in development, I believe it will be difficult for Textronics to launch any product that senses signals from the body using conductive fibers that does not interfere with Sensatex's  IP rights."

This notion that this letter communicated infringement is further bolstered by the subsequent correspondence in which Textronics' counsel responds to the allegation of infringement,  the parties narrow down the patents that are being -- allegedly being infringed and they focus on the '731 patent, and there is this focus on whether or not there is infringement.   So,  the first,  that first component of Aspex case is back.

The second component, where Aspex focused on the intention to enforce, this threat of enforcement. Where do we see that? Well, it is in that second paragraph:

"As you know, I have spent the past 18 months working to save Sensatex and launch the commercial SmartShirt. We have three other products we are working towards launching."

And then he says:

"All of this work will have been valueless if we allow competitors to walk all over the intellectual property rights that were the cornerstone of the investments made in Sensatex."

In his concluding sentence, Your Honor, says:

"I believe it is in the best interest of the shareholders to find a solution as soon as possible."

There is that urgency.

"So that we can both focus on building our business and not battling about ownership rights."

So, where does that leave us with this threat of

enforcement as compared to the Meyers case? I would submit, Your Honor, it puts you squarely within the aspects of the Radio Systems cases from an equitable perspective.

You look at slide five, I have got excerpts from Ms. Burr's declaration. She was the person who met with the principal at the time, received these communications, and worked with Textronics and then counsel to respond to Sensatex's communications. And she states her view that there was a threat of enforcement proceedings here. She understood that from the context. And given the seriousness with which Textronics took these allegations about having counsel send a 30-plus page analysis of why they did not infringe the patents that were being asserted, including 12 pages just addressing the '731 patent, I would suggest to the Court that from the body of correspondence, you, in your equitable discretion, can conclude that there was exactly the kind of threat of enforcement followed by years of misleading silence and inaction that are appropriate for finding equitable estoppel in this situation.

On the last couple of elements, the reliance and the delay, I did not see where Sarvint really objected to the evidence we tendered on those points. It really had to do just with this first point about the misleading communication that triggers that first prong of equitable estoppel.

I am not going to further address that, but while we are

on the topic of the delay, if you would skip forward to slide nine, Your Honor. I just have a little time line here. On the right-hand side, I put forth the time line that we are dealing with here, the '731 patent, it issues in November 2005, promptly thereafter, December 17th, which again followed that meeting with Ms. Burr, the e-mail from Sensatex is sent to Textronics. And then you see some correspondence between Textronics' counsel and Sensatex running from January 2006 through the last letter from Textronics to Sensatex on March 13, 2007. That last letter is the letter that said, okay, we will try one more time to meet and see if we can reach a resolution, but if we can't, we won't trust we won't hear from you again. After that, things went silent from 2007 until this lawsuit was filed. That is the kind of delay that we are talking about.

Now, why is that -- I don't think there has been any challenge by Sarvint that it is bound by its predecessor and interest delay. There was a suggestion by counsel for Sarvint that, well, perhaps the products that Adidas and Textronics are selling today are not the same as the products that were the subject of these early communications. And I would refer the Court to Ms. Burr's declaration at paragraph 9. She explains that the Textronics technology that was being released in 2005 that led to this December 2005 letter is called the NuMetrex technology. That is the same technology

that Textronics sells today in the accused products.  It is branded as a coMicro Adidas product, but it is the same technology.  You know, obviously, the product is not exactly the same.  Over time they have changed the colors of the shirts and the design of the shirts, but the accused technology that underlies that, that is the sensor pads, that is the same technology.  So, it is the same dispute today that we had in these letters almost a decade ago.

The significance of this also for the preliminary injunction purposes,  not just on the merits, on the equitable estoppel issue if the court found equitable estoppel, there would be no likelihood of success,  but it also goes to irreparable harm.  We have pointed out the delay in how the way in this case, the excessive delay with respect to these and Textronics, in particular, suggest that there can be no finding irreparable harm.

In response in the reply brief,  they cited the Trebro case.  You can see that on the left-hand side.  They said, look, here is a case where the Federal Circuit approvingly cited to the patent and their obtaining the exclusive rights to the patent and promptly suing thereafter.  Well, the facts in that are completely different,  Your Honor.  It is true the patent owner obtained rights to the patent, but in that case the patent had been issued in -- on December 25,  2012, the patent was acquired three months later, March 12.  The

infringement suit was filed two days later, and the day after that the motion for preliminary injunction was filed.  There was no situation in that case in which the predecessor to the patent was aware of the accused product,  had asserted the patent rights, and then gone silent for many years.  I just Don't think that salvages their position with respect to the delay.

If Your Honor could flip to page 12, I do want to talk about some of the likelihood of success issues that are unique to Adidas and Textronics.  And this slide which is titled "the electrical lead element,"  as the Court noted with respect to one of the defendants,  this is, as I understand it, this is a common issue amongst the defendants.  I am not going to try to belabor the point too much because the counsel has argued this,  but essentially we believe the claim should be interpreted so that the electrical lead has to be formed from an individually conductive fiber, and it is not a portion of the electrical lead,  it is the electrical lead.

Now, what I have put here and what has not been pointed out yet is the amendment.  If you look underneath the recitation of the claim language, there was an amendment made during prosecution.  And the amendment did a couple of things, but with respect to this element,  if you look at part B,  the original language said:

"An electrical lead for a connection

to a connector.  The electrical lead comprising"...

That was the original language.  One of the integrated individually conductive fibers.  The amendment struck the term "comprising" and inserted "being formed from."  We contend that that claim language in that prosecution history, in which "comprising" was struck and "being formed from" was made unequivocally demonstrates that Sarvint's current arguments are incorrect.

As Your Honor may know,  "comprising" is an open-ended claim term.  Comprising is a term that means,  you know,  you have to have at least the elements recited, but you could have more.  By striking "comprising" and stating that "the electrical lead" has to be formed from one of the integrated individually conductive fibers,  this prosecution history demonstrates that their argument that you conform the electrical lead from only a portion of the individually conductive fibers or you can have other things that form the electrical lead is incorrect.  They abandoned that scope of claim when they struck comprise and replaced it with being formed from.

The significance of that for Adidas, if you go to the next slide 13,  is similar to the other Defendants.  We have essentially what they call the sensor patch,  the silver patch.  It overlaps with another patch that then goes to the

connector, that snap button that is shown in the drawing. And if you flip to the next slide that has the four photos, the figure one 1, 3, 5, and 6 photos from Dr. Jones's attachment two, you will see in figure one those silver patches are the patches that they contend are the sensor patches. If you look at the bottom right figure of six, you will see there is a little black line sewn across the tip of the silver patch, that is what connects it to the patch that ultimately goes over to the connector. And none of these constructions has Sarvint been able to identify an individually conductive fiber that connects to the electrical connector. They can't. As I said, I believe we have a common issue there with all parties.

I also think just picking up on the Court's comment about summary judgment, I mean, this is an issue where I don't think there is any dispute over the facts as to the physical construction of the accused Adidas sensor and miCoach products and the Textronics technology. Really, it comes a claim construction issue for Your Honor. In the posture of this case, the Court can certainly issue a tentative claim construction on this issue that could guide the parties thereafter or ultimately issue a final instruction on it.

I want to go to just one other issue on this electrical lead element and it has to do with the argument in reply. In reply, the Plaintiff contended -- if you go to slide 16 --

that the specification supports the notion that you don't need to have  -- that you could have the individual electrically-conductive fiber connect to the connector and it only needs to be a portion of it.  In fact,  if you look at figure three, which I have replicated here,  that is not what the embodiments -- the sole embodiment of the patent disclose. If you look at figure three, there are two patches there. The one on the left,  the one on the right, the cross hatched area is the sensor area.  You will see there is two different cross hatched areas.  And then there is a kind of a dashed line, if you look at the legend it is labeled "conductive thread."  Each of those sensor patches has an individual conductive fiber, that conductive thread that ultimately runs the electrical connector directly to the connector.  Indeed, the claim language says that:

"The individually conductive fiber

is for connection to the connector."

What the patent shows is this direct connection between the single individual fiber and the connector.  So, we think that the specification supports our view of this claim element.

If you flip to slide 18,  Your Honor,  this is the second non-infringement issue that Adidas has that, again, is this may overlap with one or more of the Defendants, but I don't think it is common across all the Defendants, it has to do

with the fully-conductive fiber element.  And, Your Honor, for this element we contend that there are two aspects of the claim construction, which the Plaintiff has overlooked.  The first aspect is that the fully-conductive fabric element requires that -- the claim is to a sensor, okay.  And when it says the fully-conductive fabric element, that part of the sensor, the entire part of the sensor has to be fully conductive.  There can be no nonconductive aspects of that.

Now, it is true that that sensor can then be placed on a garment in which the garment -- the rest of the garment has nonconductive fibers in it.  But the sensor itself, the patch itself has got to be fully conductive, that means all of the individual fibers have to be conductive.  And, in fact, if Your Honor flips back to the slide with figure three, that is exactly what the specification teaches, that is slide 16.  And I have excerpted the language from column five, lines 23 to 25.  And it talks about the illustration in figure two and three:

"The fabric-based sensor 12 can be incorporated into a garment, wherein the sensor is itself knitted or woven integrally within the garment fabric."

It says, if you skip down to line 30:

"A conductive patch or conductive

patches"...

So it is talking about the entire patches conductive, that is the fabric that the claim is describing:

"Comprised of woven or knitted

conductive fibers... may be

incorporated into the garment."

Now, elsewhere it does say that you can form the entire garment out of conductive thread.  But those are the only two embodiments they disclose.  Either you make the whole embodiment out of the conductive thread or you take a patch and make it entirely out of conductive thread and put it on a garment with nonconductive thread.  I notice counsel in opening, Plaintiff's counsel said that is not what the patent teaches,  it says the patent teaches you can put conductive thread with nonconductive thread and they cited the Court to, by my notes from earlier today, column five, lines 10 through 15, as an example of that disclosure and specification.  If the Court reviews that disclosure and specification, what you will see is, that part of the specification is talking about the strap that can hold the patch to the individual.  It is not talking about the patch itself.  This is the disclosure that is talking about the patch itself.  The patent disclosed the entire patch will be made out of conductive fibers.

And, if you flip forward again, Your Honor, to page 18, that was made very clear in the prosecution history consistent

with both the claim language and the specification.  There is a reference in the middle of the page where the applicant is distinguishing the Flick reference and says:

"The present invention, on the other hand, is comprised of a single fabric made from individually conductive fibers and optionally with other nonconductive fibers. The fabric of the present invention does not consist of placing a conductive layer between a nonconductive layer.  Rather, it is the same single fabric."

And then, at the next citation there, further on in the file history.  The applicant is arguing again with the examiner about what the claims teach and how they distinguish over Flick.

"The phrase 'integrated individually conductive fibers' requires that each such fiber be conductive and that the individually conductive fibers are integrated.  This limitation is found nowhere in the Flick reference.

And Flick was a reference that had conductive fibers and

nonconductive fibers.  So,  both the specification,  the claim language, and the prosecution history confirm that the fully-conductive fabric had to be conductive throughout.

If you flip to page 19, obviously we address this in our briefs.  The silver sensor patch that Plaintiff points to as meeting the claim one elements,  it is made up of both regular nylon yarns,  Lycra yarns, as well as silver yarn, that is the conductive yarn.  So,  therefore,  we do not have a fully-conductive fabric element.

Your Honor,  there was an additional argument that was developed in our papers, I won't go through with it, but essentially we believe there was a disclaimer that the fully-conductive fiber element could cover a multi-layer sandwich type design, which is our design.  I won't spend the Court's time going through that since we briefed that and argued it.  It was in the original letters that were exchanged between the parties, so I don't feel the need to get into it.

The last topic I would like to just touch on is invalidity.  If you could flip to page 23.  We identify the Reinhold reference.  Dr. Jones opined about the Reinhold reference.  Pointed out where each element of claim one could be found in the Reinhold reference.  At that point we had met our burden of demonstrating a substantial doubt as to validity and the burden shifted to the Plaintiff to show that our challenge to validity lacks substantial merit.

And in response, the plaintiff's reply brief only contests one aspect of whether or not Reinhold anticipates.  And it is this notion about whether or not Reinhold discloses a knitted or woven fully-conductive fabric.  That is there is no dispute that all other elements are present, that Reinhold has these individually conductive fibers.  The dispute is whether or not the Reinhold reference discloses to skilled persons that those fibers were woven into the garment.  And, obviously, we had Dr. Jones opine on that,  that is in the record.   I want to focus on what the Plaintiff said in order to try to create a challenge to the merits of our validity challenge there.

And it is on page 34.   It is in Dr. Jayaraman's declaration.   This is at pages 29 to 30 of his declaration. And he is quoting from Reinhold.   And remember,  Your Honor, the argument is that Reinhold does not disclose to a skilled person that you would weave or knit these individually conductive fibers into the garment.   And this is the quote he cites for:

"Reinhold states that, 'for example,'" this is Reinhold teaching a skilled person, "the pads and electrodes could be formed of woven or knitted material with the electrodes being provided by

electrically conductive yarns (e.g., carbon powder loaded resin or metallic coated thread) positioned in the fabric to engage the infant's back by the weaving or knitted operation."

I mean, the reference is saying, you create the garment by weaving or knitting the electrically conductive yarns into the garment. And the contention is Reinhold doesn't disclose weaving or knitting the electrically conductive yarns into the garment.

The way they get there is it is in the next paragraph, they kind of construe the terms "positioned" or "fixed," but the black and white teaching of the reference is that you do weave these yarns in. This is all they can come up with with respect to why Reinhold is different. And I would submit, Your Honor, it does not show that our validity challenge lacks substantial merit, which again is an independent and sufficient ground to deny the injunction.

Finally, I will not go through the irreparable harm points, but with respect to the balance of equities, I would point out because Adidas and Textronics, as counsel acknowledged in his opening, has been in this market for so long, they have made substantial investments. The balance of equities, we think, tips in their favor in terms of denying

the preliminary injunctive relief because those investments would be put at risk, we would lose the position we do have in the market and have built, and we request the Court to deny the motion.

Thank you.

THE COURT:    We will take a ten-minute break.

(Whereupon, a short recess was held.)

(The following portion is sealed.)

MR. MILLER:  Your Honor,  I think it is my turn.  I am Rich Miller.   I am with Ballard Spahr and we represent Victoria's Secret.

I wanted to say that with me is our client, Ms. Bianca Peachey, who is the Associate to the Vice President responsible for patents.

A small bit of housekeeping before I go on, is one of the things I am going to discuss here relates to a supplier of Victoria's Secret.  Victoria's Secret considers it supplier relationships to be confidential and I wanted to raise that to you now so Your Honor could consider the best way to go forward and the best way, rule of practice say we should go about this.

THE COURT:   Is there any objection to placing this portion of the transcript under seal?

MR. SCHOENTHALER:  No,  Your Honor.

THE COURT:  All right.  That is what we will do.

MR. Miller:  Okay.  Then also with me are representatives of Victoria's Secret.  In light of Victoria's Secret, the crux of this argument, I will get to in a moment, is how the conductive fiber in the Victoria's Secret bra is made.  And we have the manufacturer of that fabric that is here, that is Mr. Bennett Fisher, he supplied a declaration also with Victoria's Secret briefing, and his counsel Mr. Mike Hickey from the Lewis Rice law firm.

THE COURT:    Are any of the models here?

MR. MILLER:    I'm afraid I am the best you are going to get,  Your Honor.

THE COURT:    I do need to make one correction.  I said earlier -- asked whether or not Sarvint was calling, I said, "Kidder a liar," fya, I'm sure you all understood that. That was my mistake.

MR. MILLER:  Let me begin and I will say that the advantage of going last is I get to stand on the shoulders of others who have said almost all of the things that I want to say.  I will try very hard to keep this slide show down to what is truly relevant just to Victoria's Secret.

Let me begin by just setting the stage, this is the accused product, this is the incredible heart-rate monitor compatible sports bra, that is what it is called.  It is a mouthful, but it is appropriate because it is heart-rate monitor compatible, Victoria's Secret does not sell the monitor, that has to be purchased from some third party by whoever purchases the bra.   We don't make software for monitoring anything.   Just the bra.

I want to talk very briefly about two irreparable harm points that I think are particular to Victoria's Secret with respect to Sarvint, just very, very quickly.  There is no competition between Sarvint and Victoria's Secret.   We know they don't have a product now, of course they say they are

going to have a product.  Up until today, they have been saying their product is going to be a SmartShirt.  The document they handed out today included some hand drawings of something that may have been a bra, but I don't think was one. The only thing that we had seen that had been represented as a prototype to us prior to this morning was this SmartShirt. And I would argue that a shirt and a bra are not substitutes for one another.

I would also submit that Sarvint has not testified that it has experience in making bras.  And I think that there is something to that, Your Honor.  I don't think they have presented any evidence that they could make a product that would be competitive with a bra.  And that is all I need to say about that.

I guess one other point, Sarvint does argue in its briefing that the Victoria's Secret product will compete for shelf space with the Sarvint products.  That is also not true, Your Honor.  Victoria's Secret sells its products only in Victoria's Secret stores.  Victoria's Secret does not sell apparel from other manufacturer's in Victoria's Secret stores. They would not be competing for shelf space.  It simply would not be a situation where these two products would be directly up against each other either in reality or in the minds of consumers.

So, now I do want to talk about non-infringement.  This

is our primary argument.  We believe that there is no likelihood of success on the merits with respect to this case. And the question is,  so,  this is one of the Victoria's Secret bras,  be happy to pass it up if Your Honor would like to see it.  If you are interested.

THE COURT:  Sure.  I will take a real close look. It is like nothing I have ever seen before.

MR. MILLER:  I am going to keep the pink one here for myself,  Your Honor.  What we have here,  if you look at the front of the bra, it looks like a sports bra with two snaps on it.  On the back, there are two patches of conductive fabric, those are connected to the snaps.  The conductive fabric is the oval shape with the kind of silvery-gray color.  The dispute, and I think the dispute which must be resolved in Victoria's Secret favor is how was their conductive fiber made?  Was it made by integrating individually conductive fibers into some kind of previously nonconductive fabric as is required by the patent?  Or was it made, as we have shown, with the testimony of the person who makes it, that it is made by dipping nonconductive fabric into a solution made with silver?

And I will point out,  Your Honor,  that it has been said before, but just to highlight it, Sarvint has the burden to show in this preliminary injunction context that Victoria's Secret's non infringement argument lacks substantial merits in

order to succeed on its preliminary injunction.

So a quick comparison of the evidence that has been presented so far, on the Victoria's Secret side, we have the direct testimony from the manufacturer of the fabric who has said exactly how he makes it based on his personal knowledge of the process that was used to manufacture.  On Sarvint's side, they have speculation about how the fabric was made based on opinion testimony from an interested fact witness. I think that this right here is enough to deny Sarvint's motion, but I will go into it and I will also explain why the testimony given by Sarvint's witness Dr. Jayaraman is not correct.

So, the incredible heart-rate monitor does not infringe. Let me skip a few slides here.  I am going to talk about the individually conductive fiber limitation.  I don't believe there is any dispute between the parties that fabric that is made conductive by dipping it or metallizing it after the fabric is formed as opposed to weaving it with individually conductive fibers does not infringe this patent.  I have not heard any dispute on that point by Sarvint, so I am going forward on that basis.

So, Sarvint's assertion against  VSS,  same picture you just saw, this is the conductive fabric.   In Sarvint's opening brief, this was the sum total of the evidence that Sarvint presented.  This is their claim chart.  And they said:

"In this claim chart the fibers appear to be individually conductive prior to being woven or knitted into the garment."

They then had a statement from Dr. Jayaraman saying:

"I have reviewed the claim chart and that is consistent with my understanding of the Victoria's Secret product and the patent."

So, that is what they submitted on opening.  Okay.  So, in our response we showed that the conductive fabric is not made from individually conductive fibers.  We began with -- we went to Mr. Fisher, who is with Noble Biomaterials.  They make this fabric.  He explained the process that they used.  So, they take a substrate fabric made of spandex and nylon and coat it and plate it with metal to make it conductive.  So, I wanted to just elaborate a little bit on the process that Noble uses and so I can perhaps bring it to light a little bit more on the Court.

Step one you start with nylon and spandex cloth.  So, what Noble does is they purchase this nylon and spandex cloth from a third party.  They get it on giant rolls and bring it into their plant.  As Mr. Fisher testifies, the fabric that is used is not conductive when Noble receives it.  To demonstrate this,  we have got this image which was given to

us by Mr. Fisher for the purpose of this hearing here.   So, this is the fabric on the roll.  This roll is the fabric that is the first stage of creating the conductive fabric in the Victoria's Secret bra.   What that is connected to is a device called multimeter.  And, in fact, that multimeter is here, Your Honor, we can repeat that experiment here because I also brought samples of the cloth before and after being made. But what this is showing, Your Honor,  if I might approach the screen just to point out because it is kind of a little bit more dim than I had hoped, This is a multimeter and it is set right now to measure resistance.   The resistance between the two points here (indicating).

THE COURT:   Right.

MR. MILLER:  This multimeter, it says "zero L," that is the way that this multimeter indicates that there is no current passing between the two test points.   So,  what this picture shows is that the fabric before it is put into the process is not conductive.

So,  what Noble then does is it takes that nonconductive fabric and they put it into a metallizing bath,  it is actually a two-step process, which I will explain in a minute, but eventually they just apply metallic coatings to the fabric.   One other thing I want to point out and this is in our first -- this is in our response to their -- to Sarvint's opening brief,  the process, the auto catalytic metallizing

process adheres the metal to the nylon portion of the fabric. It is important to remember that point as we go forward, it directly rebuts one of Sarvint's points in its reply.

Step two of the process is we take the -- Noble takes the fabric off the roll and does what it calls activation.  And what activation does is it places this fabric in a chemical bath acids and other chemicals that prepares the nylon fabric but not the spandex fabric in the material to receive silver metal when it is put in the silver bath.  So, it is this part of the process that allows the fabric to be dipped and only the nylon, not the spandex, to receive the silver.

So, just an additional, this is the fabric after the activation process.  I didn't bring a post --  I don't have a post-activation sample,  but as you can see this is the same multimeter,  it is still set to measure resistance between the two points, and it still registers zero L, which indicates that fabric at this stage in the process still is not conductive.

Step three is the silver bath.  The activated fabric is then placed into a silver bath, this is a picture of the fabric and the bath.  Once again, I think if we dim the lights you could see that the bath -- it is not necessary -- that this bath is sort of a milky substance,  a little bit of foam on top.  And there is chemicals including silver.  The fabric is then placed into the bath.  It is placed in there

for a period of time and agitated once it is in there to try and get the silver evenly distributed throughout the fabric, throughout the fibers that are in the fabric.

Eventually it comes out.  This is a picture of the fabric after it has been in the silver bath.  This fabric,  Your Honor,  and this is the fabric that Noble ultimately sells or goes into the  Victoria's Secret bra.  This is the same multimeter, again set to measure resistance, and you can see that now it is actually,  if I may,  recording resistance of zero point nine ohms between these two points.  What zero point nine ohms of resistance indicates is that there is very little resistance between those two points,  the current can flow between them quite readily and that the fabric is now conductive.

And just to confirm anything else that might be might be something else to the process,  Mr. Fisher testifies that Noble's metallization process does not involve incorporating any additional fiber,  conductive or otherwise,  into the nylon spandex substrate fabric at any time.

So, that is what we submitted on opening,  that is the evidence, and I think that evidence standing alone is sufficient to deny the preliminary injunction motion against Sarvint, but I will address what they say in their reply, nevertheless.

So, Sarvint in reply where they essentially put in their

case-in-chief, I think, against Victoria's Secret in fact confirms everything that Mr. Fisher testified to in his opening brief. So, Sarvint says or Dr. Jayaraman says that he looked at SEM images of the fabric from the Victoria's Secret bra, and he confirmed that there was spandex and nylon in the fabric. Well, that is right and that is exactly what Mr. Fisher said on his opening declaration. We used substrate fabric made from nylon and spandex, it is plated with metal to make it conductive.

Sarvint notes and confirms that the nylon yarn appears to have a uniform and consistent coat of a material suspected to be silver. The spandex does not appear to be coated with any material. True. That is exactly what Mr. Fisher said. Autocatalytic metal, as he processes it, adheres the metal to the nylon portion of the fabric, that is the intent of the process. That is what they were trying to achieve. They don't want to get the silver to adhere to the spandex.

So, then we have Sarvint's -- I think what they probably consider is their primary argument and what they are saying is that this is an SEM closeup image of two nylon fibers that are next to one other. And what Sarvint says, if I might, is that because these are touching and because there is silver in between them, that it must not have been made in a bath, Because how else could that silver get in that gap in that fiber? That is what they are suggesting. That is what

Dr. Jayaraman is suggesting with his argument.  And this argument has, you know, a certain amount of seeming logical appeal except that it is wrong.

So, the issue with this argument is that it is based on a couple of flawed assumptions.  They are unstated assumptions, but they are assumptions.  Assumption number one is that these fibers are some how fused together creating some kind of silver liquid proof barrier prior to being placed into the silver bath.  That would be a necessary precondition for it to be correct that if the silver got into the middle there that these must have been made conductive prior to weaving.  That is not the case.  These fibers are not fused together at any time prior to the bath.  And, in fact, the way this fabric is made,  let me back up a little bit,  if you look, this is a bundle of fibers,  this is -- these are the nylon fibers, that is correct.  This is one piece of yarn right here (indicating) with all of these little ones inside of it.  That thing is roughly,  maybe roughly the size of twice the thickness of a human hair.  And all of those little ones in there are made through an extrusion process,  they are not fused together, they are held together a variety of ways,  one is simply by twisting it,  just like yarn that we are all familiar with,  the way that yarn is made of smaller threads and they twist it together to hold it together.  So, there isn't, in fact, no fusion,  no barrier before this fabric is

treated to silver metal getting between them.

Second flawed assumption, is that they suggest that if these move with respect to one another during the bath then that argument fails, as well. They do because they are not fused together, so that is how you get the uniform coating around the nylon. That is exactly what Noble goes for and in fact this image demonstrates the quality of Noble's process for metallizing the nylon and not the spandex.

So, back to the flawed premise. I think I have basically short-circuited all of my remaining slides with that discussion. So I will pass through that.

I will say that, just as a side note, that Mr. Jayaraman (sic) is putting this in as an expert opinion and I don't think we have seen any of the requirements of rule 26 satisfied with respect to Dr. Jayaraman at this point. We have not seen a CV, we have not seen --

THE COURT: I am not sure that applies for certain to an injunction hearing.

MR. MILLER: That may not be, Your Honor. But I do want to put out that Sarvint has only actually disclosed Dr. Jayaraman as a fact witness in this case. This is the Sarvint's initial disclosures. So, I think that the fact he comes in with opinions on reply, it is something of at least a concern, but nevertheless. We think that those opinions are rebutted here.

By the way, if Your Honor has any questions about the process, Mr. Fisher is here and can answer any of them if you want to hear it from him and not from the lawyer.

THE COURT:    All right.

MR. MILLER:  So, and then finally, just one other point that goes with this,  it is not based on personal knowledge, that is obvious, he is taking the fabric and sort of making a statement about how he believes it would have been made.   But also that I think that Sarvint has avoided the truth on this issue.   Sarvint has known about Mr. Fisher and about that Noble Biomaterials supplies this fabric for these bras since at least May 13th when we submitted our opposing brief to the preliminary injunction motion.  And, to my knowledge Sarvint, had not subpoenaed Noble Biomaterials to try and get after this information to try and as Your Honor wanted to show that it is not correct.  I think it is important to note that it is correct, that this is how they are made.

Just to finish up in conclusion.   The conductive fabric in Victoria's Secret bra is not made from individually conductive fibers,  it is made by taking nonconductive, already woven fabric that we are dipping it in a chemical process including a dip in silver bath that imparts conductivity on to the fabric.   That negates infringement of this patent and I think that Sarvint cannot show a likelihood

of success on the merits.

And at the same time, first of all in agreement with everything that was said before,  generally about irreparable harm with respect to Sarvint, but also I think that Victoria's Secret has its own special issues as to why Sarvint's further not irreparably harmed by the sales of this bra.

THE COURT:    All right.  Thank you.

MR. MILLER:    Thank you.

THE COURT:    All right.   Mr. Schoenthaler, I think we return to you.

Mr. Gresham.

(Conclusion of sealed portion.)

MR. GRESHAM:  Please the Court, I will attempt to respond regarding the irreparable harm issues.  And just as a preface, there have been a couple of statements made that we don't agree with.  One was that we didn't assert any sort of claim construction for this claim.  Well, there is only claim one that is at issue in this preliminary injunction.  We did state in the opening brief that we believed that each of these claims carries its plain and ordinary meaning.  I believe in response and in some of the declarations that were submitted by the other side,  they essentially agreed with that.  So we believe that these claim terms have their plain and ordinary meaning.

There is only a couple of terms that are in dispute that was raised only frankly when we got the reply opposition briefs.  And these surprised us that there was any issue with these terms.  But in response to that, we did address the terms that have been raised as being allegedly in dispute.

I would like to talk about, specifically, I know a number of different parties dealt with this electrical lead element. If you look at claim one of the patent, which is on page two of the original handout I gave you this morning,  the electrical lead is for connection to a connector.  The electrical lead being formed from one of the integrated individually conductive fibers.  Well,  what the patent calls for in the sensor is a fabric sensor made of individually

conductive fibers that senses electrical impulses, vital signs, what have you from a subject.   Those electrical impulses have to get to the connector and there are several ways to do it.   One is you can put the connector right on top of the fabric sensor and that is disclosed in the patent,  I believe it is in figure one.   You can see how the connector itself goes right on top of the fabric sensor.

And then in figure three, there is a discussion of how the connector can be located somewhere that would be more convenient to connect to a monitor.   You might have a sensor that measures heart rate, but you need the connector maybe at waist level to connect it to a monitor.   So, somehow that electrical signal has to get from the fabric sensor to the monitor.   Now,  several people have said the electrical lead formed from one of the individually conductive fibers somehow limits, that you have to ravel one of those fibers all the way down and connect it to the connector.   We think that that is too limiting a language.

To go back to Mr. Stockwell's presentation,  he talked about an amendment to the claim on page 12, this was the Textronics Adidas presentation.   He talked about an amendment to the claim that dealt with the electrical lead.  And the amendment originally -- the claim originally read, "electrical lead for a connection to a connector."  The electrical lead being -- "the electrical lead comprising one of the integrated

individually conductive fibers."   And the claim stopped there.   Well,  the examiner in examining that claim said, well, that is too indefinite, you have got a lead, what about it?  He just gave an indefinite in his rejection to that.

In response to that, the patent applicant amended the claim.   They changed "the comprised" to being "formed from" one of the individually conductive fibers.   And then they also added a connector connected to the electrical lead. Now, notably, the language says form from.   Well,  if you have a fabric sensor that has individually conductive fibers that are getting the electrical impulse and you are going to connect that to a connector, there absolutely has to be electrical conductivity between that fabric sensor and the connector.   If it is not formed from one of the fibers, meaning there is conductivity between the fibers and the fabric sensor and the lead,  there is no electrical conductivity that would get there.   So, if they have different physical structures that aren't even touching the fabric sensor, there would be no electrical conductivity. Obviously, that is nonsensical.   The whole purpose of all of these accused products and the products that the -- the embodiments described in the patent is to get that electrical signal from the fabric sensor to the connector.   So, that is all the electrical lead is doing and the language says "formed from."   It doesn't say formed exclusively by one of the

threads, it says "formed from." So, from to, it is formed from the sensor, where you have conductivity with the thread to the connector. So, the from is not a limiting argument as they are trying to make it that the thread has to extend all the way from the fabric sensor to the connector. And that is illustrated in figure three of the patent, which does show the hatched area being the fabric sensor and then a connector which is connected with a conductive thread.

Now, there is no requirement that that conductive thread has to be one of the same threads that is in the sensor. The sensor has individually conductive fibers and then it is connected by a conductive thread to a connector. That is an embodiment straight out of the intrinsic evidence of the patent that precludes this limiting argument that the Defendants are trying to make with regard to the electrical lead out. So, we don't believe that they have raised a substantial issue of infringement with regard to the electrical lead element. And as Mr. Stockwell indicated, Your Honor can construe the claim tentatively for purposes of the ruling on this. We think the correct instruction, based on the intrinsic evidence, what is shown in the patent, how the products work, is that the electrical lead from the fabric sensor is all that is required as electrical conductivity. Otherwise, it would be -- nobody would ever infringe the patent because all they would do is, you know, put a piece

here.

In fact, the original prototype that was used in developing the product has a sensor here, the dark-colored portion, and this is a valuable artifact, so we don't want to damage it in any way. And then you have thread running and then connecting to another wire and running over to the connector. That was the original prototype that was the design for figure three of the patent. So, we believe the electrical lead element -- clearly the Defendants are offering a very, very limited construction that is just not supported by the patent itself.

Now, moving on to OMSignal raised an argument with respect to -- a validity argument with respect to a patent called Lebby. Well, the specific Lebby patent that they cited, and again there is basically no mention of the evidence that Sarvint submitted and questions about Dr. Jayaraman's declaration, well the declaration that OMSignal submitted regarding validity of the Lebby patent is a declaration from their attorney. They have no expert testimony regarding the Lebby patent. So, we don't think there is anything before the Court that would make that admissible. But, we went ahead and took a look at it. This particular Lebby patent was incorporated by reference in another patent to the inventor Lebby, which was in fact considered during the prosecution of the '731 patent and it was cited on the face of

the patent as being considered by the examiner.  So, the arguments that counsel makes with regard to Lebby really add nothing that was not already in the prosecution history.

THE COURT:   What was the name of that other patent?

MR. GRESHAM:  The other patent was also named Lebby. There is a Lebby '004 that OMSignal was trying to use to raise an issue of validity.  And on the face of the '731 patent, there is a  -- did I misspeak?  It is incorporated by reference.   I will have to check with that.  But, yes, on the face of the patent, there is a patent Lebby 6080690.  If you see the front page of the patent on the --

THE COURT:   Right,  I see it.

MR. GRESHAM:  So, that patent incorporated by reference the Lebby '004.   And then besides that, Dr. Jayaraman looked at the Lebby '004 patent, which discloses an antenna that is sewn into the fabric.  It does nothing to touch the body or to take electrical signals, impulses, vital signs, or anything from the body.   It is an antenna that you could theoretically wear that would increase the reception area of a cellphone or something of that nature.   So, the examiner properly didn't consider that as being a reason not to issue the patent.   And given the presumption of validity, it doesn't raise any sort of substantial issue with regard to validity of the patent.

I think those are the main arguments that OMSignal raised

with regard to the likelihood of success element.

Moving on to Carre.  Carre indicated that its conductive fiber is not conductive prior to being knitted.  Again, the evidence, the  SEM and the EDS analysis that Dr. Jayaraman performed rebut that argument.  The fiber again is coated, there is a higher concentration of silver -- a high concentration of silver on the nylon, basically no concentration of silver on the spandex.  Carre offered no testimony regarding any proprietary process that is used to do that.  They just say, well, we coat our fiber later. Well, without any evidence to support that, the only evidence of record is the SEM and EDS analysis that Dr. Jayaraman performed regarding that product.  So, we don't think Carre has raised a substantial issue with regard to the factual issue of whether their fiber is conductive prior to being woven or not.  There is nothing in the record to support that.  I know Mr. Ward offered some sort of expert testimony standing here, but with all due respect, Mr. Ward is not an expert as neither am I.  And so that is attorney argument, which is not admissible, especially against the considered analysis of Dr. Jayaraman.

Moving to Sensoria.  As counsel noted, Sarvint did in fact make a great effort to buy the accused socks and they weren't able to get them because Sensoria wouldn't ship. They did end up getting the socks and they examined the socks.

And the argument that Sensoria makes that vital signs is limiting and are not measured is just belied by the product. The whole issue is to get electrical signal from the sensor and transmit them to a connector so that they can be analyzed and provide information to the wearer.  Now, whether those signs are vital or not, there is -- vital signs has an ordinary meaning.  And they -- I think they try to limit by some examples given in specification.  But, again, that is improper.  We submit that the term has ordinary and customary meaning.  We put in evidence from some contemporaneous publications that indicated that gait and things of that nature did in fact comprise vital signs.  So, we don't think that that raises a substantial issue of non infringement.

Now, there is something in Mr. Vigano's declaration that says that the sock is not capable of measuring electrical impulses or vital signs.  Well,  with all due respect, that makes no sense.  Because later he testified that the striped portion of the sock is a conductor that connects with the sensor and conducts electrical impulses to the connector and they have a strap that fits around there as shown in the claim charts.  So,  undoubtedly electrical signals are being sensed by the fabric sensor.  There is just -- I don't know the explanation or where the confusion is coming on that,  but the whole purpose of the sock is to measure electrical signals so that they can be analyzed to provide feedback to the user.

And Dr. Jayaraman did measure with a multimeter the conductivity of the fabric sensor portion and it is conductive.  So,  there is really no question about that.

Sensoria also raised the issue of a fully conductive fabric if something had spandex.  I spoke to that in my opening remarks and several of the accused products includes spandex so that they can stretch because silver wouldn't stretch.  But the question is,  is it still fully conductive? If you look at the claim language in claim one dealing with a knitted -- in subsection A,  a  knitted or woven fully conductive fabric including one or more individually-conductive fibers integrated therein,  okay. Including is an open-ended term as used in a patent claim. That means, to infringe the claim,  the claim requires that the knitted or woven or fully conductive fabric include one or more individually-conductive fibers.  It doesn't say -- it doesn't exclude the fabric from including anything else by the very language of the claim.  So, the test performed on the Sensoria product indicate that it is fully conductive.

Now, there was some issue raised in my notes that I don't have it in-depth that Sensoria said,  well,  you could have asked more,  you could have done some discovery on this to find out how our socks are made or how things are done. Someone else raised the issue,  I think Victoria's Secret, well, you didn't subpoena our declarant, you should have done

that and then you could have found out more information. Well, there has been a discovery dispute going on in the case. Sarvint timely served discovery requests on all of the Defendants to address essentially merits-related issues, infringement validity, things of that nature. The defendants have taken the position that discovery hadn't opened because several folks had filed motions to dismiss based on jurisdictional grounds and things of that nature. The bottom line is, despite the discovery being out there for quite a while, we still don't have any substantive discovery. And I think for them to fault Sarvint for being derelict in attempting to gain discovery is a little disingenuous to present to the Court today.

I'm going back from -- back to Sensoria again, they have the fabric and they have the conductive thread that connects the fabric to the sensor. And they are making the same electrical lead type argument. But if there was physical separation between the connective fiber and the fiber in the sensor, there would be no electrical conductivity. So by definition, at least one of the fibers in the sensor has to be in intellectual contact with this other thread, which is exactly what is shown in figure three of the patent and meets the form from one of the conductive fibers limitation.

I will move onto the Textronics/Adidas. With all due respect, Adidas has filed a motion for summary judgment on

the equitable estoppel argument.  As Your Honor is probably aware, in response to that, Sarvint filed a rule 56(D) declaration, we haven't been able to take any sort of discovery on that.  Mr. Stockwell essentially made a summary judgment motion argument to the Court on the basis of the preliminary injunction.  We have had no opportunity to depose the declarant who submitted the declaration who said that there was reliance, they didn't say what they would have done differently, but they are just trying to say, well, we relied on the fact that Sarvint had the product.  With all due respect, the evidence that Mr. Stockwell put in where a letter was written back from Textronics to Sensatex, the former patent owner at that time, basically laying out the non-infringement argument belies any sort of reliance on supposed inaction by the previous owner.  I mean, they did the same thing.  They laid out a non-infringement argument.  They would have continued doing what they were doing, in fact they have continued doing that based on their declaration to the present day.  When they were sued in this case, they didn't immediately change or take any steps to change their product.  They maintained that they don't believe that they infringed.  So, even with what we know from the single-sided declaration that was put in on the estoppel argument, we know that there really is no way that they can meet the reliance element of estoppel because they continued doing what they

were doing even when contacted by Sensatex.  They did it throughout while they were exchanging correspondence.  They continued to do it, they continued to do it after they got sued.  They relied on their own determination that either they didn't believe they infringed or they believed it was worth taking the chance to continue marketing the product. So, I will reserve the right once the motion is ripe to actually argue the merits.

THE COURT:  All right.

MR. GRESHAM:  In fact, the parties are -- we have not been able to take any discovery on that motion and Mr. Stockwell presented us with a proposed consent motion dealing with that type of discovery just this morning.  So, the parties are working to deal with that.  I don't think at this point the equitable estoppel argument would be a basis to deny the injunction.  If it were, if the Court wanted to wait until that issue is briefed, that might make sense, but certainly we don't think it would be fair to deny the motion just on that basis without having the opportunity to be heard from.

THE COURT:  All right.  Paragraph.

MR. GRESHAM:  The same type argument, I don't want to belabor the point on the electrical lead argument.  Everybody seems to be raising it and I think I have addressed it from Sarvint's point of view and I don't want to belabor  the

point.

The same argument Adidas made on fully conductive, again, as we just talked about, the claim that deals with the fully conductive fiber is open-ended so it can include individually conductive threads and nonconductive threads woven together as long as the fabric sensor itself is conductive point to point. And we have tested those and all of the accused devices meet that limitation.

Now, Adidas also raised an invalidity argument based on a patent called Reinhold. Now, Reinhold -- and I will give them credit, because unlike any of the other parties making the invalidity arguments, they did present supposed expert declaration. Again we haven't been able to depose him to really go into it, but in response to the arguments raised, Dr. Jayaraman took a look at the arguments and pointed out that the Reinhold patent -- essentially it is important to note the Reinhold patent doesn't really deal in any detail whatsoever with woven or knitted fabric sensors. The Reinhold patent deals with old types of electrodes, silver electrodes. And that in one paragraph they say, we don't intend to be limited, so we believe you could do certain things by knitting and weaving conductive fibers. But it is important to note that talking about what the invention is, if you look at figure four of the Reinhold patent, and this is discussed in detail in Dr. Jayaraman's rebuttal declaration at

pages 27 through 31, but figure four of the patent shows the electrode assembly. Basically, it is a-two part assembly. There is a substrate with an electrode put on top. And then in this one paragraph talking about weaving, they said you could form the substrate by knitting or weaving and then you could position threads on top to contact the inference back in order to measure electrical impulses. Well, those would be threads put into the product. They wouldn't be knitted or woven into a single fully conductive fabric. Such a big distinction between the Reinhold disclosure and what Jayaraman discovered and patented in the '731 patent. Basically, there was a sheet pad of material with a hard electrode on top. And then in this one paragraph, I think it is in column four, there was a determinant, there was a statement that said, well, you could also potentially do it by weaving and by positioning a thread in the fabric. No discussion as to how you would do that and no explanation as to how a patent that was issued in 1974 that nobody did it, Dr. Jayaraman did it. So, there would be no real issue -- we don't think there is a substantial issue of validity raised by the Reinhold reference.

Finally, with regard to Victoria's secret -- I know Your Honor likes the use of the word finally and I will try to make it as brief as possible. Victoria's secret for their non-infringement argument relies almost exclusively -- well,

probably exclusively on the declaration their supplier Mr. Fisher supplied, dealing with how the conductive fabric was made. And then today for the first time we are confronted with various pieces of new evidence. On Mr. Fisher's declaration, which is in the record, stated was at the plating was done using a proprietary metallization process to adhere the silver to the nylon. Dr. Jayaraman looked at the fiber, performed the SEM analysis, performed the EDS analysis, confirmed that the silver spikes on the nylon and there is very little silver, if any, on the spandex. Now, that led to the conclusion that these were individually conductive fibers beforehand. We have not had the benefit, there was no data sheet provided, we searched on the website, we searched all over to try to find a data sheet on the specific product that they claim is being used here. Basically, we haven't had an opportunity to address that evidence. And we don't think it is really proper for that evidence to come in to Court without us having an opportunity to address it.

I think counsel has faulted us for not serving a subpoena on Mr. Fisher. We have discussed the ability of taking depositions and taking discovery from the parties, and as I alluded to before, there has been an ongoing dispute as to whether discovery is open, there has been some refusals to produce things. There haven't been any substantive responses

provided to discovery requests that have been out there for a while.  Sarvint has served detailed infringement contentions as required by the rules, there have been no responses to infringement contentions or validity contentions served by any of the Defendants.

We are in court.  We realize that we have a heavy burden to show in order to get a preliminary injunction.  And we certainly believe that we have done that with regard to the merits of the case.

If you have any questions I would be happy to address.

THE COURT:  No, sir.

MR. SCHOENTHALER:  Your Honor, if I may, I will move quick, I just want to touch on some of the arguments for the irreparable injury.

They have raised it.  They have raised it, the Defendants, as a whole, have raised it in using various words, no urgency, no sense of urgency, et cetera.  But they don't focus on the right date here, in our opinion.  They go back to when was the patent live.  They go back to when was the patent issued, 2005.  They say, well, you know, geez, the former licensee, GTRC, they couldn't get a product up and running.  So, they are doing two things here.  Number one, they are confusing what the issue of delay is.  It is irrelevant that the former licensee and GTRC could not get a license -- I mean, could not get a product out.  That has no

bearing on the issue of delay.  Maybe they were incompetent. Maybe the market wasn't ready, but that is completely irrelevant.

What is relevant is the delay sends an infringing product out on the market.  What does it matter when the patent issued?  Who are we supposed to sue?  If someone has a product out, how are we supposed to enforce our patent?  So, the delay issue is we have to compare from one perspective, when Sarvint received the patent rights and when there were infringing products on the market.  I touched on this a little bit initially, which is it doesn't look so bad from the delay standpoint, in fact, it looks pretty reasonable from Sarvint's position.  Ralph Lauren says, we have only offered to sell, we have never sold them.  OMSignal and I know counsel disagrees with me and maybe I am wrong,  but we tried -- OMSignal didn't ship orders until after we filed for an injunction.  We had been waiting for six or seven or eight months to receive this OMSignal product and they kept saying, it is not ready,  it is not ready,  it is not ready.  So,  on those two you can't hold -- you can't go back to 2005 and say somebody delayed you, there was no product on the market.

Carre,  only evidence in the record we have is October, November of 2014 and March of 2015 because that is the only evidence they have given us.   That is when they shipped in to Georgia.   And that hasn't been -- that wasn't too far in the

past.

Victoria's Secret and Sensoria, I have no evidence in the record that they have -- when they started selling. They certainly haven't put anything in the record that would show that we unreasonably delayed.

Adidas, special case. Granted, they are different in the sense that there were conversations in the 2000s between the former licensee. I will tell you, though, taking a look at the Burr declaration, if I can find it, it doesn't exactly say what they say it does. I mean, we all know that people produce products and they go from various generations, et cetera. What was represented in Stacey Burr's declaration said, which is the exact same technology we had in 2007. What paragraph nine, which was referred to by counsel actually says is:

> "Textronics continued selling the
> NuMetrex, registered trademark" --
> so we are talking about a class or a
> brand name -- "line from its 2005
> launch to the present day and Adidas
> has likewise continued to sell
> miCoach" -- again, a brand name --
> "garments from 2008 until present
> day."

We have no reason to believe that those products that were

sold in 2007 to 2008 have any similarity to the product we are accusing of infringement.  So, the issue of delay is not a legitimate basis for denying injunctive relief in this case.

Defendants talk about absence of competition.  I talked to you a little bit about that in the opening.  I am not sure what they would have us do to show they are competitors. They want to create this bright line rule if you don't sell a product you are not a competitor.  I don't think there is any law supporting that.  We are spending thousands of dollars to try to get to a commercially-viable product.  We can't seek injunctive relief until we actually sell?  I mean, I had to ask OMSignal, assuming my facts are correct that they just recently started to ship, were they not a competitor of Adidas before they actually shipped the product?  Were they not a competitor of Sensatex?  I think they were competitors. We are a competitor.

Appropriately-defined market.  You know, a lot of time and effort and writing was spent on whether Challagalla erred in his definition of market.  I think there is a simple answer to this, he didn't.  They want to read his declaration a certain way to make it appear as if Professor Challagalla just got it wrong.  Well, he didn't.  He knows what the importance of market here is.  And if you look at his declaration, he goes through progression, starting with the broad market of wearables, he uses the broad market of

wearables to show this is a hot area that people are trying to enter this.   Then he comes down and he narrows it.  And, in fact, if you look at,  if you look at they kind of admit this on page 9 and 10 of Cooley's documents,  they say Challagalla's quote, unquote, wearable market.   Then they show glasses,  they show socks with something that attaches to them,  they show a watch,  they show a bra, and they show a, I guess, kind of a pager-type item that you can track, then they show a shirt.   So there is the broader market.   So far, no one is in disagreement here, there is a wearables market.  And it includes a lot more than smart apparel.

Then, if you turn to page ten, hey, look at this, Challagalla smart apparel market.   That includes what we are sitting here talking about today.   So,  professor Challagalla did not get this wrong, and, frankly, they know that.  But when you get right down to it, so what?  What are we trying to determine what the market is any way?  We are trying to determine the market to determine if these are substitute products.  We are trying to determine whether these are substitute products, we are trying to determine if Sarvint is being irreparably injured.   So, whether it is a perfect definition of market or not, the fact of the matter is, we are talking about shirts, we are talking about bras, we are talking about socks.   We are not talking about glasses.   We are not talking about arm bands.   None of these guys -- we

didn't sue anybody for selling arm bands, we didn't sue anybody for selling head gear. We didn't sue anybody for selling pagers. These are substitute products, they are in the market, they are harming Sarvint.

The issue of casual nexus. Defendants cite the Apple case to say that the patent feature does not drive the demand for the product, the sales will be lost even if the offending feature were absent from the accused product. I think they are overcomplicating this. I mean, this isn't rocket science. The causal connection is that there is a sensor. That is what is driving demand here. There is a smart garment with a sensor. There is not some magical causal nexus that we have got to go out and find. The evidence is the products. Now, they don't think they infringe and we think they do, but I mean we are getting into the weeds of claim construction. The causal nexus is they are selling products into the market that we say infringe and that are socks, just like us that we want to sell; shirts, just like us we want to sell; bras, just like us we want to sell. So sure, there is a causal nexus here, it is in the product. We have shown it.

Monetary damages. Let's go to first-mover advantage. I don't think there is really a dispute about this. Professor Challagalla says it is nice to be a first mover. Mr. Kidder says, it is nice to be a first mover, but it doesn't guarantee you much, it doesn't guarantee you everything, you still have

to perform.   We don't dispute that.   We fully anticipate performing.    The fact of the matter is, they are first movers and they are out there and they are taking the mark from us, and they are using our infringing technology.

The monetary damages, this is what it really comes down to:  Can Sarvint be compensated based on monetary damages,  is the injury such that no amount of monetary damages will put them in the place they should be but for the defendant's infringement?  Challagalla,  they showed on page 19 of Cooley's documents, Challagalla identifies difficulty in competing established brands.   Loss of market share, lower prices,  difficulty of the access to adjacent markets, and then says, "all four can be compensated by money." Obviously, we disagree or we wouldn't be here.   The fact of the matter though is all four of these things is going to be very difficult to show down the road.   They are going to be very difficult to show and it is going to border on speculation to be able to show that somehow that we can determine how much money Sarvint is entitled to a year from now when Sarvint is fully in the market with just their socks and their bra and their shirts.

Challagalla's declaration shows that he is definitive that you can't recreate this market that is burgeoning right now that the Defendants are stepping into using the infringing technology,  you can't do it.   Sarvint will never catch up to

that in that respect.   Will they be able once -- at some point could they then receive dollars theoretically down the road from sales?  You can't,  not based on this,  not based on the current market conditions and the fact they are going to be well ahead of Sarvint in brand recognition and customer appreciation by the time Sarvint is in the market.

The final thing is the assumption of success.   It was raised somewhat that Challagalla assume success.   I spent ten minutes during Defendants' arguments trying to find where Challagalla says that he assumes success,  I didn't find it, I don't think he does.   What Defendants are basically doing is saying you are not entitled to an injunction until you can show you are going to be a success.   And I would represent to the Court that that is not why we are here and that is not the evidentiary standard --

THE COURT:   Well, but you haven't cited any case supporting the grant of injunctive relief where the Plaintiff is yet to bring a product to market yet,  have you?

MR. SCHOENTHALER:  I don't recall my brief sufficiently well.   I tell you, we will go look at the brief, if we don't have a case, we will find one.  If one doesn't exist, we will agree with Your Honor.

THE COURT:   All right.

MR. SCHOENTHALER:  I don't see,  you are right,  Your Honor.  This is a case of first impression as far as I know.

No Court has said one way or the other, that I know, that you have to have a product in the market to get injunctive relief or if you don't have a product you can't get it.

Thank you, Your Honor.

THE COURT:  All right.  Thank you.

I have decided the motion and I am going to go ahead and rule from the bench.  I am not inclined to spend the time preparing an order because I have got everybody here and when I was a lawyer, I would rather the Judge just rule and give us an answer instead of making us wait sometimes seemingly forever to get a written order.  I don't think it would take that long to get an order out,  but I still think it is in the interest of justice and kindness for me to go ahead and rule on it and deny the motion.  The case presents substantial questions of both claim construction and validity, thereby making the issuance of injunctive relief unlikely if not impossible.

Sarvint, I find, has not carried its burden of showing a likelihood of success of its infringement claims.  We all know that an injunction is a drastic relief and in this Circuit the burden squarely rests with Sarvint to prove all four of the factors related to issuance of injunction.  And I find they have not carried that burden in this case.

Sarvint has yet to develop or market a product in violating the patent, which raises against the finding of

irreparable harm.   And its claim it has lost market shares is inadequate to support issuance of an injunction.   I believe issuance of an injunction would result in a substantial change of status quo, which the purpose of an injunction is ordinarily to maintain status quo.

For all of those reasons, I am going to deny Sarvint's motion in each of the six cases or maybe seven,  how many ever cases there are.

On this issue on discovery dispute, I will rule in favor of Sarvint.   I will direct its interrogatories, document requests, and other discovery requests be responded to in full within two weeks from today,  fourteen days from today.

I am going to go ahead and deny Carre's motion to stay discovery,  I am not going to stay discovery.  I don't need to see Sarvint's response to know I will not do that.   I will not stay discovery, I want the discovery to move forward in the case.

Anybody have any questions?  Good.   We are excused.

*** END OF REQUESTED TRANSCRIPT ***

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from my stenographic notes in the above-entitled matter.

S/Debra R. Bull, RPR, CRR             April 11, 2016
                                      Date

**'**

'004 [3] - 100:6, 100:14, 100:15
'177 [1] - 62:24
'283 [1] - 62:23
'731 [17] - 3:17, 3:19, 4:6, 10:5, 11:21, 13:17, 30:23, 40:22, 44:11, 60:24, 65:22, 67:14, 68:4, 99:25, 100:7, 108:11
'for [1] - 78:20
'integrated [1] - 76:18

**0**

004 [1] - 44:7

**1**

1 [1] - 72:3
1.25 [1] - 15:6
10 [2] - 75:16, 114:4
11 [1] - 8:5
12 [5] - 67:13, 69:25, 70:8, 74:19, 96:20
13 [4] - 1:4, 38:25, 68:10, 71:23
13-year [1] - 39:4
1324 [1] - 32:14
1375 [1] - 32:16
13th [1] - 93:12
15 [5] - 35:22, 38:15, 46:4, 46:6, 75:17
15th [1] - 22:15
16 [2] - 72:25, 74:16
17 [1] - 50:19
17th [1] - 68:5
18 [4] - 34:25, 66:5, 73:22, 75:24
19 [3] - 50:19, 77:4, 116:9
1949 [1] - 2:2
1974 [1] - 108:18
1990's [1] - 25:20
1990s [1] - 39:14
1996 [1] - 38:15
1:15-CV-69-74 [1] - 1:3

**2**

20 [4] - 3:3, 3:4, 19:23, 50:19
2000 [1] - 25:23
2000s [1] - 112:7
2005 [8] - 22:15, 63:21, 68:5, 68:24, 110:20, 111:20,

112:19
2006 [1] - 68:9
2007 [4] - 68:10, 68:13, 112:13, 113:1
2008 [3] - 26:2, 112:23, 113:1
2012 [2] - 26:2, 69:24
2014 [1] - 111:23
2015 [3] - 1:4, 111:23, 120:10
23 [2] - 74:17, 77:19
25 [2] - 69:24, 74:17
26 [1] - 92:14
27 [1] - 108:1
29 [1] - 78:14
297 [1] - 51:24

**3**

3 [1] - 72:3
30 [2] - 74:24, 78:14
30-plus [1] - 67:12
30303 [1] - 2:3
31 [1] - 108:1
31-9 [1] - 58:9
34 [1] - 78:13
357 [1] - 51:24

**5**

5 [2] - 7:7, 72:3
50 [1] - 47:8
56(D [1] - 105:2

**6**

6 [1] - 72:3
60 [1] - 7:7
6080690 [1] - 100:10
678 [1] - 32:14
695 [1] - 32:15

**7**

713 [1] - 11:21
75 [2] - 2:2, 37:2

**8**

8 [2] - 7:7, 120:10
8800 [1] - 39:25

**9**

9 [3] - 18:21, 68:22, 114:4
90 [1] - 37:2

**A**

a-two [1] - 108:2
abandoned [1] -

71:19
ability [2] - 38:2, 109:21
able [13] - 9:1, 13:9, 13:19, 14:3, 14:7, 24:23, 72:10, 101:24, 105:3, 106:11, 107:13, 116:18, 117:1
above-entitled [1] - 120:5
absence [6] - 23:4, 24:3, 27:8, 33:9, 45:6, 113:4
absent [3] - 24:17, 32:12, 115:8
absolute [2] - 14:4, 27:5
absolutely [2] - 40:17, 97:12
access [3] - 34:19, 35:18, 116:12
according [4] - 25:19, 37:1, 50:5, 59:22
accuracies [1] - 5:17
accused [29] - 4:18, 5:1, 5:14, 5:15, 7:19, 8:13, 21:22, 24:13, 26:11, 32:6, 32:13, 32:19, 45:4, 48:12, 48:13, 51:17, 53:23, 61:6, 69:1, 69:5, 70:4, 72:17, 82:14, 97:21, 101:23, 103:6, 107:7, 115:8
accusing [1] - 113:2
achieve [2] - 12:17, 90:16
achieved [3] - 13:7, 13:8, 13:9
acids [1] - 88:7
acknowledged [1] - 79:23
acknowledges [1] - 16:4
acquired [2] - 60:22, 69:25
act [1] - 64:12
acting [1] - 3:20
action [4] - 23:24, 61:24, 62:4, 64:13
activated [1] - 88:19
activation [4] - 88:5, 88:6, 88:13, 88:14
activity [2] - 29:20, 51:20
actual [2] - 9:6, 49:24
add [1] - 100:2
added [1] - 97:8

additional [6] - 35:25, 36:2, 47:12, 77:10, 88:12, 89:18
address [9] - 27:5, 67:25, 77:4, 89:23, 95:16, 104:4, 109:16, 109:19, 110:10
addressed [2] - 14:9, 106:24
addresses [1] - 58:21
addressing [1] - 67:13
adequate [1] - 33:14
adhere [2] - 90:17, 109:7
adheres [2] - 88:1, 90:14
Adidas [24] - 6:14, 14:4, 16:1, 18:22, 19:7, 19:8, 19:9, 60:15, 60:19, 60:22, 68:19, 69:2, 70:10, 71:22, 72:17, 73:23, 79:22, 96:21, 104:25, 107:2, 107:9, 112:6, 112:20, 113:14
adjacent [4] - 35:18, 36:10, 36:18, 116:12
admissible [3] - 55:10, 99:21, 101:20
admit [3] - 9:11, 58:12, 114:3
advantage [9] - 27:22, 36:21, 37:12, 37:15, 37:17, 38:6, 38:10, 82:9, 115:21
advertising [1] - 15:7
affidavit [6] - 5:11, 11:4, 13:19, 20:25, 21:3, 21:15
afraid [1] - 82:2
afterwards [2] - 19:7, 49:23
agitated [1] - 89:1
ago [1] - 69:8
agree [4] - 29:12, 38:5, 95:4, 117:22
agreed [1] - 95:10
agreement [4] - 10:12, 50:22, 50:23, 94:2
agrees [1] - 38:10
ahead [7] - 11:23, 39:19, 99:22, 117:5, 118:6, 118:13, 119:13
AIDED [1] - 2:5
AL [1] - 1:7
allegation [1] - 65:20
allegations [2] -

43:25, 67:11
alleged [3] - 4:8, 26:11, 32:4
allegedly [2] - 65:22, 95:17
alleging [1] - 49:16
allow [2] - 28:24, 66:12
allowance [1] - 45:10
allows [1] - 88:10
alluded [1] - 109:23
alluding [1] - 7:23
almost [9] - 14:10, 38:18, 44:22, 44:24, 47:9, 61:12, 69:8, 82:10, 108:25
alone [1] - 89:21
Alta [1] - 39:17
Altair [1] - 39:25
alternative [1] - 17:11
alternatives [2] - 17:21, 17:22
altogether [2] - 21:16, 37:24
Amazon [5] - 51:5, 51:6, 51:7, 51:8, 51:14
ambiguity [1] - 55:11
amen [1] - 44:20
amended [1] - 97:5
amendment [8] - 10:12, 70:20, 70:21, 70:22, 71:4, 96:20, 96:21, 96:23
amorphous [1] - 30:7
amount [5] - 13:3, 13:6, 43:1, 91:2, 116:7
amounted [1] - 5:7
analysis [14] - 21:19, 26:25, 27:6, 27:15, 40:24, 43:4, 54:19, 55:9, 67:12, 101:4, 101:12, 101:21, 109:8, 109:9
analyze [1] - 49:23
analyzed [2] - 102:4, 102:25
Andrew [1] - 3:13
annual [1] - 56:10
answer [4] - 24:22, 93:2, 113:20, 118:10
answers [1] - 59:3
antenna [2] - 100:16, 100:18
anticipate [1] - 116:1
anticipates [2] - 44:9, 78:2

**anyway** [1] - 44:17
**apart** [2] - 41:5, 53:21
**apparel** [13] - 17:7, 17:18, 25:10, 26:23, 28:16, 30:10, 30:21, 35:9, 36:12, 53:8, 83:20, 114:11, 114:13
**appeal** [1] - 91:3
**appear** [6] - 23:10, 23:14, 23:15, 86:2, 90:12, 113:21
**APPEARANCES** [1] - 1:11
**apple** [2] - 32:14, 32:15
**Apple** [5] - 24:21, 29:25, 31:25, 32:21, 115:5
**applicant** [3] - 76:2, 76:15, 97:5
**application** [1] - 58:25
**applications** [1] - 36:13
**applied** [1] - 57:25
**applies** [2] - 11:8, 92:17
**apply** [1] - 87:22
**applying** [3] - 4:12, 61:18, 62:15
**appreciation** [1] - 117:6
**approach** [7] - 3:25, 14:17, 20:3, 32:23, 37:19, 59:18, 87:8
**appropriate** [2] - 67:18, 82:16
**Appropriately** [1] - 113:17
**appropriately** [1] - 28:21
**Appropriately-defined** [1] - 113:17
**approvingly** [1] - 69:19
**apps** [3] - 29:3, 29:6, 29:8
**Appx** [1] - 51:24
**area** [5] - 73:9, 98:7, 100:20, 114:1
**areas** [2] - 7:21, 73:10
**arguably** [1] - 18:23
**argue** [9] - 3:21, 6:14, 9:10, 15:19, 15:23, 16:19, 83:7, 83:15, 106:8
**argued** [7] - 5:22, 7:24, 8:1, 14:10,

53:19, 70:14, 77:16
**argues** [1] - 61:14
**arguing** [1] - 76:15
**argument** [39] - 9:8, 15:14, 16:21, 42:6, 47:11, 48:21, 53:18, 57:18, 71:16, 72:24, 77:10, 78:16, 81:20, 84:1, 84:25, 90:19, 91:1, 91:2, 91:4, 92:4, 98:3, 98:14, 99:12, 99:13, 101:5, 101:20, 102:1, 104:17, 105:1, 105:5, 105:14, 105:16, 105:23, 106:15, 106:22, 106:23, 107:2, 107:9, 108:25
**arguments** [13] - 5:8, 15:12, 17:23, 48:17, 49:25, 71:9, 100:2, 100:25, 107:12, 107:14, 107:15, 110:13, 117:9
**arm** [3] - 17:9, 114:25, 115:1
**arms** [2] - 27:1, 30:7
**art** [5] - 5:13, 5:19, 44:7, 44:10, 45:22
**article** [3] - 37:1, 38:14, 38:22
**articles** [6] - 33:24, 34:2, 34:20, 38:14, 57:13, 57:14
**articulate** [1] - 44:23
**artifact** [1] - 99:4
**Asics** [3] - 61:13, 62:13, 62:17
**aside** [1] - 41:16
**aspect** [3] - 42:6, 74:4, 78:2
**aspects** [4] - 40:10, 67:2, 74:2, 74:8
**Aspex** [8] - 61:4, 64:15, 64:16, 64:18, 64:19, 64:23, 65:24, 66:1
**assembled** [1] - 58:20
**assembly** [2] - 108:2
**assert** [2] - 27:11, 95:4
**asserted** [2] - 67:13, 70:4
**assertion** [3] - 8:3, 56:17, 85:22
**Associate** [1] - 81:5
**associated** [1] - 37:3
**assume** [1] - 117:8
**assumed** [1] - 42:14

**assumes** [3] - 36:22, 37:12, 117:10
**assuming** [1] - 113:12
**assumption** [3] - 91:6, 92:2, 117:7
**assumptions** [4] - 36:21, 91:5, 91:6
**Athena** [2] - 25:21, 37:7
**athletes** [1] - 13:10
**ATLANTA** [3] - 1:2, 1:3, 2:3
**attached** [1] - 63:20
**attaches** [1] - 114:6
**attachment** [1] - 72:4
**attempt** [1] - 95:1
**attempted** [1] - 9:2
**attempting** [1] - 104:12
**attest** [1] - 11:3
**attesting** [1] - 13:19
**attorney** [3] - 5:8, 99:19, 101:19
**attorneys** [3] - 3:14, 14:19, 15:2
**attorneys-eyes-only** [1] - 14:19
**attributable** [1] - 24:24
**Auckerman** [2] - 61:16, 61:19
**audio** [1] - 20:1
**auto** [1] - 87:25
**autocatalytic** [1] - 90:14
**Automated** [1] - 51:23
**automatic** [1] - 52:14
**Auvil** [1] - 47:21
**AUVIL** [11] - 1:19, 48:1, 48:5, 48:10, 49:22, 52:11, 52:21, 55:4, 56:2, 58:5, 59:14
**available** [4] - 18:12, 29:8, 47:6, 51:13
**average** [1] - 38:18
**avoided** [1] - 93:9
**award** [3] - 12:23, 13:1, 22:16
**awarded** [1] - 20:16
**awards** [5] - 12:11, 12:13, 12:16, 12:18, 13:8
**aware** [3] - 18:20, 70:4, 105:2
**awfully** [1] - 25:13

**B**

**backdrop** [1] - 17:7
**backwards** [1] - 45:22
**bad** [1] - 111:11
**balance** [8] - 15:22, 15:23, 15:25, 23:5, 47:4, 60:1, 79:21, 79:24
**balancing** [1] - 3:23
**ball** [1] - 56:24
**Ballard** [1] - 81:2
**banc** [2] - 61:16, 61:20
**bands** [4] - 17:9, 17:14, 114:25, 115:1
**bar** [2] - 23:12, 24:8
**Barcelona** [1] - 64:4
**barrier** [2] - 91:8, 91:25
**barriers** [1] - 14:2
**based** [26] - 4:12, 4:20, 8:10, 16:11, 22:23, 35:4, 35:7, 41:19, 41:22, 42:15, 46:13, 54:11, 65:10, 74:19, 85:5, 85:8, 91:4, 93:6, 98:20, 104:7, 105:18, 107:9, 116:6, 117:3
**basis** [13] - 9:5, 42:3, 42:22, 42:25, 44:1, 52:4, 59:6, 62:14, 85:21, 105:5, 106:15, 106:19, 113:3
**bath** [17] - 31:12, 31:16, 87:20, 88:7, 88:9, 88:19, 88:20, 88:21, 88:22, 88:23, 88:25, 89:5, 90:23, 91:9, 91:13, 92:3, 93:23
**BATTEN** [1] - 1:9
**battling** [2] - 53:20, 66:24
**BAYSINGER** [1] - 1:14
**Baysinger** [1] - 3:13
**bear** [2] - 40:17, 41:13
**bearing** [1] - 111:1
**become** [1] - 64:13
**becomes** [1] - 16:5
**BEFORE** [1] - 1:9
**beforehand** [1] - 109:12
**began** [1] - 86:12
**begin** [3] - 9:17, 82:8, 82:13

**beginning** [2] - 13:21, 54:9
**behalf** [2] - 19:17, 40:13
**behind** [3] - 9:2, 41:9, 41:14
**belabor** [3] - 70:14, 106:23, 106:25
**belated** [1] - 53:3
**belied** [1] - 102:2
**belief** [1] - 62:9
**belies** [1] - 105:14
**believes** [4] - 10:16, 16:6, 37:18, 93:8
**bench** [2] - 4:1, 118:7
**benefit** [2] - 37:19, 109:12
**benefits** [2] - 12:17, 28:12
**Bennett** [1] - 81:23
**best** [6] - 55:6, 57:15, 66:18, 81:11, 81:12, 82:2
**better** [8] - 11:25, 12:4, 12:9, 37:7, 37:25, 45:17, 48:2, 49:25
**between** [29] - 7:18, 23:18, 24:4, 32:4, 41:18, 55:22, 58:3, 58:6, 58:9, 60:23, 68:8, 73:18, 76:11, 77:17, 82:24, 85:16, 87:11, 87:16, 88:15, 89:10, 89:12, 89:13, 90:23, 92:1, 97:13, 97:15, 104:18, 108:10, 112:7
**Bianca** [1] - 81:4
**big** [4] - 41:8, 46:22, 108:9
**bigger** [1] - 25:10
**Biomaterials** [3] - 86:13, 93:11, 93:14
**bit** [13] - 20:21, 29:13, 39:5, 41:15, 53:24, 81:7, 86:17, 86:18, 87:10, 88:23, 91:14, 111:10, 113:5
**black** [2] - 72:7, 79:14
**blood** [1] - 50:13
**board** [1] - 34:25
**Bob** [1] - 44:16
**body** [4] - 65:15, 67:15, 100:17, 100:18
**Boggs** [2] - 47:22, 47:23
**bolstered** [1] - 65:19

**bootstrap** [1] - 26:25
**border** [1] - 116:17
**Bosch** [1] - 34:18
**bottom** [6] - 30:3, 32:8, 39:19, 39:24, 72:6, 104:8
**bought** [1] - 19:4
**bound** [1] - 68:17
**bounds** [1] - 28:20
**bra** [26] - 4:23, 18:12, 18:15, 30:13, 30:16, 49:1, 50:18, 51:4, 51:5, 51:8, 81:21, 82:15, 82:19, 82:20, 83:4, 83:7, 83:13, 84:10, 87:4, 89:7, 90:5, 93:20, 94:6, 114:7, 116:21
**bracelets** [1] - 17:9
**brand** [6] - 13:8, 41:8, 112:19, 112:22, 117:5
**branded** [1] - 69:2
**brands** [4] - 14:4, 14:5, 35:17, 116:11
**bras** [6] - 30:4, 83:10, 84:4, 93:12, 114:23, 115:18
**breadth** [1] - 16:24
**break** [1] - 80:6
**Brian** [1] - 3:13
**brief** [17] - 18:14, 27:18, 40:20, 51:3, 53:19, 58:5, 63:2, 69:17, 78:1, 85:24, 87:25, 90:3, 93:13, 95:7, 108:24, 117:19, 117:20
**briefed** [4] - 58:11, 60:20, 77:15, 106:17
**briefing** [5] - 33:13, 35:3, 53:19, 81:24, 83:16
**briefly** [5] - 5:21, 31:8, 48:22, 60:20, 82:21
**briefs** [3] - 61:3, 77:5, 95:15
**bright** [1] - 113:7
**bring** [7] - 10:8, 10:14, 33:19, 86:18, 86:22, 88:13, 117:18
**bringing** [3] - 49:8, 53:1, 60:5
**broad** [4] - 16:21, 17:5, 113:25
**broader** [3] - 17:3, 35:6, 114:9
**broadly** [1] - 29:17
**brought** [5] - 21:6,

49:14, 50:11, 52:18, 87:7
**browse** [1] - 29:22
**BRYAN** [1] - 1:14
**bubble** [1] - 39:14
**building** [1] - 66:23
**BUILDING** [1] - 2:2
**built** [1] - 80:3
**bull** [2] - 2:1, 120:10
**bullet** [2] - 28:5, 28:14
**bundle** [1] - 91:15
**burden** [11] - 10:17, 23:7, 40:17, 41:13, 77:23, 77:24, 84:23, 110:6, 118:18, 118:21, 118:23
**burgeoning** [1] - 116:23
**Burr** [4] - 63:20, 63:22, 68:6, 112:9
**Burr's** [3] - 67:5, 68:22, 112:12
**business** [10] - 11:19, 18:5, 34:10, 47:5, 50:7, 50:14, 50:16, 63:23, 64:10, 66:23
**button** [1] - 72:1
**buy** [4] - 30:15, 30:16, 49:17, 101:23
**buyers** [1] - 28:9
**buying** [1] - 30:17

**C**

**cadence** [4] - 30:2, 30:18, 56:8, 56:19
**calculus** [1] - 51:21
**CAMPBELL** [22] - 1:17, 19:16, 20:5, 21:2, 21:6, 21:10, 21:13, 21:17, 22:2, 22:12, 23:25, 24:11, 24:17, 25:5, 27:14, 29:12, 29:15, 32:25, 36:4, 37:6, 37:11, 47:18
**Campbell** [7] - 19:17, 40:14, 40:21, 48:17, 48:18, 51:19, 52:24
**Canada** [1] - 16:11
**cannot** [7] - 12:22, 13:24, 14:1, 15:13, 23:3, 23:23, 93:25
**capability** [1] - 57:9
**capable** [2] - 57:7, 102:15
**capably** [1] - 37:20
**carbon** [1] - 79:2

**Carlin** [1] - 47:21
**Carre** [14] - 16:4, 16:10, 19:4, 44:13, 44:14, 44:15, 44:16, 45:4, 58:18, 101:2, 101:8, 101:14, 111:22
**CARRE** [2] - 1:6, 1:16
**Carre's** [1] - 119:13
**carried** [2] - 118:18, 118:23
**carries** [1] - 95:8
**case** [67] - 3:15, 5:6, 5:9, 18:25, 20:15, 22:17, 22:19, 23:21, 32:14, 32:15, 34:18, 37:13, 38:12, 39:1, 42:12, 43:5, 44:19, 45:3, 45:25, 47:24, 50:5, 51:23, 51:24, 51:25, 52:7, 52:23, 52:24, 53:3, 54:21, 54:25, 61:5, 61:14, 61:16, 61:17, 61:18, 61:20, 62:1, 62:2, 62:14, 63:4, 64:15, 64:16, 65:25, 67:1, 69:14, 69:18, 69:19, 69:23, 70:3, 72:20, 84:2, 90:1, 91:12, 92:21, 104:2, 105:19, 110:9, 112:6, 113:3, 115:6, 117:16, 117:21, 117:25, 118:14, 118:23, 119:17
**case-in-chief** [1] - 90:1
**cases** [10] - 24:21, 27:17, 30:25, 32:1, 32:6, 33:13, 46:18, 67:3, 119:7, 119:8
**casings** [1] - 42:5
**casts** [1] - 6:12
**casual** [1] - 115:5
**catalytic** [1] - 87:25
**catch** [1] - 116:25
**category** [1] - 38:8
**causal** [13] - 24:19, 27:5, 27:10, 27:15, 27:19, 32:4, 32:21, 34:23, 35:12, 115:10, 115:12, 115:16, 115:19
**causes** [1] - 33:3
**causing** [1] - 11:24
**cayenne** [1] - 31:2
**CDs** [1] - 39:21
**cede** [1] - 3:24
**cellphone** [1] -

100:20
**CEO** [2] - 3:20, 48:3
**certain** [6] - 56:25, 57:1, 91:2, 92:17, 107:21, 113:21
**certainly** [8] - 5:13, 11:8, 12:10, 30:16, 72:20, 106:18, 110:8, 112:4
**CERTIFICATE** [1] - 120:3
**certify** [1] - 120:4
**cetera** [2] - 110:17, 112:12
**chain** [1] - 8:21
**Challagalla** [29] - 10:24, 11:11, 11:14, 12:8, 13:18, 13:23, 17:3, 28:3, 30:6, 30:22, 31:21, 33:15, 35:10, 35:15, 35:22, 36:22, 37:12, 38:5, 38:13, 38:19, 113:18, 113:22, 114:13, 114:14, 115:23, 116:9, 116:10, 117:8, 117:10
**Challagalla's** [10] - 17:2, 26:8, 26:18, 30:20, 31:6, 33:24, 34:20, 36:20, 114:5, 116:22
**challenge** [5] - 68:17, 77:25, 78:11, 78:12, 79:17
**chance** [2] - 59:5, 106:6
**change** [4] - 17:25, 105:20, 119:3
**changed** [3] - 22:15, 69:4, 97:6
**channel** [1] - 25:6
**characterized** [2] - 21:4, 39:2
**charge** [1] - 26:9
**chart** [7] - 5:5, 5:7, 5:10, 41:5, 85:25, 86:1, 86:6
**charts** [5] - 5:16, 5:17, 5:18, 44:8, 102:21
**check** [2] - 38:4, 100:9
**checkup** [1] - 56:11
**chemical** [2] - 88:6, 93:22
**chemicals** [2] - 88:7, 88:24
**chief** [1] - 90:1
**chili** [1] - 31:1

**choose** [1] - 36:12
**Chris** [1] - 19:16
**CHRISTOPHER** [1] - 1:17
**cilantro** [1] - 31:3
**Circuit** [14] - 24:2, 33:14, 33:21, 34:23, 35:14, 55:1, 55:4, 61:17, 62:2, 62:21, 63:11, 64:11, 69:19, 118:21
**circuit** [2] - 32:3, 51:25
**circuited** [1] - 92:10
**circumstances** [2] - 53:4, 63:1
**circumstantial** [1] - 8:15
**citation** [2] - 61:13, 76:14
**cite** [1] - 115:5
**cited** [11] - 5:6, 34:2, 38:13, 61:20, 63:2, 69:17, 69:20, 75:15, 99:15, 99:25, 117:16
**cites** [2] - 37:14, 78:19
**citing** [1] - 36:24
**claim** [90] - 4:9, 4:10, 5:5, 5:7, 5:10, 5:16, 5:17, 6:1, 6:19, 10:4, 21:18, 22:3, 23:23, 31:8, 31:22, 34:15, 40:21, 40:22, 40:25, 41:5, 42:1, 42:12, 42:14, 43:2, 43:12, 43:18, 43:19, 44:7, 44:24, 45:1, 45:5, 45:10, 45:11, 45:24, 53:6, 53:7, 53:10, 53:11, 53:16, 53:18, 53:22, 54:15, 54:20, 54:22, 59:14, 70:15, 70:21, 71:6, 71:11, 71:20, 72:18, 72:20, 73:15, 73:20, 74:3, 74:5, 75:3, 76:1, 77:2, 77:6, 77:21, 85:25, 86:1, 86:6, 95:5, 95:11, 95:20, 96:20, 96:22, 96:23, 97:1, 97:2, 97:6, 98:19, 102:20, 103:9, 103:13, 103:14, 103:18, 107:3, 109:15, 115:15, 118:15, 119:1
**claimed** [2] - 10:4, 45:13
**claiming** [1] - 12:6

**claims** [22] - 21:18, 21:21, 30:24, 30:25, 31:4, 31:7, 31:17, 31:21, 41:7, 43:18, 43:20, 43:21, 44:11, 45:25, 55:6, 55:19, 64:19, 64:24, 76:16, 95:8, 118:19
**clarity** [1] - 64:16
**class** [2] - 38:16, 112:18
**clear** [12] - 43:2, 43:19, 48:24, 53:20, 55:8, 55:14, 55:23, 55:24, 56:12, 59:9, 59:14, 75:25
**clearly** [5] - 30:1, 42:17, 51:18, 59:23, 99:9
**client** [8] - 12:22, 22:5, 47:4, 47:5, 48:2, 51:14, 81:4
**client's** [2] - 56:15, 58:16
**clip** [1] - 39:22
**clockwise** [1] - 30:11
**close** [3] - 18:10, 34:11, 84:6
**closer** [1] - 28:22
**closeup** [1] - 90:20
**cloth** [3] - 86:20, 86:21, 87:7
**clothing** [1] - 48:13
**clubs** [1] - 39:21
**coat** [4] - 45:18, 86:16, 90:11, 101:10
**coated** [6] - 8:2, 58:1, 58:20, 79:3, 90:12, 101:5
**coating** [3] - 57:25, 58:25, 92:5
**coatings** [1] - 87:22
**cocounsel** [2] - 3:12, 3:15
**cognizable** [1] - 34:22
**colleague** [5] - 19:24, 39:6, 40:8, 40:14, 60:17
**colleagues** [1] - 20:10
**collectively** [1] - 40:4
**color** [1] - 84:13
**colored** [1] - 99:3
**colors** [1] - 69:4
**column** [5] - 7:7, 74:16, 75:16, 108:13
**combination** [2] - 44:10, 57:21
**coMicro** [1] - 69:2

**coming** [6] - 25:15, 28:20, 30:8, 40:18, 64:9, 102:23
**commend** [1] - 32:1
**comment** [1] - 72:14
**commercial** [4] - 15:12, 15:21, 51:20, 66:6
**commercialize** [3] - 25:23, 25:25, 38:2
**commercializing** [1] - 15:5
**commercially** [1] - 113:10
**commercially-viable** [1] - 113:10
**common** [5] - 19:20, 48:14, 70:13, 72:13, 73:25
**communicate** [1] - 9:13
**communicated** [4] - 63:8, 63:11, 65:1, 65:18
**communication** [5] - 5:25, 6:7, 62:19, 64:23, 67:23
**communications** [3] - 67:6, 67:8, 68:21
**companies** [2] - 16:10, 25:10
**company** [12] - 12:15, 25:21, 25:22, 41:10, 41:14, 46:25, 47:2, 50:21, 52:25, 63:5, 63:10, 63:15
**compare** [1] - 111:8
**compared** [1] - 67:1
**comparison** [1] - 85:2
**compatible** [2] - 82:15, 82:17
**compelled** [1] - 63:25
**compensable** [1] - 35:19
**compensated** [4] - 36:5, 36:9, 116:6, 116:13
**compensation** [1] - 13:25
**compete** [2] - 49:25, 83:16
**competing** [5] - 13:15, 17:5, 35:17, 83:21, 116:11
**competition** [7] - 23:18, 23:19, 24:3, 34:18, 35:21, 82:24, 113:4

**competitive** [2] - 15:1, 83:13
**competitor** [4] - 113:8, 113:13, 113:15, 113:16
**competitors** [4] - 15:2, 66:12, 113:6, 113:15
**complains** [1] - 38:19
**complaint** [1] - 18:21
**complaints** [1] - 38:20
**completely** [5] - 24:17, 30:23, 34:15, 69:22, 111:2
**component** [2] - 65:24, 66:1
**comprise** [2] - 71:20, 102:12
**comprised** [4] - 53:23, 75:4, 76:5, 97:6
**comprises** [1] - 59:23
**comprising** [7] - 4:12, 71:5, 71:7, 71:10, 71:11, 71:13, 96:25
**comprising".** [1] - 71:2
**computer** [2] - 23:16, 39:24
**computers** [1] - 39:25
**conceived** [1] - 25:19
**concentration** [3] - 101:6, 101:7, 101:8
**concern** [1] - 92:24
**concerns** [1] - 34:12
**conclude** [1] - 67:16
**concluding** [1] - 66:17
**conclusion** [8] - 21:20, 22:22, 34:16, 36:23, 36:24, 93:19, 94:12, 109:11
**conclusions** [4] - 22:23, 33:5, 33:8, 33:11
**conclusively** [1] - 10:14
**conclusory** [1] - 9:8
**conditions** [2] - 12:24, 117:4
**conductive** [145] - 4:15, 4:16, 5:1, 6:15, 6:17, 6:18, 6:20, 6:22, 6:25, 7:3, 7:8, 7:17,

7:21, 7:22, 7:25, 8:2, 8:12, 8:18, 31:10, 31:18, 31:23, 40:22, 41:2, 42:2, 42:3, 42:4, 42:5, 42:8, 42:18, 42:19, 43:17, 45:2, 45:3, 53:24, 54:1, 54:2, 54:6, 57:19, 57:22, 58:1, 58:6, 58:10, 58:12, 58:14, 58:23, 65:15, 70:17, 71:4, 71:15, 71:18, 72:11, 73:3, 73:11, 73:13, 73:16, 74:1, 74:4, 74:6, 74:8, 74:12, 74:13, 74:25, 75:2, 75:5, 75:8, 75:10, 75:11, 75:14, 75:23, 76:7, 76:11, 76:19, 76:20, 76:21, 76:25, 77:3, 77:8, 77:9, 77:13, 78:4, 78:6, 78:18, 79:1, 79:8, 79:10, 81:21, 84:11, 84:12, 84:15, 84:16, 85:15, 85:17, 85:19, 85:23, 86:2, 86:11, 86:12, 86:16, 86:24, 87:3, 87:18, 88:18, 89:14, 89:18, 90:9, 91:11, 93:19, 93:21, 95:24, 96:1, 96:15, 97:1, 97:7, 97:10, 98:8, 98:9, 98:11, 98:12, 101:2, 101:3, 101:15, 103:3, 103:4, 103:8, 103:11, 103:12, 103:15, 103:16, 103:19, 104:15, 104:23, 107:2, 107:4, 107:5, 107:6, 107:22, 108:9, 109:2, 109:12
**conductivity** [11] - 7:18, 7:20, 93:24, 97:13, 97:15, 97:17, 97:19, 98:2, 98:23, 103:2, 104:19
**conductor** [2] - 6:21, 102:18
**conducts** [1] - 102:19
**confidential** [2] - 14:18, 81:10
**confine** [1] - 31:22
**confirm** [2] - 77:2, 89:15
**confirmed** [2] - 90:5, 109:9
**confirms** [2] - 90:2,

90:10
**conform** [1] - 71:16
**confronted** [1] - 109:4
**confused** [2] - 36:7
**confusing** [1] - 110:23
**confusion** [1] - 102:23
**connect** [6] - 4:23, 73:3, 96:10, 96:12, 96:17, 97:12
**connected** [6] - 4:24, 84:12, 87:4, 97:8, 98:8, 98:12
**connecting** [2] - 4:13, 99:6
**connection** [6] - 70:25, 73:17, 73:18, 95:22, 96:24, 115:10
**connective** [1] - 104:18
**connector** [39] - 4:17, 4:18, 4:24, 5:2, 5:24, 5:25, 6:4, 6:6, 6:10, 53:9, 71:1, 72:1, 72:9, 72:12, 73:3, 73:14, 73:17, 73:19, 95:22, 96:3, 96:4, 96:6, 96:9, 96:11, 96:17, 96:24, 97:8, 97:12, 97:14, 97:23, 98:3, 98:5, 98:8, 98:12, 99:7, 102:4, 102:19
**connectors** [1] - 41:19
**connects** [5] - 4:17, 72:8, 72:11, 102:18, 104:15
**consent** [1] - 106:12
**consider** [7] - 54:21, 55:11, 64:6, 64:7, 81:11, 90:19, 100:21
**consideration** [1] - 10:13
**considered** [5] - 35:9, 44:4, 99:24, 100:1, 101:21
**considers** [1] - 81:9
**consist** [1] - 76:10
**consistent** [3] - 75:25, 86:7, 90:11
**construct** [1] - 18:1
**constructed** [1] - 4:14
**construction** [19] - 21:18, 22:3, 34:15, 42:12, 42:14, 43:3, 43:10, 43:14, 43:19,

54:20, 54:22, 72:17, 72:19, 72:21, 74:3, 95:5, 99:10, 115:15, 118:15
**constructions** [1] - 72:10
**construe** [3] - 21:17, 79:13, 98:19
**consumer** [3] - 25:1, 32:19, 32:22
**consumers** [7] - 12:13, 16:20, 17:11, 17:21, 33:3, 51:13, 83:24
**contact** [6] - 4:21, 6:10, 62:17, 62:22, 104:21, 108:6
**contacted** [2] - 60:21, 106:1
**contacts** [1] - 54:16
**contemporaneous** [1] - 102:10
**contend** [3] - 71:6, 72:5, 74:2
**contended** [1] - 72:25
**contends** [1] - 23:22
**content** [1] - 63:12
**contention** [1] - 79:9
**contentions** [4] - 9:19, 110:2, 110:4
**contests** [1] - 78:1
**context** [5] - 17:4, 24:1, 53:2, 67:10, 84:24
**continue** [2] - 12:17, 106:6
**continued** [7] - 105:17, 105:18, 105:25, 106:3, 112:16, 112:21
**contradicts** [1] - 37:14
**contrary** [1] - 43:17
**control** [3] - 13:7, 20:1, 51:14
**controls** [1] - 40:14
**convenient** [1] - 96:10
**conversation** [2] - 19:22, 34:14
**conversations** [1] - 112:7
**Cooley's** [2] - 114:4, 116:10
**copies** [2] - 4:2, 10:12
**copy** [2] - 38:23, 60:11
**cornerstone** [1] -

66:15
**CORP** [1] - 1:17
**corporation** [1] - 10:10
**Corporation** [1] - 61:14
**correct** [11] - 22:2, 22:9, 37:11, 85:12, 91:10, 91:16, 93:16, 93:17, 98:20, 113:12, 120:4
**correction** [1] - 82:4
**correlated** [2] - 56:25, 57:1
**correspondence** [5] - 60:23, 65:19, 67:15, 68:7, 106:2
**counsel** [22] - 5:15, 20:8, 22:6, 50:14, 59:4, 61:14, 63:2, 65:20, 67:7, 67:11, 68:8, 68:18, 70:14, 75:12, 75:13, 79:22, 81:24, 100:2, 101:22, 109:20, 111:14, 112:14
**couple** [8] - 14:6, 20:8, 51:5, 67:20, 70:22, 91:5, 95:3, 95:13
**course** [5] - 29:24, 36:9, 39:22, 45:7, 82:25
**COURT** [85] - 1:1, 1:10, 2:1, 2:1, 3:1, 3:9, 6:21, 7:1, 7:15, 8:3, 8:6, 8:14, 8:21, 9:3, 9:9, 9:21, 10:19, 10:21, 11:2, 11:13, 11:25, 12:21, 13:1, 13:18, 16:23, 17:13, 18:4, 19:15, 20:4, 20:21, 21:5, 21:8, 21:12, 21:15, 21:25, 22:11, 23:21, 24:8, 24:16, 25:4, 27:10, 29:10, 29:13, 32:24, 36:3, 37:4, 37:9, 40:11, 41:25, 42:21, 43:8, 44:13, 45:15, 47:15, 47:19, 48:4, 48:7, 49:20, 52:9, 52:19, 55:3, 56:1, 58:4, 59:13, 60:7, 60:13, 80:6, 81:14, 81:17, 82:1, 82:4, 84:6, 87:13, 92:17, 93:4, 94:7, 94:9, 100:4, 100:12, 106:9, 106:21, 110:11,

117:16, 117:23, 118:5
**Court** [45] - 3:25, 5:6, 7:23, 11:8, 11:10, 16:7, 16:19, 18:2, 19:22, 22:13, 22:15, 22:19, 22:21, 23:1, 23:17, 25:18, 37:22, 38:11, 38:22, 38:23, 38:24, 40:7, 45:25, 46:13, 46:20, 52:12, 60:12, 61:18, 64:7, 67:14, 68:22, 70:11, 72:20, 75:15, 75:18, 80:3, 86:19, 95:1, 99:21, 104:13, 105:5, 106:16, 109:18, 117:14, 118:1
**court** [2] - 69:11, 110:6
**Court's** [7] - 10:13, 19:18, 32:1, 40:8, 55:9, 72:14, 77:15
**courtroom** [2] - 22:18, 39:10
**cover** [4] - 31:23, 40:22, 55:20, 77:13
**covered** [2] - 64:19, 64:24
**covering** [1] - 15:10
**CRAIN** [1] - 1:13
**Crane** [2] - 3:13, 51:24
**cream** [1] - 31:4
**create** [6] - 13:11, 61:22, 64:11, 78:11, 79:7, 113:7
**created** [2] - 14:3, 34:12
**creating** [3] - 34:23, 87:3, 91:7
**credit** [1] - 107:11
**Crenshaw** [6] - 19:24, 40:8, 40:13, 48:18, 53:25, 54:4
**CRENSHAW** [5] - 1:18, 40:12, 42:1, 42:23, 43:9
**critical** [3] - 20:19, 21:11, 24:20
**cross** [2] - 73:8, 73:10
**CRR** [2] - 2:1, 120:10
**crux** [1] - 81:20
**crystal** [1] - 59:14
**cumulative** [1] - 9:23
**Curfman** [1] - 47:21
**current** [6] - 19:9, 27:7, 71:8, 87:16, 89:12, 117:4
**cusp** [1] - 53:1

**customary** [2] - 31:15, 102:9
**customer** [1] - 117:5
**customers** [2] - 34:8, 34:19
**cut** [2] - 38:4, 46:6
**CV** [2] - 1:3, 92:16

**D**

**damage** [4] - 11:18, 12:21, 26:10, 99:5
**damages** [6] - 23:4, 35:19, 115:21, 116:5, 116:6, 116:7
**Dan** [2] - 3:12, 3:21
**DAN** [1] - 1:14
**dark** [1] - 99:3
**dark-colored** [1] - 99:3
**dashed** [1] - 73:10
**data** [3] - 54:18, 109:13, 109:14
**data-output** [1] - 54:18
**date** [2] - 110:18, 120:10
**Daubert** [1] - 21:7
**Davide** [1] - 48:3
**days** [2] - 70:1, 119:12
**deal** [5] - 18:18, 56:17, 58:5, 106:14, 107:17
**dealing** [6] - 8:25, 15:1, 68:4, 103:9, 106:13, 109:2
**deals** [2] - 107:3, 107:19
**dealt** [2] - 95:19, 96:22
**DEBRA** [1] - 2:1
**decade** [2] - 61:12, 69:8
**December** [4] - 63:21, 68:5, 68:24, 69:24
**decided** [2] - 5:7, 118:6
**decisions** [1] - 33:4
**declarant** [2] - 103:25, 105:7
**declaration** [52] - 5:3, 5:11, 5:19, 8:5, 9:7, 10:3, 10:11, 10:24, 11:10, 11:12, 12:3, 12:4, 12:8, 13:23, 17:2, 20:11, 26:8, 26:14, 28:1, 34:20, 43:21, 43:22,

49:7, 49:16, 50:19, 57:5, 58:21, 59:2, 63:20, 67:5, 68:22, 78:14, 81:23, 90:7, 99:17, 99:18, 102:14, 105:3, 105:7, 105:18, 105:23, 107:13, 107:25, 109:1, 109:5, 112:9, 112:12, 113:21, 113:24, 116:22
**declarations** [3] - 19:8, 22:13, 95:9
**deeper** [1] - 53:24
**Defendant** [5] - 3:4, 10:6, 10:18, 24:4, 36:14
**DEFENDANT** [1] - 1:8
**defendant's** [3] - 10:25, 58:8, 116:8
**defendants** [4] - 62:13, 70:12, 70:13, 104:5
**Defendants** [43] - 5:4, 5:20, 5:22, 6:14, 7:24, 8:16, 11:21, 11:23, 12:11, 12:14, 12:17, 14:10, 15:10, 15:12, 15:18, 15:23, 16:1, 16:19, 17:1, 17:23, 18:10, 19:1, 19:2, 19:13, 31:11, 39:1, 40:5, 42:21, 47:2, 48:14, 62:5, 71:23, 73:24, 73:25, 98:15, 99:9, 104:4, 110:5, 110:15, 113:4, 115:5, 116:24, 117:11
**DEFENDANTS** [1] - 1:15
**Defendants'** [4] - 16:18, 21:22, 40:18, 117:9
**defense** [3] - 59:24, 60:18, 60:19
**define** [3] - 26:19, 27:23, 31:22
**defined** [5] - 27:25, 28:21, 29:17, 31:7, 113:17
**defining** [2] - 28:17, 30:23
**definitely** [1] - 12:7
**definition** [4] - 30:20, 104:20, 113:19, 114:22
**definitions** [1] - 28:3
**definitive** [1] - 116:22

**defy** [1] - 50:1
**degree** [1] - 16:23
**delay** [14] - 37:9, 67:21, 68:1, 68:14, 68:18, 69:13, 69:14, 70:7, 110:23, 111:1, 111:4, 111:7, 111:11, 113:2
**delayed** [2] - 111:21, 112:5
**demand** [14] - 24:13, 25:1, 32:6, 32:7, 32:10, 32:19, 32:22, 33:22, 34:4, 35:2, 35:5, 35:11, 115:6, 115:11
**demonstrate** [1] - 86:25
**demonstrates** [3] - 71:8, 71:16, 92:7
**demonstrating** [2] - 37:16, 77:23
**denied** [2] - 59:8, 60:6
**deny** [11] - 12:9, 40:7, 79:19, 80:3, 85:9, 89:22, 106:16, 106:18, 118:14, 119:6, 119:13
**denying** [3] - 16:17, 79:25, 113:3
**depose** [2] - 105:6, 107:13
**depositions** [1] - 109:22
**depth** [1] - 103:21
**derelict** [1] - 104:11
**describe** [1] - 4:14
**described** [1] - 97:22
**describes** [2] - 28:18, 28:23
**describing** [1] - 75:3
**description** [3] - 8:2, 54:10, 54:15
**design** [4] - 69:5, 77:14, 99:8
**designed** [4] - 4:19, 6:9, 50:3, 57:7
**designs** [3] - 14:20, 23:15, 46:14
**desirable** [2] - 33:7, 33:10
**despite** [1] - 104:9
**detail** [4] - 9:6, 18:10, 107:17, 107:25
**detailed** [3] - 8:5, 54:15, 110:2
**detecting** [1] - 57:7
**determinant** [1] - 108:14

**determination** [1] - 106:4
**determine** [8] - 22:24, 54:20, 114:17, 114:18, 114:19, 114:20, 116:19
**determined** [2] - 8:10, 49:15
**determines** [1] - 9:14
**determining** [2] - 21:13, 32:3
**detracts** [1] - 16:17
**devastating** [3] - 41:15, 60:4
**develop** [2] - 7:12, 118:24
**developed** [4] - 7:11, 7:13, 49:13, 77:11
**developing** [3] - 5:16, 14:22, 99:3
**development** [3] - 15:11, 50:12, 65:12
**device** [1] - 87:4
**devices** [1] - 107:7
**devoid** [1] - 31:6
**difference** [1] - 58:6
**different** [15] - 8:25, 9:1, 10:4, 29:18, 41:23, 59:12, 59:15, 59:16, 62:1, 69:22, 73:9, 79:16, 95:19, 97:18, 112:6
**differently** [1] - 105:9
**difficult** [4] - 28:19, 65:13, 116:16, 116:17
**difficulty** [4] - 35:17, 35:18, 116:10, 116:12
**dim** [2] - 87:10, 88:21
**dip** [2] - 31:12, 93:23
**dipped** [2] - 31:16, 88:10
**dipping** [3] - 84:20, 85:17, 93:22
**direct** [10] - 8:15, 8:17, 8:19, 15:1, 23:17, 24:3, 34:18, 73:18, 85:4, 119:10
**directed** [1] - 53:8
**directly** [6] - 24:24, 25:11, 54:16, 73:14, 83:22, 88:3
**disagree** [3] - 8:3, 16:25, 116:14
**disagreement** [1] - 114:10
**disagrees** [3] - 17:24, 59:2, 111:15
**disclaim** [1] - 42:20

**disclaimer** [2] - 45:5, 77:12
**disclose** [4] - 73:6, 75:9, 78:16, 79:9
**disclosed** [3] - 75:22, 92:20, 96:5
**discloses** [3] - 78:3, 78:7, 100:15
**disclosure** [4] - 75:17, 75:18, 75:21, 108:10
**disclosures** [1] - 92:22
**discovered** [1] - 108:11
**discovery** [25] - 9:2, 19:11, 45:23, 46:1, 59:5, 59:8, 103:22, 104:2, 104:3, 104:6, 104:9, 104:10, 104:12, 105:4, 106:11, 106:13, 109:22, 109:24, 110:1, 119:9, 119:11, 119:14, 119:16
**discretion** [2] - 64:7, 67:15
**discuss** [2] - 24:21, 81:8
**discussed** [3] - 64:3, 107:25, 109:21
**discussion** [6] - 54:13, 61:11, 64:5, 92:11, 96:8, 108:16
**discussions** [1] - 64:10
**disingenuous** [1] - 104:12
**dismiss** [1] - 104:7
**dispersive** [1] - 8:10
**dispute** [20] - 14:16, 15:4, 20:12, 54:23, 58:3, 69:7, 72:16, 78:5, 78:6, 84:14, 85:16, 85:20, 95:13, 95:17, 104:2, 109:23, 115:22, 116:1, 119:9
**disputed** [1] - 23:10
**disputes** [1] - 12:4
**disputing** [1] - 61:7
**disrupt** [1] - 18:4
**distinction** [2] - 55:22, 108:10
**distinguish** [2] - 58:9, 76:16
**distinguishing** [2] - 58:13, 76:3
**distributed** [2] - 50:21, 89:2
**distribution** [1] -

50:23
**distributor** [1] - 25:12
**DISTRICT** [3] - 1:1, 1:1, 1:10
**district** [1] - 46:19
**District** [1] - 61:18
**disturbing** [1] - 18:6
**DIVISION** [1] - 1:2
**divorced** [1] - 30:23
**doctor** [1] - 56:10
**document** [2] - 83:3, 119:10
**documents** [7] - 33:21, 33:23, 34:3, 34:5, 114:4, 116:10
**dollars** [3] - 15:6, 113:9, 117:2
**dominant** [1] - 39:13
**dominated** [2] - 39:11, 39:16
**dominates** [3] - 39:8, 39:19, 39:23
**dominating** [1] - 39:12
**done** [6] - 103:22, 103:23, 103:25, 105:8, 109:6, 110:8
**doubt** [2] - 6:12, 77:23
**Douglas** [1] - 26:14
**down** [14] - 28:13, 46:19, 51:10, 58:8, 59:19, 65:21, 74:24, 82:11, 96:17, 114:2, 114:16, 116:5, 116:16, 117:2
**dozens** [2] - 46:17
**Dr** [63] - 5:3, 5:11, 5:19, 7:13, 7:19, 8:5, 8:6, 8:11, 8:15, 9:7, 10:2, 13:18, 20:12, 20:14, 20:18, 20:23, 21:20, 26:8, 26:18, 28:3, 30:6, 30:20, 30:22, 31:6, 33:15, 33:24, 34:20, 35:10, 35:15, 35:22, 36:20, 36:22, 36:24, 37:12, 38:5, 38:13, 38:19, 42:16, 43:11, 43:21, 49:14, 59:2, 72:3, 77:20, 78:9, 78:13, 85:11, 86:5, 90:3, 91:1, 92:15, 92:21, 99:16, 100:15, 101:4, 101:13, 101:21, 103:1, 107:15, 107:25, 108:18, 109:7
**dramatically** [1] -

22:16
**drastic** [2] - 22:14, 118:20
**drawing** [1] - 72:1
**drawings** [1] - 83:3
**drive** [5] - 24:13, 32:7, 32:10, 35:5, 115:6
**drives** [1] - 32:18
**driving** [3] - 25:1, 34:4, 115:11
**dry** [1] - 31:17
**due** [4] - 101:18, 102:16, 104:24, 105:10
**during** [5] - 44:4, 70:22, 92:3, 99:24, 117:9

**E**

**e-mail** [1] - 68:6
**e.g** [1] - 79:1
**early** [24] - 11:22, 12:5, 12:6, 12:7, 12:9, 12:12, 12:13, 12:25, 14:6, 27:23, 27:24, 30:1, 36:20, 38:17, 38:20, 38:21, 38:24, 39:3, 39:5, 39:7, 39:8, 39:16, 61:5, 68:21
**early-stage** [2] - 12:25, 14:6
**easier** [1] - 45:16
**eastern** [1] - 46:19
**eBay** [3] - 22:17, 46:10, 52:15
**ecosystem** [3] - 29:2, 29:6, 29:9
**EDS** [3] - 101:4, 101:12, 109:9
**EEG** [2] - 56:5, 57:3
**effort** [2] - 101:23, 113:18
**eight** [4] - 15:7, 25:24, 25:25, 111:17
**either** [4] - 40:16, 75:9, 83:23, 106:4
**EKG** [2] - 56:5, 57:3
**elaborate** [2] - 4:4, 86:17
**electric** [1] - 41:18
**electrical** [71] - 4:16, 5:2, 5:23, 5:25, 6:2, 6:7, 6:10, 7:18, 40:25, 41:1, 41:20, 41:21, 42:7, 43:12, 43:13, 43:15, 54:5, 54:12, 54:17, 55:19, 55:21, 55:23, 55:24, 56:5,

57:8, 70:11, 70:16, 70:18, 70:25, 71:1, 71:14, 71:17, 71:19, 72:11, 72:23, 73:14, 95:19, 95:22, 95:23, 96:1, 96:2, 96:13, 96:14, 96:22, 96:23, 96:24, 96:25, 97:8, 97:11, 97:13, 97:16, 97:19, 97:22, 97:24, 98:15, 98:18, 98:22, 98:23, 99:9, 100:17, 102:3, 102:15, 102:19, 102:21, 102:24, 104:17, 104:19, 106:23, 108:7

**electrically** [5] - 9:13, 73:3, 79:1, 79:8, 79:10

**electrically-conductive** [1] - 73:3

**electrode** [3] - 108:2, 108:3, 108:12

**electrodes** [4] - 78:23, 78:25, 107:19, 107:20

**electron** [1] - 8:9

**element** [24] - 6:8, 6:16, 6:25, 7:22, 34:14, 61:23, 70:11, 70:23, 72:24, 73:21, 74:1, 74:2, 74:4, 74:6, 77:9, 77:13, 77:21, 95:19, 98:18, 99:9, 101:1, 105:25

**elements** [9] - 3:22, 4:13, 21:21, 31:5, 65:2, 67:20, 71:12, 77:6, 78:5

**elsewhere** [1] - 75:7

**email** [6] - 3:1, 8:21, 63:19, 63:22, 63:23, 64:9

**embodiment** [3] - 73:6, 75:10, 98:13

**embodiments** [3] - 73:6, 75:9, 97:22

**emerging** [1] - 17:4

**en** [2] - 61:16, 61:20

**END** [1] - 120:1

**end** [2] - 38:4, 101:25

**ended** [3] - 71:10, 103:13, 107:4

**energy** [1] - 8:9

**enforce** [5] - 62:10, 64:20, 64:25, 66:2, 111:7

**enforceability** [1] - 23:8

**enforceable** [1] - 40:19

**enforcement** [9] - 25:17, 61:10, 62:7, 63:1, 64:11, 66:2, 67:1, 67:9, 67:17

**engage** [1] - 79:4

**engineering** [1] - 34:1

**engines** [1] - 39:17

**enjoined** [1] - 37:23

**enjoyed** [1] - 34:1

**enjoys** [1] - 10:1

**enter** [2] - 38:8, 114:2

**entered** [3] - 23:23, 24:10, 37:21

**entering** [3] - 16:9, 38:25, 60:3

**entire** [6] - 35:12, 42:18, 74:7, 75:2, 75:7, 75:23

**entirely** [3] - 21:23, 27:4, 75:11

**entitled** [9] - 10:22, 22:25, 25:3, 42:22, 42:24, 44:2, 116:19, 117:12, 120:5

**entity** [1] - 46:17

**entrant** [2] - 12:6, 35:23

**entrants** [2] - 12:7, 12:14

**environmental** [1] - 29:14

**equipment** [1] - 20:1

**equitable** [15] - 60:19, 61:18, 61:23, 62:3, 62:15, 64:8, 64:14, 67:3, 67:15, 67:18, 67:24, 69:10, 69:11, 105:1, 106:15

**equities** [8] - 3:23, 15:22, 15:23, 15:25, 23:5, 47:4, 79:21, 79:25

**ERIC** [1] - 1:12

**Eric** [1] - 3:13

**eroding** [1] - 34:6

**erosion** [4] - 11:20, 14:14, 15:15, 34:5

**erred** [1] - 113:18

**especially** [1] - 101:20

**ESQ** [17] - 1:12, 1:13, 1:13, 1:14, 1:14, 1:16, 1:17, 1:17, 1:18, 1:19, 1:19, 1:20, 1:20, 1:21, 1:24, 1:24, 1:25

**essential** [1] - 35:8

**essentially** [12] - 4:10, 9:23, 61:14, 63:14, 70:15, 71:24, 77:12, 89:25, 95:10, 104:4, 105:4, 107:16

**establish** [3] - 23:2, 34:24, 52:20

**established** [3] - 21:8, 35:17, 116:11

**estoppel** [15] - 60:19, 61:19, 61:23, 62:3, 62:15, 64:8, 64:14, 67:18, 67:24, 69:11, 105:1, 105:23, 105:25, 106:15

**et** [2] - 110:17, 112:11

**ET** [1] - 1:7

**evenly** [1] - 89:2

**event** [1] - 60:4

**eventually** [2] - 87:22, 89:4

**evidence** [65] - 8:15, 8:16, 8:17, 8:19, 9:14, 10:23, 18:25, 19:6, 24:24, 26:16, 32:25, 33:1, 33:2, 33:4, 33:5, 33:7, 33:9, 33:10, 33:12, 33:22, 34:17, 34:22, 38:12, 40:5, 41:3, 41:4, 41:17, 43:1, 50:17, 50:18, 51:3, 51:9, 52:1, 52:21, 54:23, 54:24, 54:25, 55:9, 56:13, 57:12, 57:15, 67:22, 83:12, 85:2, 85:24, 89:21, 98:13, 98:21, 99:15, 101:4, 101:11, 101:12, 102:10, 105:11, 109:4, 109:17, 109:18, 111:22, 111:24, 112:2, 115:13

**evidentiary** [1] - 117:15

**evolve** [1] - 38:8

**exacerbated** [1] - 15:17

**exact** [1] - 112:13

**exactly** [15] - 25:14, 27:2, 28:18, 28:19, 30:8, 44:8, 67:16, 69:3, 74:15, 85:5, 90:6, 90:13, 92:6, 104:22, 112:9

**Exactly** [1] - 56:2

**exaggerated** [1] - 48:9

**examination** [2] -

9:6, 10:1

**examined** [2] - 5:14, 101:25

**examiner** [4] - 76:16, 97:2, 100:1, 100:21

**examining** [1] - 97:2

**example** [6] - 7:7, 11:24, 24:9, 24:11, 75:17, 78:21

**examples** [2] - 27:16, 102:8

**except** [2] - 5:22, 91:3

**exception** [1] - 18:22

**excerpt** [1] - 58:8

**excerpted** [1] - 74:16

**excerpts** [1] - 67:4

**excessive** [1] - 69:14

**exchanged** [2] - 61:22, 77:16

**exchanging** [1] - 106:2

**exclude** [1] - 103:17

**excluded** [1] - 13:20

**exclusive** [3] - 10:8, 10:12, 69:20

**exclusively** [3] - 97:25, 108:25, 109:1

**excuse** [1] - 36:24

**excused** [1] - 119:18

**execute** [1] - 37:20

**exercise** [1] - 22:3

**exhibit** [1] - 58:8

**exhibits** [1] - 5:9

**exist** [2] - 7:12, 117:22

**exists** [2] - 27:19, 41:18

**expend** [1] - 35:24

**experience** [1] - 83:10

**experiment** [1] - 87:6

**expert** [19] - 5:12, 5:19, 8:11, 11:3, 16:21, 16:24, 20:15, 20:23, 21:3, 21:9, 26:19, 33:16, 92:13, 99:19, 101:17, 101:19, 107:12

**experts** [1] - 16:18

**explain** [2] - 85:10, 87:21

**explained** [1] - 86:14

**explaining** [1] - 3:2

**explains** [1] - 68:23

**explanation** [2] - 102:23, 108:17

**Explorer** [1] - 39:15

**expressing** [1] - 34:12

**extend** [1] - 98:4

**extraordinary** [2] - 22:25, 26:5

**extrinsic** [2] - 55:9, 57:15

**extrusion** [1] - 91:20

**eyes** [2] - 14:19, 15:2

**Eyewear** [1] - 61:4

**F**

**F3d** [3] - 32:14, 32:16, 51:24

**fabric** [130] - 4:12, 4:15, 4:17, 4:20, 5:2, 5:24, 6:5, 6:9, 6:15, 6:17, 6:23, 6:25, 7:4, 7:5, 7:16, 7:20, 7:22, 8:18, 31:12, 31:23, 35:4, 35:7, 40:22, 41:3, 41:19, 41:21, 41:22, 41:24, 42:4, 42:5, 42:18, 53:24, 54:3, 54:11, 55:18, 57:20, 58:21, 58:22, 58:25, 59:1, 59:23, 74:4, 74:6, 74:19, 74:23, 75:3, 76:6, 76:9, 76:13, 77:3, 77:9, 78:4, 79:4, 81:22, 84:11, 84:12, 84:17, 84:20, 85:4, 85:7, 85:16, 85:18, 85:23, 86:11, 86:14, 86:15, 86:23, 87:2, 87:3, 87:17, 87:20, 87:23, 88:1, 88:5, 88:6, 88:7, 88:8, 88:10, 88:12, 88:17, 88:19, 88:21, 88:25, 89:2, 89:3, 89:4, 89:5, 89:6, 89:13, 89:19, 90:4, 90:6, 90:8, 90:15, 91:13, 91:25, 93:7, 93:11, 93:19, 93:22, 93:24, 95:25, 96:5, 96:7, 96:13, 97:10, 97:13, 97:16, 97:19, 97:23, 98:5, 98:7, 98:22, 100:16, 102:22, 103:2, 103:5, 103:11, 103:15, 103:17, 104:15, 104:16, 107:6, 107:18, 108:9, 108:16, 109:2

**fabric-based** [8] - 4:12, 4:20, 35:4, 35:7, 41:19, 41:22, 54:11, 74:19

**face** [5] - 8:16, 41:13,

99:25, 100:7, 100:10
**Facebook** [1] - 39:11
**facebook** [1] - 39:12
**facing** [1] - 36:5
**fact** [50] - 6:20, 11:7, 13:24, 15:3, 18:1, 19:11, 20:18, 22:14, 25:24, 27:17, 27:24, 29:7, 32:4, 32:22, 34:12, 36:22, 36:23, 37:13, 37:14, 38:10, 38:21, 44:21, 55:4, 55:17, 57:5, 58:7, 64:8, 73:4, 74:14, 85:8, 87:5, 90:1, 91:13, 91:25, 92:7, 92:21, 92:22, 99:2, 99:24, 101:23, 102:12, 105:10, 105:17, 106:10, 111:12, 114:3, 114:22, 116:2, 116:14, 117:4
**facto** [2] - 27:13, 27:18
**factor** [2] - 22:22, 51:20
**factors** [2] - 19:25, 118:22
**facts** [10] - 11:8, 22:23, 22:24, 24:12, 24:17, 37:16, 61:20, 69:21, 72:16, 113:12
**factual** [2] - 61:25, 101:15
**fail** [1] - 37:2
**failed** [2] - 25:23, 25:25
**fails** [4] - 26:19, 27:4, 27:7, 92:4
**failure** [1] - 38:17
**fair** [2] - 37:7, 106:18
**fairly** [3] - 39:2, 41:10, 64:17
**fallen** [1] - 35:13
**false** [3] - 14:12, 14:15, 18:1
**familiar** [1] - 91:23
**far** [10] - 4:4, 35:13, 36:14, 36:23, 52:17, 53:4, 85:3, 111:25, 114:9, 117:25
**fascinated** [1] - 33:25
**fascinating** [1] - 38:15
**fashion** [1] - 9:8
**fast** [3] - 17:1, 17:4, 26:2
**faster** [1] - 38:8

**fatal** [2] - 21:15, 21:17
**fatally** [1] - 21:22
**fault** [1] - 104:11
**faulted** [1] - 109:20
**favor** [6] - 15:24, 15:25, 23:5, 79:25, 84:15, 119:9
**favorite** [1] - 31:1
**feature** [9] - 32:6, 32:9, 32:12, 32:18, 33:2, 33:6, 33:9, 115:6, 115:8
**features** [6] - 24:12, 24:25, 25:1, 33:3, 33:22, 34:4
**Fed** [1] - 51:25
**Federal** [14] - 24:2, 33:14, 33:21, 34:23, 35:14, 45:24, 55:1, 55:4, 61:17, 62:2, 62:21, 63:11, 64:11, 69:19
**federal** [1] - 32:3
**fee** [1] - 13:19
**feedback** [2] - 56:23, 102:25
**felt** [1] - 62:25
**few** [3] - 53:12, 85:14
**fiber** [29] - 6:3, 6:5, 6:19, 6:22, 45:1, 45:2, 70:17, 72:11, 73:3, 73:13, 73:16, 73:19, 74:1, 76:20, 77:13, 81:21, 84:15, 85:15, 89:18, 90:25, 101:3, 101:5, 101:10, 101:15, 104:18, 107:4, 109:8
**fibers** [76] - 4:16, 6:3, 6:6, 6:18, 7:3, 7:5, 7:8, 7:9, 7:25, 8:12, 8:17, 31:10, 31:17, 41:2, 42:2, 42:3, 42:4, 42:8, 42:9, 42:18, 42:19, 43:17, 54:2, 54:6, 57:20, 58:19, 58:20, 58:22, 58:24, 59:12, 65:15, 71:4, 71:15, 71:18, 74:11, 74:13, 75:23, 76:7, 76:8, 76:22, 76:25, 77:1, 78:6, 78:8, 78:18, 84:17, 85:19, 86:1, 86:12, 89:3, 90:20, 91:7, 91:12, 91:15, 93:21, 95:24, 96:1, 96:15, 96:16, 97:1, 97:7, 97:10, 97:14, 97:15,

98:11, 103:12, 103:16, 104:20, 104:23, 107:22, 109:12
**fibers'** [1] - 76:19
**fibers..** [1] - 75:5
**field** [6] - 5:12, 20:13, 20:23, 34:2, 54:9, 54:13
**fields** [1] - 36:11
**figure** [15] - 26:12, 72:3, 72:4, 72:6, 73:5, 73:7, 74:14, 74:18, 96:6, 96:8, 98:6, 99:8, 104:22, 107:24, 108:1
**file** [3] - 45:24, 55:13, 76:15
**filed** [18] - 10:10, 15:9, 18:19, 18:22, 22:7, 25:18, 29:7, 49:3, 50:23, 61:2, 61:9, 68:14, 70:1, 70:2, 104:7, 104:25, 105:2, 111:16
**filing** [2] - 22:8, 62:18
**fills** [1] - 44:5
**final** [2] - 72:22, 117:7
**finally** [12] - 9:10, 10:6, 25:16, 33:8, 34:17, 35:4, 36:10, 54:4, 79:20, 93:5, 108:22, 108:23
**financial** [1] - 34:4
**finder** [1] - 64:8
**finish** [1] - 93:19
**firm** [2] - 47:24, 81:25
**firmly** [1] - 4:5
**firms** [1] - 38:17
**first** [39] - 8:1, 13:6, 14:19, 18:19, 20:9, 21:18, 21:23, 21:25, 23:15, 26:19, 27:22, 28:2, 28:4, 28:5, 28:22, 33:14, 35:20, 36:20, 37:12, 37:14, 39:24, 42:13, 57:25, 64:23, 65:5, 65:24, 67:23, 67:24, 74:4, 87:3, 87:24, 94:2, 109:3, 115:21, 115:23, 115:24, 116:2, 117:25
**first-mover** [1] - 115:21
**Fisher** [12] - 81:23, 86:13, 86:23, 87:1, 89:16, 90:2, 90:7,

90:13, 93:2, 93:10, 109:2, 109:21
**Fisher's** [1] - 109:5
**Fitbit** [1] - 29:19
**fitness** [1] - 28:15
**fits** [1] - 102:20
**fitting** [1] - 7:9
**five** [6] - 13:14, 14:23, 18:14, 67:4, 74:17, 75:16
**fixed** [1] - 79:13
**flaw** [1] - 36:21
**flawed** [4] - 21:23, 91:5, 92:2, 92:9
**flaws** [1] - 26:18
**Flick** [4] - 76:3, 76:17, 76:24, 76:25
**flick** [1] - 45:7
**flight** [1] - 48:6
**flip** [7] - 63:19, 70:8, 72:2, 73:22, 75:24, 77:4, 77:19
**flips** [1] - 74:14
**flow** [1] - 89:13
**foam** [1] - 88:24
**focus** [8] - 57:18, 60:15, 64:14, 65:22, 65:23, 66:22, 78:10, 110:18
**focused** [2] - 40:24, 66:1
**folks** [2] - 25:8, 104:7
**follow** [1] - 3:22
**followed** [6] - 30:12, 30:13, 61:6, 67:17, 68:6
**follower** [1] - 30:1
**following** [3] - 22:19, 24:2, 80:8
**follows** [1] - 63:22
**foot** [1] - 56:22
**footsteps** [1] - 29:20
**FOR** [3] - 1:1, 1:12, 1:15
**forces** [1] - 47:2
**foregoing** [2] - 11:19, 120:4
**Foregone** [1] - 36:23
**foreign** [2] - 6:2, 6:5
**foremost** [1] - 33:15
**foresee** [1] - 25:2
**forever** [1] - 118:11
**forgot** [1] - 38:22
**form** [6] - 7:9, 71:18, 75:7, 97:9, 104:23, 108:5
**formed** [25] - 7:25, 25:23, 41:1, 41:20, 41:22, 42:1, 42:7,

42:19, 43:16, 54:5, 70:16, 71:5, 71:7, 71:14, 71:21, 78:23, 85:18, 95:23, 96:15, 97:6, 97:14, 97:24, 97:25, 98:1
**former** [4] - 105:12, 110:21, 110:24, 112:8
**forms** [1] - 59:17
**forth** [9] - 28:17, 29:4, 39:6, 40:18, 41:17, 42:11, 45:20, 63:17, 68:3
**forward** [9] - 26:2, 43:10, 44:4, 68:1, 75:24, 81:12, 85:21, 88:2, 119:16
**founder** [2] - 3:16, 3:18
**founders** [1] - 3:20
**four** [16] - 7:7, 11:15, 14:23, 22:22, 26:1, 35:16, 49:13, 50:11, 63:19, 72:2, 107:24, 108:1, 108:13, 116:13, 116:15, 118:22
**four-year** [2] - 49:13, 50:11
**fourteen** [1] - 119:12
**fourthly** [1] - 46:16
**framing** [1] - 26:9
**frankly** [4] - 59:2, 61:12, 95:14, 114:15
**Friendster** [1] - 39:9
**front** [3] - 46:23, 84:10, 100:11
**full** [2] - 43:4, 119:11
**fully** [31] - 4:15, 5:1, 5:8, 6:15, 6:17, 6:25, 7:17, 7:22, 42:5, 53:23, 57:19, 64:20, 74:1, 74:4, 74:6, 74:7, 74:12, 77:3, 77:9, 77:13, 78:4, 103:4, 103:8, 103:10, 103:15, 103:19, 107:2, 107:3, 108:9, 116:1, 116:20
**fully-conductive** [15] - 4:15, 5:1, 6:15, 6:17, 6:25, 7:22, 42:5, 57:19, 74:1, 74:4, 74:6, 77:3, 77:9, 77:13, 78:4
**fundamental** [1] - 36:21
**fused** [4] - 91:7, 91:12, 91:21, 92:5
**fusion** [1] - 91:25

**fya** [1] - 82:6

**G**

**GA** [2] - 1:3, 2:3
**gain** [2] - 35:25, 104:12
**gait** [9] - 9:12, 9:15, 56:8, 56:17, 56:18, 57:13, 57:15, 102:11
**gait-related** [1] - 9:12
**gap** [1] - 90:24
**garment** [17] - 4:23, 13:10, 74:10, 74:20, 74:22, 75:6, 75:8, 75:12, 78:8, 78:18, 79:7, 79:9, 79:11, 86:4, 115:11
**garments** [6] - 17:15, 17:20, 28:24, 28:25, 112:23
**gear** [1] - 115:2
**geez** [1] - 110:20
**generally** [4] - 29:16, 30:5, 55:11, 94:3
**generated** [1] - 23:16
**generations** [1] - 112:11
**GEORGIA** [1] - 1:1
**Georgia** [7] - 10:9, 19:5, 25:21, 26:3, 38:1, 46:18, 111:25
**German** [2] - 8:22, 8:24
**giant** [1] - 86:22
**given** [10] - 13:16, 13:17, 28:9, 38:1, 67:10, 85:11, 86:25, 100:22, 102:8, 111:24
**glasses** [3] - 29:22, 114:6, 114:24
**gold** [1] - 59:21
**Google** [2] - 29:22, 39:19
**gotcha** [1] - 51:3
**grant** [1] - 117:17
**granted** [2] - 12:17, 112:6
**granting** [6] - 13:12, 16:14, 16:16, 17:24, 52:3, 52:6
**gray** [1] - 84:13
**great** [5] - 9:6, 18:18, 27:11, 41:11, 101:23
**Greece** [2] - 48:6, 48:8
**Gresham** [3] - 3:12, 3:21, 94:11
**GRESHAM** [17] -

1:14, 3:25, 6:24, 7:2, 7:16, 8:4, 8:7, 8:19, 8:23, 9:5, 9:10, 9:22, 95:1, 100:5, 100:13, 106:10, 106:22
**ground** [1] - 79:19
**grounding** [1] - 54:8
**grounds** [1] - 104:8
**group** [1] - 19:20
**GTRC** [2] - 110:21, 110:24
**guarantee** [3] - 12:10, 115:24, 115:25
**guess** [4] - 48:7, 49:3, 83:15, 114:8
**guide** [1] - 72:21
**guiding** [1] - 26:9
**guy** [1] - 20:24
**guys** [1] - 114:25

**H**

**hair** [1] - 91:19
**hand** [8] - 5:15, 38:23, 60:11, 68:3, 69:18, 76:5, 83:3
**hand-in-hand** [1] - 5:15
**handed** [3] - 14:18, 23:17, 83:3
**handout** [5] - 4:1, 4:9, 4:19, 6:2, 95:21
**hands** [1] - 49:15
**happy** [2] - 84:4, 110:10
**Harbin** [1] - 47:20
**HARBIN** [2] - 1:20, 47:20
**hard** [10] - 14:16, 20:22, 26:21, 27:1, 30:7, 30:14, 37:15, 60:5, 82:11, 108:12
**harder** [1] - 45:19
**hardly** [2] - 29:24, 39:1
**hardships** [1] - 60:1
**harm** [38] - 11:5, 16:9, 19:21, 19:25, 22:13, 22:20, 23:3, 24:6, 24:24, 25:13, 25:14, 26:7, 26:13, 26:25, 27:3, 27:8, 30:8, 31:25, 32:5, 34:24, 35:15, 35:16, 36:5, 37:16, 40:6, 48:19, 50:15, 51:21, 51:22, 52:17, 60:2, 69:13, 69:16, 79:20, 82:21, 94:4, 95:2, 119:1

**harmed** [2] - 10:25, 94:6
**harming** [1] - 115:4
**Harris** [1] - 47:22
**HARRIS** [1] - 1:19
**hatched** [3] - 73:8, 73:10, 98:7
**head** [2] - 46:10, 115:2
**health** [1] - 39:21
**hear** [14] - 3:5, 20:14, 24:19, 24:21, 25:7, 26:20, 26:22, 31:9, 31:20, 44:13, 47:1, 68:13, 93:3
**heard** [4] - 44:21, 53:17, 85:20, 106:19
**hearing** [2] - 87:1, 92:18
**HEARING** [1] - 1:10
**heart** [7] - 29:23, 30:12, 30:19, 82:14, 82:16, 85:13, 96:11
**heart-rate** [3] - 82:14, 82:16, 85:13
**heartbeats** [1] - 29:21
**heartily** [1] - 48:20
**heavily** [1] - 24:5
**heavy** [1] - 110:6
**heel** [1] - 56:25
**heels** [1] - 64:9
**held** [2] - 80:7, 91:21
**help** [2] - 31:22, 55:8
**helpful** [1] - 25:14
**hence** [1] - 15:2
**Hi** [1] - 24:7
**Hi-tech** [1] - 24:7
**Hickey** [1] - 81:25
**high** [3] - 23:7, 36:25, 101:6
**higher** [1] - 101:6
**highlight** [3] - 53:12, 61:25, 84:23
**highlighted** [3] - 32:7, 32:23, 53:10
**himself** [1] - 37:14
**hired** [2] - 15:6, 25:8
**historically** [1] - 37:3
**history** [11] - 42:10, 42:17, 45:8, 55:7, 58:7, 71:6, 71:15, 75:25, 76:15, 77:2, 100:3
**hold** [3] - 75:20, 91:24, 111:20
**holdup** [1] - 46:13
**hole** [1] - 21:15
**holes** [1] - 20:25

**Honor** [84] - 3:6, 3:11, 10:20, 12:16, 13:12, 13:22, 14:8, 14:17, 14:18, 18:8, 19:16, 20:3, 20:7, 20:19, 21:2, 21:10, 22:2, 23:9, 24:1, 27:20, 29:12, 30:25, 31:13, 34:22, 40:4, 40:12, 42:13, 43:1, 44:12, 44:15, 44:16, 46:24, 47:12, 47:18, 47:20, 47:25, 48:1, 50:1, 50:20, 55:19, 60:2, 60:9, 60:14, 60:20, 61:3, 63:14, 65:2, 66:17, 67:2, 68:2, 69:22, 70:8, 71:10, 72:19, 73:22, 74:1, 74:14, 75:24, 77:10, 78:15, 79:17, 81:1, 81:11, 81:16, 82:3, 83:11, 83:18, 84:4, 84:9, 84:22, 87:6, 87:8, 89:6, 92:19, 93:1, 93:15, 98:19, 105:1, 108:23, 110:12, 117:22, 117:25, 118:4
**Honor's** [1] - 24:22
**HONORABLE** [1] - 1:9
**hook** [2] - 26:3, 37:9
**hope** [1] - 36:14
**hoped** [1] - 87:10
**hopeful** [1] - 19:21
**Horstemeyer** [1] - 3:14
**hospital** [1] - 36:12
**hot** [1] - 114:1
**housekeeping** [1] - 81:7
**huge** [1] - 47:2
**human** [1] - 91:19
**Hyde** [2] - 62:20, 62:22

**I**

**idea** [4] - 25:12, 45:22, 46:8, 47:6
**identical** [1] - 44:22
**identified** [1] - 50:1
**identifies** [3] - 11:14, 35:15, 116:10
**identify** [3] - 26:3, 72:10, 77:19
**illustrated** [1] - 98:6
**illustration** [1] - 74:17

**image** [3] - 86:25, 90:20, 92:7
**images** [1] - 90:4
**imagine** [2] - 30:14, 31:13
**immediate** [1] - 62:6
**immediately** [1] - 105:20
**imparted** [1] - 58:24
**imparts** [1] - 93:23
**importance** [1] - 113:23
**important** [9] - 41:12, 42:19, 53:10, 53:11, 53:13, 88:2, 93:17, 107:16, 107:23
**impossible** [2] - 44:25, 118:17
**impression** [1] - 117:25
**improper** [1] - 102:9
**improved** [1] - 46:5
**impulse** [2] - 55:24, 97:11
**impulses** [11] - 54:12, 55:19, 55:23, 56:6, 57:8, 96:1, 96:3, 100:17, 102:16, 102:19, 108:7
**IN** [1] - 1:1
**in-depth** [1] - 103:21
**inaction** [3] - 64:13, 67:18, 105:15
**inadequate** [1] - 119:2
**inappropriately** [1] - 27:23
**INC** [6] - 1:3, 1:6, 1:16, 1:17, 1:19, 1:21
**incentivize** [1] - 16:15
**incidentally** [1] - 44:20
**inclined** [1] - 118:7
**include** [4] - 7:16, 54:1, 103:15, 107:4
**included** [2] - 47:17, 83:3
**includes** [4] - 7:2, 103:6, 114:11, 114:13
**including** [11] - 6:17, 7:5, 10:23, 29:20, 31:19, 67:13, 88:24, 93:23, 103:11, 103:13, 103:17
**inclusion** [1] - 33:6
**incompetent** [1] - 111:1
**inconsistent** [1] - 58:10

**incorporated** [5] - 74:20, 75:6, 99:23, 100:8, 100:13
**incorporating** [1] - 89:17
**incorporation** [4] - 6:23, 7:4, 8:18, 54:3
**incorrect** [2] - 71:9, 71:19
**increase** [1] - 100:19
**incredible** [2] - 82:14, 85:13
**incurred** [1] - 26:10
**indeed** [1] - 45:12
**Indeed** [1] - 73:14
**indefinite** [2] - 97:3, 97:4
**independent** [3] - 8:8, 22:22, 79:18
**independently** [1] - 44:22
**indicate** [2] - 8:12, 103:19
**indicated** [4] - 10:3, 98:18, 101:2, 102:11
**indicates** [3] - 87:15, 88:16, 89:11
**indicating** [1] - 91:17
**indicating)** [1] - 87:12
**individual** [7] - 58:22, 58:24, 73:2, 73:12, 73:19, 74:13, 75:20
**individually** [51] - 4:16, 6:17, 6:22, 7:2, 7:25, 8:12, 8:17, 31:9, 31:10, 31:18, 41:2, 42:2, 42:3, 42:4, 42:7, 42:8, 42:18, 42:19, 43:17, 54:1, 54:2, 54:6, 58:23, 70:17, 71:4, 71:15, 71:17, 72:11, 73:16, 76:6, 76:18, 76:21, 78:6, 78:17, 84:16, 85:15, 85:18, 86:2, 86:12, 93:20, 95:24, 95:25, 96:15, 97:1, 97:7, 97:10, 98:11, 103:12, 103:16, 107:4, 109:11
**individually-conductive** [3] - 7:25, 103:12, 103:16
**indulge** [1] - 19:22
**indulgence** [2] - 19:18, 40:9
**industry** [1] - 15:1
**infant's** [1] - 79:4
**inference** [1] - 108:6

**inform** [2] - 42:12, 56:18
**information** [7] - 5:14, 9:13, 25:6, 33:19, 93:15, 102:5, 104:1
**informative** [1] - 32:2
**informed** [1] - 61:19
**infringe** [13] - 16:13, 17:9, 44:25, 50:4, 61:11, 64:25, 67:12, 85:13, 85:19, 98:24, 103:14, 115:14, 115:17
**infringed** [5] - 40:19, 63:10, 65:22, 105:22, 106:5
**infringement** [64] - 4:6, 4:8, 5:21, 6:13, 9:4, 9:19, 9:20, 11:1, 12:20, 13:13, 18:3, 18:9, 19:9, 19:12, 20:18, 20:19, 20:20, 21:14, 21:19, 21:20, 22:20, 23:8, 23:11, 23:24, 26:11, 32:5, 34:13, 40:16, 40:20, 42:6, 42:15, 43:3, 43:5, 43:23, 43:25, 44:18, 44:24, 46:2, 48:12, 48:21, 49:16, 57:19, 59:24, 61:7, 64:17, 65:18, 65:21, 65:24, 70:1, 73:23, 83:25, 84:25, 93:24, 98:17, 102:13, 104:5, 105:14, 105:16, 108:25, 110:2, 110:4, 113:2, 116:9, 118:19
**infringer** [2] - 61:6, 61:7
**infringers** [1] - 26:12
**infringing** [11] - 4:22, 11:21, 17:12, 32:18, 45:14, 46:5, 49:1, 111:4, 111:9, 116:4, 116:24
**initial** [1] - 92:22
**injunction** [55] - 4:8, 5:10, 10:23, 12:18, 13:12, 14:4, 16:2, 16:5, 16:9, 16:15, 16:16, 16:17, 17:21, 17:25, 18:20, 18:21, 18:24, 22:7, 22:9, 23:4, 23:6, 25:6, 26:6, 27:6, 27:8, 37:21, 41:14, 46:9, 46:12, 46:15, 46:21, 52:3,

52:14, 52:25, 53:3, 60:3, 69:10, 70:2, 79:19, 84:24, 85:1, 89:22, 92:18, 93:13, 95:6, 105:6, 106:16, 110:7, 111:17, 117:12, 118:20, 118:22, 119:2, 119:3, 119:4
**injunctions** [2] - 22:14, 52:6
**injunctive** [9] - 22:16, 25:3, 40:10, 80:1, 113:3, 113:11, 117:17, 118:2, 118:16
**injure** [1] - 16:5
**injured** [8] - 11:15, 11:16, 11:17, 15:13, 16:6, 16:7, 114:21
**injuries** [4] - 11:20, 15:16, 56:25, 57:1
**injury** [7] - 3:23, 11:24, 13:25, 14:11, 28:20, 110:14, 116:7
**insert** [1] - 45:9
**inserted** [1] - 71:5
**inside** [3] - 28:20, 59:20, 91:17
**instead** [6] - 4:2, 21:19, 22:20, 39:2, 58:23, 118:10
**instruction** [2] - 72:22, 98:20
**instructs** [1] - 4:22
**integrally** [1] - 74:22
**integrated** [8] - 28:24, 43:16, 71:3, 71:14, 76:22, 95:23, 96:25, 103:12
**integrating** [1] - 84:16
**intellectual** [2] - 66:13, 104:21
**intelligent** [1] - 53:8
**intend** [4] - 36:16, 51:16, 62:9, 107:21
**intent** [1] - 90:15
**intention** [6] - 49:8, 49:10, 51:1, 64:20, 64:25, 66:1
**interest** [7] - 3:23, 16:14, 16:17, 23:6, 66:19, 68:18, 118:13
**interested** [3] - 38:23, 84:5, 85:8
**interesting** [4] - 24:18, 33:25, 38:5, 39:17
**interface** [1] - 5:6
**interfere** [1] - 65:16

**interfering** [1] - 65:7
**international** [1] - 16:10
**internet** [1] - 39:14
**Internet** [1] - 39:15
**interpretation** [1] - 17:2
**interpreted** [1] - 70:16
**interrogatories** [1] - 119:10
**intrinsic** [4] - 54:25, 56:13, 98:13, 98:21
**introduce** [2] - 47:21, 48:2
**introduced** [2] - 50:9, 50:10
**introduction** [1] - 3:7
**invalidity** [4] - 44:2, 77:19, 107:9, 107:12
**invent** [1] - 16:16
**invented** [1] - 20:24
**invention** [15] - 7:12, 25:19, 42:20, 45:21, 52:8, 52:10, 52:12, 52:13, 54:9, 54:10, 54:14, 56:7, 76:4, 76:9, 107:23
**inventor** [1] - 99:24
**inventors** [3] - 3:17, 3:18, 16:15
**inventory** [3] - 51:8, 51:9, 51:12
**investigation** [1] - 8:8
**investment** [1] - 50:12
**investments** [3] - 66:15, 79:24, 80:1
**investor** [1] - 64:5
**involve** [1] - 89:17
**involved** [1] - 61:5
**IP** [1] - 65:17
**Ipod** [1] - 39:22
**ipso** [2] - 27:13, 27:18
**irrelevant** [2] - 110:24, 111:3
**irreparable** [31] - 3:22, 11:5, 13:25, 14:11, 19:21, 19:25, 22:13, 22:20, 23:3, 24:6, 25:13, 26:7, 26:10, 26:13, 26:25, 27:3, 31:25, 34:24, 37:16, 40:6, 48:19, 51:21, 52:17, 69:13, 69:16, 79:20, 82:21, 94:3, 95:2, 110:14, 119:1

**irreparably** [4] - 10:25, 15:13, 94:6, 114:21
**issuance** [4] - 118:16, 118:22, 119:2, 119:3
**issue** [56] - 4:7, 9:19, 10:7, 11:11, 19:20, 20:17, 22:12, 23:11, 29:16, 48:22, 49:11, 54:7, 54:8, 55:5, 55:10, 58:11, 58:18, 58:21, 59:11, 59:24, 62:21, 64:9, 69:11, 70:13, 72:13, 72:15, 72:19, 72:20, 72:21, 72:22, 72:23, 73:23, 91:4, 93:10, 95:6, 95:15, 98:17, 100:7, 100:22, 100:23, 101:14, 101:15, 102:3, 102:13, 103:4, 103:20, 103:24, 106:17, 108:19, 108:20, 110:23, 111:1, 111:8, 113:2, 115:5, 119:9
**issued** [7] - 9:25, 52:25, 62:24, 69:24, 108:18, 110:20, 111:6
**issues** [8] - 5:5, 23:10, 48:19, 68:4, 70:9, 94:5, 95:2, 104:4
**IT** [1] - 60:10
**item** [3] - 14:9, 14:19, 114:8
**itself** [12] - 6:20, 28:23, 31:22, 54:25, 74:11, 74:12, 74:21, 75:21, 75:22, 96:7, 99:11, 107:6

---

**J**

**January** [3] - 18:21, 38:15, 68:8
**Jayaraman** [34] - 3:16, 5:3, 5:11, 5:19, 7:13, 7:19, 8:15, 10:2, 20:12, 20:14, 20:18, 20:23, 21:20, 43:11, 49:14, 59:1, 59:2, 85:11, 86:5, 90:3, 91:1, 92:12, 92:15, 92:21, 100:15, 101:4, 101:13, 101:21, 103:1, 107:15, 108:10, 108:18, 109:7
**Jayaraman's** [8] - 8:5, 8:11, 9:7, 42:16,

43:21, 78:13, 99:16, 107:25

**jobs** [1] - 40:1
**John** [1] - 47:20
**JOHN** [1] - 1:20
**join** [1] - 48:20
**Jones** [2] - 77:20, 78:9
**Jones's** [1] - 72:3
**Journal** [2] - 36:25, 37:1
**JR** [1] - 1:9
**judge** [1] - 46:1
**JUDGE** [1] - 1:10
**Judge** [1] - 118:9
**judgment** [8] - 42:22, 43:7, 59:24, 62:3, 62:16, 72:15, 104:25, 105:5
**JULY** [1] - 1:4
**jump** [1] - 46:6
**jumping** [1] - 48:24
**June** [1] - 8:5
**jurisdictional** [1] - 104:8
**justice** [1] - 118:13

**K**

**keep** [2] - 82:11, 84:8
**kept** [1] - 111:18
**kidder** [6] - 8:6, 26:14, 26:17, 36:24, 37:18, 37:25
**Kidder** [2] - 82:6, 115:23
**kind** [18] - 42:14, 43:9, 43:22, 48:24, 52:15, 53:2, 53:8, 58:2, 67:16, 68:14, 73:10, 79:13, 84:13, 84:17, 87:9, 91:7, 114:3, 114:8
**kindness** [1] - 118:13
**KING** [1] - 1:17
**knit** [3] - 45:17, 45:18, 78:17
**knitted** [14] - 6:16, 45:3, 74:21, 75:4, 78:3, 78:24, 79:5, 86:3, 101:3, 103:10, 103:15, 107:18, 108:8
**knitting** [4] - 79:8, 79:10, 107:22, 108:5
**knowledge** [5] - 59:7, 65:10, 85:5, 93:7, 93:14
**knowledgeable** [1] - 20:13

**known** [2] - 14:5, 93:10
**knows** [7] - 20:19, 22:14, 22:18, 23:1, 47:8, 60:20, 113:22

**L**

**label** [1] - 25:10
**labeled** [2] - 38:17, 73:11
**lack** [3] - 25:16, 26:4, 51:19
**lacks** [3] - 77:25, 79:18, 84:25
**laid** [2] - 48:18, 105:16
**land** [1] - 56:22
**language** [21] - 6:1, 40:21, 42:1, 43:12, 43:18, 43:22, 53:6, 55:25, 70:21, 70:24, 71:3, 71:6, 73:15, 74:16, 76:1, 77:2, 96:18, 97:9, 97:24, 103:9, 103:18
**larger** [1] - 26:24
**last** [11] - 50:21, 50:24, 50:25, 57:6, 59:10, 59:25, 67:20, 68:9, 68:10, 77:18, 82:9
**late** [3] - 12:1, 12:9, 25:20
**launch** [3] - 65:13, 66:6, 112:20
**launched** [1] - 29:25
**launching** [1] - 66:9
**Lauren** [14] - 14:5, 16:1, 18:17, 19:17, 40:13, 40:23, 40:24, 41:7, 41:8, 41:9, 41:11, 41:13, 44:1, 111:13
**LAUREN** [1] - 1:17
**Lauren's** [1] - 47:16
**law** [7] - 11:7, 11:8, 22:15, 27:21, 46:16, 81:25, 113:9
**lawsuit** [6] - 50:23, 61:1, 61:8, 61:12, 63:4, 68:14
**lawyer** [5] - 22:18, 44:17, 60:11, 93:3, 118:9
**lawyers** [1] - 39:10
**layer** [3] - 76:11, 76:12, 77:13
**laying** [1] - 105:13
**lead** [48] - 4:16, 5:2,

5:23, 6:2, 6:7, 40:25, 41:1, 41:18, 41:20, 41:21, 42:7, 43:12, 43:14, 43:16, 43:23, 47:25, 53:9, 54:5, 59:11, 59:15, 70:11, 70:16, 70:18, 70:25, 71:1, 71:14, 71:17, 71:19, 72:24, 95:19, 95:22, 95:23, 96:14, 96:22, 96:24, 96:25, 97:3, 97:8, 97:16, 97:24, 98:16, 98:18, 98:22, 99:9, 104:17, 106:23
**leader** [5] - 13:5, 27:24, 36:21, 39:8, 39:16
**leaders** [8] - 27:23, 38:17, 38:20, 38:21, 38:24, 39:3, 39:5, 39:7
**leap** [1] - 27:11
**leaping** [1] - 46:20
**lease** [1] - 14:24
**leased** [1] - 25:8
**leasing** [1] - 15:8
**least** [5] - 23:11, 71:12, 92:23, 93:12, 104:20
**leave** [1] - 66:25
**Lebby** [14] - 44:7, 44:9, 99:14, 99:18, 99:20, 99:22, 99:24, 100:2, 100:5, 100:6, 100:10, 100:14, 100:15
**led** [2] - 68:24, 109:11
**left** [5] - 29:19, 30:11, 37:21, 69:18, 73:8
**left-hand** [1] - 69:18
**legacy** [1] - 49:9
**legal** [2] - 11:3, 11:5
**legend** [1] - 73:11
**legitimate** [2] - 11:9, 113:3
**less** [2] - 33:10, 38:9
**letter** [6] - 65:18, 68:9, 68:10, 68:24, 105:11
**letters** [8] - 61:5, 61:22, 63:12, 63:13, 63:17, 64:16, 69:8, 77:16
**level** [1] - 96:12
**Lewis** [1] - 81:25
**liar** [2] - 8:6, 82:6
**license** [4] - 10:12,

26:1, 63:15, 110:25
**licensee** [4] - 10:8, 110:21, 110:24, 112:8
**life** [1] - 50:12
**light** [2] - 81:19, 86:18
**lights** [1] - 88:22
**likelihood** [14] - 3:21, 6:12, 10:17, 20:9, 23:2, 23:7, 40:15, 56:15, 69:12, 70:9, 84:2, 93:25, 101:1, 118:19
**likely** [1] - 4:5
**likewise** [1] - 112:21
**limit** [1] - 102:7
**limitation** [5] - 53:22, 76:23, 85:15, 104:23, 107:8
**limitations** [2] - 44:9, 45:9
**limited** [3] - 30:24, 99:10, 107:21
**limiting** [5] - 9:17, 96:18, 98:3, 98:14, 102:2
**limits** [1] - 96:16
**line** [14] - 7:7, 39:24, 44:17, 56:2, 57:6, 68:2, 68:3, 72:7, 73:11, 74:24, 104:9, 112:19, 113:7
**lines** [3] - 63:14, 74:17, 75:16
**liquid** [1] - 91:8
**literature** [2] - 27:25, 37:13
**live** [1] - 110:19
**LLC** [1] - 1:24
**loaded** [1] - 79:2
**located** [1] - 96:9
**logical** [2] - 18:1, 91:2
**look** [43] - 4:10, 6:1, 17:5, 18:10, 19:5, 28:13, 28:22, 29:17, 30:18, 40:20, 45:8, 55:1, 55:6, 55:14, 59:21, 61:4, 61:9, 61:15, 64:14, 65:3, 67:4, 69:19, 70:20, 70:23, 72:6, 73:4, 73:7, 73:11, 84:6, 84:9, 91:14, 95:20, 99:22, 103:9, 107:15, 107:24, 111:11, 112:8, 113:23, 114:3, 114:12, 117:20
**looked** [6] - 17:3, 29:19, 33:14, 90:4,

100:15, 109:8
**looking** [6] - 14:20, 18:2, 28:23, 30:17, 33:12, 37:15
**looks** [3] - 64:12, 84:10, 111:12
**loose** [1] - 17:1
**lose** [3] - 14:13, 52:22, 80:2
**losing** [1] - 15:15
**loss** [15] - 11:16, 11:18, 13:20, 15:19, 23:19, 23:20, 34:9, 34:19, 35:17, 35:21, 51:25, 52:4, 52:20, 52:21, 116:11
**lost** [5] - 23:19, 32:11, 36:8, 115:7, 119:1
**love** [1] - 40:7
**lower** [7] - 35:18, 36:6, 36:7, 36:8, 56:2, 116:11
**lucky** [1] - 48:7
**lulled** [1] - 62:8
**Lycos** [1] - 39:18
**Lycra** [1] - 77:7
**LYNN** [1] - 1:24

**M**

**magical** [1] - 115:12
**mail** [2] - 63:21, 68:6
**main** [1] - 100:25
**maintain** [4] - 12:18, 23:24, 24:9, 119:5
**maintained** [1] - 105:21
**major** [1] - 14:4
**man** [1] - 46:25
**Management** [1] - 38:13
**manner** [1] - 17:19
**manufacture** [1] - 85:6
**manufacturer** [4] - 8:22, 8:25, 81:22, 85:4
**manufacturer's** [1] - 83:20
**manufacturers** [1] - 15:9
**March** [3] - 68:10, 69:25, 111:23
**mark** [1] - 116:3
**marked** [2] - 15:2, 26:20
**market** [127] - 11:17, 11:22, 11:23, 12:1, 12:12, 12:24, 12:25,

13:4, 13:5, 13:7, 13:15, 13:21, 13:24, 14:2, 14:6, 14:14, 14:17, 15:15, 15:16, 15:19, 16:13, 16:22, 17:3, 17:4, 17:5, 17:13, 17:16, 17:17, 17:18, 18:6, 18:15, 19:14, 22:8, 23:14, 23:20, 24:10, 26:20, 26:24, 26:25, 27:2, 27:25, 28:2, 28:4, 28:5, 28:7, 28:14, 28:16, 28:17, 28:18, 28:19, 28:21, 28:25, 29:9, 29:17, 30:5, 30:10, 30:21, 30:23, 31:7, 31:22, 34:19, 35:6, 35:9, 35:18, 35:21, 35:25, 36:12, 38:9, 38:11, 38:18, 38:25, 39:9, 39:12, 39:16, 39:23, 40:1, 47:7, 47:8, 47:9, 47:10, 49:3, 49:5, 49:8, 49:14, 50:11, 51:1, 51:14, 51:25, 52:5, 52:13, 52:18, 52:20, 52:22, 53:1, 60:6, 79:23, 80:3, 111:2, 111:5, 111:10, 111:21, 113:17, 113:19, 113:23, 113:25, 114:5, 114:9, 114:10, 114:13, 114:17, 114:18, 114:22, 115:4, 115:16, 116:11, 116:20, 116:23, 117:4, 117:6, 117:18, 118:2, 118:24, 119:1

**marketing** [5] - 11:9, 11:10, 33:16, 34:21, 106:6

**marketplace** [4] - 10:25, 17:7, 23:23, 47:3

**markets** [5] - 35:19, 36:10, 36:15, 36:18, 116:12

**Mart** [1] - 25:11

**material** [13] - 58:1, 58:2, 58:12, 59:15, 59:16, 59:17, 59:22, 78:24, 88:8, 90:11, 90:13, 108:12

**materials** [1] - 31:15

**matter** [9] - 18:1, 19:11, 64:21, 65:1, 111:5, 114:22, 116:2,

116:15, 120:5

**Maurer** [1] - 3:14

**MAURER** [1] - 1:12

**mean** [19] - 8:20, 18:5, 20:16, 27:10, 27:13, 29:3, 30:15, 33:24, 52:9, 52:23, 54:22, 72:15, 79:7, 105:15, 110:25, 112:10, 113:11, 115:9, 115:15

**meaning** [7] - 43:21, 53:20, 95:8, 95:12, 97:15, 102:7, 102:10

**means** [7] - 7:17, 26:21, 29:3, 36:3, 71:11, 74:12, 103:14

**measure** [10] - 9:11, 9:12, 56:16, 57:1, 87:11, 88:15, 89:8, 102:24, 103:1, 108:7

**measured** [4] - 7:20, 56:10, 56:11, 102:2

**measures** [1] - 96:11

**measuring** [2] - 57:8, 102:15

**Medical** [1] - 24:7

**meet** [4] - 6:15, 68:11, 105:24, 107:7

**meeting** [5] - 63:6, 63:23, 64:10, 68:6, 77:6

**meetings** [2] - 60:23, 63:16

**meets** [2] - 6:7, 104:22

**megalithic** [1] - 47:2

**mention** [9] - 22:3, 29:5, 29:6, 31:6, 33:20, 35:1, 35:11, 99:15

**mentioned** [2] - 45:23, 60:2

**MercExchange** [1] - 22:17

**Merchandise** [1] - 51:24

**merit** [3] - 6:11, 77:25, 79:18

**merits** [11] - 4:6, 6:13, 10:18, 69:10, 78:11, 84:2, 84:25, 94:1, 104:4, 106:8, 110:9

**merits-related** [1] - 104:4

**met** [5] - 6:8, 7:22, 54:3, 67:5, 77:22

**metal** [7] - 86:16, 88:1, 88:9, 90:9,

90:14, 92:1

**metallic** [2] - 79:3, 87:22

**metallization** [2] - 89:17, 109:6

**metallizing** [4] - 85:17, 87:20, 87:25, 92:8

**metes** [1] - 28:19

**method** [3] - 4:11, 55:20, 55:21

**Meunier** [1] - 47:20

**Meyer's** [2] - 62:1, 62:2

**Meyers** [13] - 61:13, 61:15, 61:21, 62:6, 62:16, 62:22, 62:25, 63:3, 63:5, 63:7, 63:15, 67:1

**miCoach** [2] - 72:17, 112:22

**microscope** [1] - 8:9

**mid** [1] - 25:20

**middle** [4] - 29:23, 65:5, 76:2, 91:10

**might** [13] - 31:2, 31:3, 31:4, 43:5, 87:8, 89:15, 90:21, 96:10, 106:17

**Mike** [1] - 81:24

**military** [1] - 36:13

**militates** [1] - 26:5

**milky** [1] - 88:23

**Miller** [2] - 81:2, 81:18

**MILLER** [9] - 1:25, 81:1, 82:2, 82:8, 84:8, 87:14, 92:19, 93:5, 94:8

**millimeter** [1] - 7:20

**million** [1] - 15:6

**minds** [1] - 83:23

**minimal** [1] - 38:17

**minimum** [1] - 43:24

**minute** [5] - 15:22, 29:21, 56:20, 80:6, 87:21

**minutes** [5] - 3:3, 3:4, 19:23, 117:9

**misleading** [5] - 61:24, 62:4, 64:13, 67:17, 67:23

**missing** [5] - 18:25, 34:15, 44:5, 44:6, 44:8

**misspeak** [1] - 100:8

**mistake** [1] - 82:7

**mistakes** [1] - 36:19

**MIT** [1] - 38:13

**MITCHELL** [1] - 1:21

**models** [2] - 5:21, 82:1

**modification** [1] - 19:19

**moment** [1] - 81:20

**monetary** [6] - 13:20, 13:25, 115:21, 116:5, 116:6, 116:7

**money** [16] - 12:23, 13:2, 13:3, 13:6, 23:4, 35:19, 36:2, 36:3, 36:4, 36:8, 36:9, 37:22, 50:13, 116:13, 116:19

**monitor** [19] - 4:13, 4:21, 4:24, 4:25, 9:13, 28:25, 30:12, 30:19, 53:15, 54:21, 55:18, 56:3, 82:14, 82:17, 82:18, 85:13, 96:10, 96:12, 96:14

**monitoring** [8] - 4:11, 6:11, 17:17, 54:7, 54:11, 55:20, 55:21, 82:20

**monitors** [2] - 17:19, 29:23

**months** [3] - 66:5, 69:25, 111:18

**morning** [11] - 10:20, 10:21, 19:16, 44:16, 48:1, 48:4, 48:5, 60:9, 83:6, 95:21, 106:13

**most** [5] - 16:6, 16:8, 46:18, 55:4

**motion** [24] - 5:4, 5:10, 5:20, 22:9, 29:2, 40:7, 49:3, 53:3, 60:6, 70:2, 80:4, 85:10, 89:22, 93:13, 104:25, 105:5, 106:7, 106:11, 106:12, 106:18, 118:6, 118:14, 119:7, 119:13

**motions** [1] - 104:7

**MOTIONS** [1] - 1:10

**mouthful** [1] - 82:16

**move** [4] - 92:3, 104:24, 110:12, 119:16

**moved** [1] - 18:24

**mover** [8] - 27:22, 36:20, 37:12, 37:14, 37:17, 115:21, 115:23, 115:24

**movers** [1] - 116:2

**moving** [4] - 29:15, 99:12, 101:2, 101:22

**MP3** [2] - 39:20, 39:23

**MR** [82] - 3:6, 3:10, 3:25, 6:24, 7:2, 7:16, 8:4, 8:7, 8:19, 8:23, 9:5, 9:10, 9:22, 10:20, 10:22, 11:6, 11:14, 12:2, 12:24, 13:3, 13:22, 16:25, 17:16, 18:7, 19:16, 20:5, 21:2, 21:6, 21:10, 21:13, 21:17, 22:2, 22:12, 23:25, 24:11, 24:17, 25:5, 27:14, 29:12, 29:15, 32:25, 36:4, 37:6, 37:11, 40:12, 42:1, 42:23, 43:9, 44:15, 45:16, 47:18, 47:20, 48:1, 48:5, 48:10, 49:22, 52:11, 52:21, 55:4, 56:2, 58:5, 59:14, 60:9, 60:14, 81:1, 81:16, 81:18, 82:2, 82:8, 84:8, 87:14, 92:19, 93:5, 94:8, 95:1, 100:5, 100:13, 106:10, 106:22, 110:12, 117:19, 117:24

**multi** [1] - 77:13

**multi-layer** [1] - 77:13

**multimeter** [8] - 87:5, 87:10, 87:14, 87:15, 88:15, 89:8, 103:1

**multiple** [3] - 13:23, 15:9, 16:18

**must** [7] - 7:3, 18:10, 32:6, 32:17, 84:14, 90:23, 91:11

**MySpace** [1] - 39:9

**N**

**name** [5] - 3:7, 10:9, 100:4, 112:19, 112:22

**named** [1] - 100:5

**naming** [1] - 10:9

**narrow** [3] - 17:19, 45:11, 65:21

**narrower** [1] - 35:8

**narrows** [1] - 114:2

**nature** [6] - 17:14, 22:14, 100:20, 102:12, 104:5, 104:8

**navigate** [1] - 29:23

**Navigator** [2] - 39:13, 39:15

**navigator** [1] - 39:14

**nearly** [2] - 44:22,

45:13
**necessarily** [1] - 63:8
**necessary** [3] - 45:9, 88:22, 91:9
**necessity** [1] - 27:6
**need** [8] - 49:23, 51:22, 73:1, 77:17, 82:4, 83:13, 96:11, 119:14
**needs** [3] - 14:9, 43:16, 73:4
**negates** [1] - 93:24
**negotiating** [2] - 14:25, 15:9
**nervous** [1] - 29:14
**netscape** [1] - 39:13
**Netscape** [1] - 39:15
**network** [1] - 39:12
**never** [10] - 12:25, 13:16, 14:7, 18:16, 52:22, 59:7, 59:8, 111:14, 116:25
**nevertheless** [4] - 30:20, 31:19, 89:24, 92:24
**new** [10] - 14:6, 34:2, 35:23, 37:6, 44:4, 46:11, 50:9, 53:18, 109:4
**next** [20] - 28:13, 35:20, 40:3, 41:19, 48:16, 51:2, 51:15, 53:5, 53:12, 53:14, 56:14, 57:10, 58:17, 60:8, 62:11, 71:22, 72:2, 76:14, 79:12, 90:21
**nexus** [13] - 24:20, 27:5, 27:10, 27:15, 27:19, 32:4, 32:22, 34:23, 35:13, 115:5, 115:12, 115:16, 115:19
**nice** [2] - 115:23, 115:24
**nine** [4] - 68:2, 89:10, 89:11, 112:14
**NO** [1] - 1:3
**Noble** [10] - 86:13, 86:18, 86:21, 86:24, 87:19, 88:4, 89:6, 92:6, 93:11, 93:14
**Noble's** [2] - 89:17, 92:7
**nobody** [3] - 45:12, 98:24, 108:18
**nominated** [1] - 19:20
**non** [17] - 5:21, 11:3,

44:18, 44:24, 45:14, 46:5, 46:17, 48:21, 57:18, 59:24, 73:23, 83:25, 84:25, 102:13, 105:14, 105:16, 108:25
**non-infringement** [6] - 48:21, 73:23, 83:25, 105:14, 105:16, 108:25
**non-infringing** [1] - 46:5
**non-legal** [1] - 11:3
**non-practicing** [1] - 46:17
**nonconductive** [17] - 7:5, 7:8, 42:9, 45:1, 45:2, 74:8, 74:11, 75:12, 75:15, 76:8, 76:12, 77:1, 84:17, 84:20, 87:19, 93:21, 107:5
**none** [5] - 13:10, 50:3, 57:4, 72:9, 114:25
**nonsensical** [1] - 97:20
**NORMAN** [1] - 1:13
**NORTHERN** [1] - 1:1
**notably** [1] - 97:9
**note** [7] - 63:7, 63:9, 63:22, 92:12, 93:17, 107:17, 107:23
**noted** [4] - 16:18, 42:13, 70:11, 101:22
**notes** [6] - 44:21, 63:7, 75:16, 90:10, 103:20, 120:5
**nothing** [14] - 5:7, 6:18, 27:17, 29:4, 34:8, 34:9, 34:16, 36:8, 36:10, 36:17, 84:7, 100:3, 100:16, 101:16
**notice** [1] - 75:12
**notion** [6] - 26:21, 27:9, 52:16, 65:18, 73:1, 78:3
**November** [3] - 19:4, 68:4, 111:23
**nowhere** [1] - 76:23
**number** [9] - 29:20, 29:21, 30:2, 53:11, 60:25, 64:2, 91:6, 95:18, 110:22
**numbers** [1] - 37:3
**NuMetrex** [2] - 68:25, 112:17
**nylon** [26] - 45:17, 57:21, 58:12, 58:13,

58:14, 58:19, 77:7, 86:15, 86:20, 86:21, 88:1, 88:7, 88:11, 89:19, 90:5, 90:8, 90:10, 90:15, 90:20, 91:15, 92:6, 92:8, 101:7, 109:7, 109:10

**O**

**objected** [1] - 67:21
**objection** [1] - 81:14
**obtained** [2] - 12:11, 69:23
**obtaining** [1] - 69:20
**obvious** [2] - 44:10, 93:7
**obviously** [11] - 14:25, 16:2, 16:17, 23:17, 39:12, 48:9, 69:3, 77:4, 78:9, 97:20, 116:14
**occurring** [1] - 11:20
**October** [1] - 111:22
**OF** [3] - 1:1, 120:1, 120:3
**offending** [2] - 32:12, 115:7
**offered** [5] - 49:5, 49:12, 101:8, 101:17, 111:13
**offering** [4] - 8:15, 8:17, 51:18, 99:9
**office** [2] - 9:24, 25:8
**ohms** [2] - 89:10, 89:11
**old** [3] - 44:17, 107:19
**omitted** [1] - 21:11
**OMSIGNAL** [2] - 1:17, 16:4
**OMSignal** [25] - 18:18, 19:6, 19:17, 22:6, 22:8, 35:3, 40:9, 40:13, 41:5, 41:6, 41:9, 41:14, 43:25, 47:16, 47:17, 48:21, 58:19, 99:12, 99:17, 100:6, 100:25, 111:14, 111:16, 111:18, 113:12
**oMSignal** [1] - 16:10
**OMSignal's** [3] - 40:24, 41:20, 42:7
**once** [6] - 32:21, 43:18, 88:21, 89:1, 106:7, 117:1
**one** [106] - 3:16, 3:18, 3:19, 4:9, 4:10, 6:2, 6:17, 7:2, 10:4,

11:4, 12:6, 14:9, 17:23, 20:15, 20:16, 20:17, 22:4, 24:19, 25:10, 26:24, 27:17, 30:14, 31:8, 31:13, 31:22, 32:5, 32:14, 33:2, 35:1, 38:14, 39:20, 40:22, 40:25, 41:1, 41:4, 43:12, 43:16, 51:8, 51:10, 51:13, 51:23, 54:5, 55:8, 57:11, 61:17, 62:13, 64:6, 68:11, 70:12, 71:3, 71:14, 72:3, 72:4, 72:23, 73:8, 73:24, 77:6, 77:21, 78:2, 81:7, 82:4, 83:4, 83:8, 83:15, 84:3, 84:8, 86:20, 87:23, 88:3, 90:21, 91:6, 91:16, 91:21, 92:3, 93:5, 95:4, 95:6, 95:20, 95:23, 96:4, 96:6, 96:15, 96:16, 96:25, 97:7, 97:14, 97:25, 98:10, 103:9, 103:11, 103:15, 104:20, 104:23, 107:20, 108:4, 108:13, 110:22, 111:8, 114:10, 117:21, 118:1
**ones** [2] - 91:17, 91:19
**ongoing** [1] - 109:23
**open** [6] - 23:17, 36:16, 71:10, 103:13, 107:4, 109:24
**open-ended** [3] - 71:10, 103:13, 107:4
**opened** [1] - 104:6
**opening** [12] - 13:21, 75:13, 79:23, 85:24, 86:10, 87:25, 89:20, 90:3, 90:7, 95:7, 103:6, 113:5
**operation** [1] - 79:6
**opine** [2] - 20:17, 78:9
**opined** [1] - 77:20
**opines** [1] - 37:25
**opinion** [6] - 8:11, 35:23, 42:16, 85:8, 92:13, 110:18
**opinions** [2] - 92:23, 92:24
**opportunities** [2] - 11:19, 34:10
**opportunity** [5] - 13:16, 105:6, 106:19,

109:16, 109:18
**opposed** [2] - 17:14, 85:18
**opposing** [1] - 93:12
**opposite** [1] - 58:15
**opposition** [4] - 5:20, 12:3, 12:8, 95:14
**optionally** [1] - 76:7
**order** [10] - 31:5, 34:23, 45:10, 78:10, 85:1, 108:7, 110:7, 118:8, 118:11, 118:12
**orders** [1] - 111:16
**ordinarily** [1] - 119:5
**ordinary** [6] - 5:13, 5:18, 95:8, 95:11, 102:7, 102:9
**original** [8] - 7:10, 7:11, 70:24, 71:3, 77:16, 95:21, 99:2, 99:7
**originally** [3] - 49:9, 96:23
**otherwise** [2] - 89:18, 98:24
**ourselves** [1] - 23:12
**outlined** [1] - 61:11
**output** [1] - 54:18
**outreach** [1] - 34:7
**outset** [1] - 60:2
**outside** [1] - 55:12
**oval** [1] - 84:13
**overcome** [1] - 14:3
**overcomplicating** [1] - 115:9
**overlap** [1] - 73:24
**overlaps** [1] - 71:25
**overlooked** [1] - 74:3
**overseas** [1] - 50:21
**overstates** [2] - 27:9, 27:22
**overtook** [1] - 39:22
**overview** [1] - 48:11
**own** [6] - 10:8, 10:15, 16:21, 22:22, 94:5, 106:4
**owner** [5] - 10:9, 13:5, 69:23, 105:13, 105:15
**ownership** [1] - 66:24
**owns** [1] - 64:1

**P**

**pad** [1] - 108:12
**pads** [2] - 69:6, 78:22
**page** [22] - 4:10, 6:1,

14:21, 14:23, 18:14, 35:2, 61:3, 61:25, 67:12, 70:8, 75:24, 76:2, 77:4, 77:19, 78:13, 95:20, 96:20, 100:11, 114:4, 114:12, 116:9

**pager** [1] - 114:8
**pager-type** [1] - 114:8
**pagers** [1] - 115:3
**pages** [4] - 14:19, 67:13, 78:14, 108:1
**pair** [4] - 30:15, 30:17, 30:18, 50:2
**Palaniswamy** [1] - 3:19
**panacea** [1] - 45:24
**paper** [1] - 60:11
**papers** [7] - 25:18, 29:2, 35:1, 40:25, 44:3, 60:21, 77:11
**paragraph** [11] - 35:22, 62:12, 65:5, 66:3, 68:22, 79:12, 106:21, 107:20, 108:4, 108:13, 112:14
**paragraphs** [1] - 50:19
**parameters** [2] - 9:12, 9:14
**park** [1] - 7:13
**Park** [1] - 3:17
**part** [10] - 29:9, 41:12, 42:20, 64:5, 70:23, 74:6, 74:7, 75:19, 88:9, 108:2
**particular** [12] - 11:15, 11:22, 28:16, 31:20, 36:15, 37:1, 37:8, 55:17, 59:18, 69:15, 82:22, 99:22
**parties** [16] - 12:19, 18:3, 18:8, 23:18, 53:20, 60:24, 65:21, 72:13, 72:21, 77:17, 85:16, 95:19, 106:10, 106:14, 107:11, 109:22
**partnership** [1] - 41:11
**parts** [2] - 13:23, 64:22
**party** [5] - 4:3, 11:4, 16:7, 82:18, 86:22
**pass** [2] - 84:4, 92:11
**passing** [1] - 87:16
**past** [4] - 13:11, 38:2, 66:4, 112:1
**patch** [13] - 71:24,

71:25, 72:8, 74:12, 74:25, 75:10, 75:20, 75:21, 75:22, 75:23, 77:5
**patches** [8] - 59:19, 72:5, 72:6, 73:7, 73:12, 75:2, 84:11
**patches".**.. [1] - 75:1
**patent** [127] - 3:17, 3:19, 4:7, 6:18, 6:20, 7:6, 9:24, 9:25, 10:5, 10:9, 11:22, 13:17, 16:13, 20:17, 20:19, 20:20, 23:22, 26:11, 27:12, 28:23, 29:4, 29:7, 30:24, 30:25, 31:4, 31:7, 31:20, 31:21, 40:19, 40:22, 42:9, 44:3, 44:7, 44:11, 44:17, 45:8, 45:12, 52:7, 54:10, 54:24, 55:12, 55:14, 55:16, 55:17, 55:19, 55:22, 56:12, 57:4, 58:7, 58:11, 60:24, 62:24, 63:3, 63:7, 63:15, 65:7, 65:23, 67:14, 68:4, 69:20, 69:21, 69:23, 69:24, 69:25, 70:4, 70:5, 73:6, 73:18, 75:13, 75:14, 75:22, 84:18, 85:19, 86:9, 93:25, 95:20, 95:24, 96:5, 97:5, 97:22, 98:6, 98:14, 98:21, 98:25, 99:8, 99:11, 99:13, 99:14, 99:18, 99:20, 99:22, 99:23, 99:25, 100:1, 100:4, 100:5, 100:7, 100:10, 100:11, 100:13, 100:15, 100:22, 100:24, 103:13, 104:22, 105:13, 107:10, 107:16, 107:17, 107:19, 107:24, 108:1, 108:11, 108:17, 110:19, 110:20, 111:5, 111:7, 111:9, 115:6, 118:25
**patented** [7] - 24:25, 32:9, 33:2, 33:6, 33:22, 108:11
**patentee** [14] - 22:17, 22:24, 23:2, 23:22, 23:23, 24:9, 24:11, 25:2, 32:17, 51:20, 52:7, 61:6, 61:7, 61:8

**patentee's** [1] - 23:5
**patents** [11] - 20:16, 25:17, 62:7, 62:10, 62:20, 62:23, 63:2, 64:2, 65:21, 67:12, 81:6
**patterns** [1] - 29:21
**Patton** [2] - 47:22, 47:23
**paying** [1] - 15:8
**Peachey** [1] - 81:5
**pedometers** [1] - 30:4
**people** [7] - 15:7, 39:21, 46:19, 47:12, 96:14, 112:10, 114:1
**pepper** [1] - 31:2
**per** [3] - 29:21, 56:20
**perceived** [1] - 61:10
**percent** [2] - 37:2, 47:9
**perfect** [1] - 114:21
**perfecting** [1] - 14:22
**perfectly** [1] - 11:9
**perform** [1] - 116:1
**performed** [5] - 101:5, 101:13, 103:18, 109:8
**performing** [1] - 116:2
**perhaps** [7] - 19:23, 20:10, 25:1, 37:6, 38:2, 68:19, 86:18
**period** [2] - 49:13, 89:1
**person** [8] - 5:13, 5:18, 11:12, 60:10, 67:5, 78:17, 78:22, 84:19
**personal** [4] - 39:24, 39:25, 85:5, 93:6
**persons** [1] - 78:7
**perspective** [2] - 67:3, 111:8
**pertaining** [1] - 28:24
**pertains** [1] - 22:5
**Peter** [1] - 3:7
**PETER** [1] - 1:13
**phase** [1] - 43:7
**Phillips** [1] - 54:25
**photos** [2] - 72:2, 72:3
**phrase** [1] - 76:18
**physical** [3] - 72:16, 97:18, 104:17
**PI** [2] - 5:3, 49:3
**picking** [1] - 72:14
**picture** [4] - 85:22,

87:17, 88:20, 89:4
**pictures** [1] - 41:18
**piece** [9] - 20:19, 31:16, 41:21, 41:23, 41:25, 44:5, 44:6, 91:16, 98:25
**pieces** [1] - 109:4
**pink** [1] - 84:8
**pioneering** [1] - 29:25
**pioneers** [4] - 38:19, 38:25, 39:2, 39:5
**place** [1] - 116:8
**placed** [6] - 4:20, 74:9, 88:20, 88:25, 91:8
**places** [1] - 88:6
**placing** [2] - 76:10, 81:14
**plain** [2] - 95:8, 95:11
**plainly** [1] - 35:7
**PLAINTIFF** [2] - 1:4, 1:12
**Plaintiff** [10] - 3:3, 22:24, 24:4, 47:1, 72:25, 74:3, 77:5, 77:24, 78:10, 117:17
**Plaintiff's** [1] - 75:13
**plaintiff's** [1] - 78:1
**plaintiffs** [1] - 24:19
**plans** [3] - 46:22, 46:23
**plant** [1] - 86:23
**plate** [1] - 86:16
**plated** [1] - 90:8
**platform** [1] - 13:10
**plating** [1] - 109:6
**platitudes** [1] - 34:21
**played** [1] - 17:1
**player** [1] - 39:21
**players** [1] - 39:23
**plays** [1] - 19:7
**podium** [1] - 3:24
**point** [37] - 12:13, 16:3, 17:8, 22:4, 22:5, 24:14, 28:5, 28:14, 41:15, 43:6, 48:24, 51:23, 52:15, 53:25, 54:4, 59:10, 67:23, 70:14, 77:22, 79:22, 83:15, 84:22, 85:20, 87:9, 87:23, 88:2, 89:10, 89:11, 92:15, 93:6, 106:15, 106:23, 106:25, 107:1, 107:6, 117:2
**pointed** [7] - 20:10, 48:23, 51:19, 69:13, 70:19, 77:21, 107:15

**pointing** [1] - 21:21
**points** [16] - 7:18, 20:8, 38:16, 47:13, 53:7, 60:15, 67:22, 77:5, 79:21, 82:22, 87:12, 87:16, 88:3, 88:16, 89:10, 89:12
**polo** [1] - 18:16
**Polo** [1] - 18:17
**portion** [16] - 32:7, 38:16, 43:15, 55:16, 55:17, 70:17, 71:17, 73:4, 80:8, 81:15, 88:1, 90:15, 94:12, 99:4, 102:18, 103:2
**portions** [1] - 49:6
**position** [10] - 13:4, 13:13, 52:17, 52:20, 58:16, 70:6, 80:2, 104:6, 108:6, 111:13
**positioned** [2] - 79:3, 79:13
**positioning** [1] - 108:16
**possible** [2] - 66:20, 108:24
**post** [2] - 88:13, 88:14
**post-activation** [1] - 88:14
**posture** [2] - 24:1, 72:19
**postures** [1] - 62:1
**potential** [2] - 38:9, 57:13
**potentially** [1] - 108:15
**powder** [1] - 79:2
**power** [1] - 33:18
**practice** [2] - 44:4, 81:12
**practices** [2] - 52:8, 52:13
**practicing** [4] - 13:17, 46:17, 52:9, 52:11
**preamble** [2] - 9:16, 53:16
**precisely** [1] - 12:21
**preclude** [1] - 7:4
**precludes** [1] - 98:14
**precondition** [1] - 91:9
**predecessor** [6] - 37:10, 60:21, 60:25, 63:21, 68:17, 70:3
**preface** [1] - 95:3
**preliminary** [29] - 4:8, 5:9, 10:22, 18:21, 22:7, 22:9, 25:3, 26:5,

27:6, 46:8, 46:12, 46:15, 46:21, 52:3, 52:6, 52:14, 52:25, 53:3, 60:3, 69:9, 70:2, 80:1, 84:24, 85:1, 89:22, 93:13, 95:6, 105:6, 110:7

**premature** [1] - 43:5

**premise** [3] - 14:12, 92:9

**premises** [1] - 14:24

**prepares** [1] - 88:7

**preparing** [1] - 118:8

**presales** [1] - 34:7

**present** [12] - 24:1, 41:7, 44:6, 54:10, 76:4, 76:9, 78:5, 104:13, 105:19, 107:12, 112:20, 112:23

**presentation** [7] - 4:2, 4:5, 27:16, 44:22, 48:20, 96:19, 96:21

**presented** [7] - 9:8, 9:14, 9:24, 83:12, 85:3, 85:25, 106:12

**presents** [1] - 118:14

**President** [1] - 81:5

**pressure** [2] - 53:23, 54:6

**presumed** [1] - 22:20

**presumption** [5] - 10:1, 46:11, 46:12, 52:16, 100:22

**pretty** [4] - 38:15, 53:19, 55:14, 111:12

**prevailed** [1] - 10:18

**prevailing** [3] - 6:13, 22:17, 27:20

**preventing** [1] - 36:11

**preview** [1] - 24:18

**previewed** [1] - 27:4

**previous** [1] - 105:15

**previously** [2] - 5:6, 84:17

**price** [5] - 11:19, 14:14, 15:15, 34:5, 34:9

**prices** [6] - 34:6, 35:18, 36:6, 36:8, 36:9, 116:12

**primary** [2] - 84:1, 90:19

**principal** [2] - 10:11, 67:6

**privately** [1] - 64:4

**probability** [1] - 36:25

**problem** [1] - 14:1

**proceedings** [3] - 40:17, 42:12, 67:9

**process** [25] - 14:22, 14:24, 15:5, 20:20, 21:11, 85:6, 86:14, 86:17, 87:18, 87:21, 87:25, 88:1, 88:4, 88:10, 88:13, 88:17, 89:16, 89:17, 90:16, 91:20, 92:7, 93:2, 93:23, 101:9, 109:7

**processed** [1] - 57:24

**processes** [1] - 90:14

**produce** [2] - 109:25, 112:11

**product** [91] - 7:10, 11:21, 12:15, 13:15, 14:11, 14:13, 14:15, 14:17, 15:3, 15:4, 15:6, 15:12, 15:14, 15:21, 16:2, 16:8, 16:20, 18:19, 19:3, 19:5, 19:9, 19:13, 20:24, 22:6, 23:13, 23:14, 24:13, 25:12, 25:23, 28:5, 28:7, 28:14, 31:7, 32:10, 32:13, 32:20, 33:6, 33:9, 36:6, 37:20, 46:10, 49:8, 49:9, 50:7, 50:11, 50:25, 51:18, 52:13, 52:18, 53:1, 56:15, 58:16, 60:5, 65:6, 65:14, 69:2, 69:3, 70:4, 82:14, 82:25, 83:1, 83:2, 83:12, 83:16, 86:9, 99:3, 101:13, 102:2, 103:19, 105:10, 105:21, 106:6, 108:8, 109:15, 110:21, 110:25, 111:4, 111:6, 111:18, 111:21, 113:1, 113:8, 113:10, 113:14, 115:7, 115:8, 115:20, 117:18, 118:2, 118:3, 118:24

**products** [59] - 4:18, 4:22, 5:1, 5:14, 5:15, 5:24, 6:8, 6:15, 7:19, 8:13, 15:10, 16:12, 17:6, 19:1, 19:10, 21:22, 24:13, 28:8, 28:10, 30:9, 30:14, 31:12, 37:23, 38:7, 48:11, 48:25, 49:2, 50:1, 50:3, 50:9,

50:20, 50:24, 51:6, 51:16, 51:17, 64:19, 64:24, 65:11, 66:8, 68:19, 68:20, 69:1, 72:17, 83:17, 83:18, 83:22, 97:21, 98:22, 103:6, 111:10, 112:11, 112:25, 114:19, 114:20, 115:3, 115:13, 115:16

**Professor** [1] - 113:21

**professor** [10] - 10:24, 11:9, 11:10, 11:14, 13:22, 17:2, 20:13, 20:16, 114:14, 115:22

**progression** [1] - 113:24

**promptly** [2] - 68:5, 69:21

**prong** [1] - 67:24

**proof** [1] - 91:8

**proofs** [1] - 27:14

**proper** [7] - 11:2, 18:7, 18:9, 43:1, 46:3, 46:4, 109:17

**properly** [2] - 26:19, 100:21

**properties** [1] - 58:24

**property** [1] - 66:14

**propose** [1] - 19:18

**proposed** [1] - 106:12

**proprietary** [2] - 101:9, 109:6

**prosecution** [13] - 42:10, 42:17, 44:5, 45:8, 55:7, 58:7, 70:22, 71:6, 71:15, 75:25, 77:2, 99:25, 100:3

**prospective** [1] - 34:8

**prototype** [7] - 7:11, 7:14, 14:21, 14:23, 83:6, 99:2, 99:7

**prove** [1] - 118:21

**proven** [1] - 51:25

**provide** [4] - 28:11, 56:23, 102:5, 102:25

**provided** [5] - 33:19, 33:20, 78:25, 109:13, 110:1

**provides** [1] - 28:4

**PTO** [2] - 44:6, 44:10

**public** [6] - 3:23,

5:14, 16:14, 16:16, 23:6, 55:13

**publications** [1] - 102:11

**pulled** [1] - 31:16

**pulse** [3] - 56:4, 57:2, 57:3

**purchase** [2] - 50:24, 86:21

**purchased** [2] - 50:20, 82:18

**purchases** [1] - 82:19

**purchasing** [1] - 33:4

**purely** [2] - 11:5, 46:14

**purpose** [5] - 14:25, 87:1, 97:20, 102:24, 119:4

**purposes** [6] - 4:7, 6:10, 7:9, 40:23, 69:10, 98:19

**put** [41] - 12:19, 13:4, 13:12, 14:17, 20:2, 26:15, 26:16, 34:5, 34:25, 36:24, 41:4, 41:17, 43:2, 43:10, 45:5, 50:6, 50:14, 50:15, 54:23, 57:20, 57:25, 58:7, 68:3, 70:19, 75:11, 75:14, 80:2, 87:17, 87:20, 88:9, 89:25, 92:20, 96:4, 98:25, 102:10, 105:11, 105:23, 108:3, 108:8, 112:4, 116:7

**puts** [1] - 67:2

**putting** [3] - 18:5, 19:2, 92:13

**Pylon** [1] - 34:18

**Q**

**qualifications** [1] - 21:9

**qualified** [2] - 20:14, 20:17

**quality** [1] - 92:7

**quantify** [1] - 26:22

**questions** [6] - 59:3, 93:1, 99:16, 110:10, 118:15, 119:18

**quick** [3] - 3:6, 85:2, 110:13

**quickly** [4] - 23:2, 35:16, 36:19, 82:23

**quite** [2] - 89:13, 104:9

**quo** [19] - 12:19, 17:25, 18:2, 18:5, 18:6, 18:7, 18:8, 18:9, 18:13, 18:16, 18:17, 18:18, 19:11, 49:4, 50:5, 50:6, 119:4, 119:5

**quote** [5] - 52:1, 64:18, 64:21, 78:18, 114:5

**quoting** [1] - 78:15

**R**

**Rachael** [1] - 47:22

**RACHAEL** [1] - 1:19

**Radio** [2] - 61:4, 67:3

**raise** [4] - 9:3, 81:10, 100:6, 100:23

**raised** [22] - 5:4, 10:7, 15:6, 43:24, 54:1, 54:4, 95:14, 95:17, 98:16, 99:12, 100:25, 101:14, 103:4, 103:20, 103:24, 107:9, 107:14, 108:20, 110:15, 110:16, 117:8

**raises** [4] - 9:19, 59:3, 102:13, 118:25

**raising** [1] - 106:24

**Rajan** [2] - 3:19, 10:11

**RALPH** [1] - 1:17

**Ralph** [14] - 14:5, 16:1, 18:17, 19:17, 40:13, 40:23, 41:7, 41:8, 41:9, 41:11, 41:13, 44:1, 47:16, 111:13

**RAMTIN** [1] - 1:24

**rate** [10] - 29:23, 30:12, 30:19, 38:17, 57:2, 57:3, 82:14, 82:16, 85:13, 96:11

**rather** [5] - 32:17, 53:2, 60:10, 76:12, 118:9

**ravel** [1] - 96:16

**reach** [2] - 38:8, 68:12

**read** [4] - 25:18, 63:4, 96:23, 113:20

**readily** [1] - 89:13

**reading** [1] - 34:1

**reads** [1] - 32:16

**ready** [5] - 3:1, 111:2, 111:19

**real** [2] - 84:6, 108:19

**reality** [1] - 83:23
**realize** [1] - 110:6
**really** [22] - 4:4, 9:15, 12:2, 26:8, 27:1, 38:6, 41:14, 43:4, 46:23, 49:23, 53:12, 62:4, 67:21, 67:22, 100:2, 103:3, 105:24, 107:14, 107:17, 109:17, 115:22, 116:5
**Really** [1] - 72:18
**reason** [5] - 8:4, 16:15, 45:7, 100:21, 112:25
**reasonable** [1] - 111:12
**reasons** [2] - 42:16, 119:6
**rebut** [2] - 43:23, 101:5
**rebuts** [1] - 88:3
**rebuttal** [6] - 3:4, 9:18, 21:4, 26:14, 57:11, 107:25
**rebutted** [2] - 9:7, 92:25
**receive** [4] - 88:8, 88:11, 111:18, 117:2
**received** [2] - 67:6, 111:9
**receives** [1] - 86:24
**receiving** [1] - 54:17
**recently** [4] - 49:13, 50:8, 50:9, 113:13
**reception** [1] - 100:19
**recess** [1] - 80:7
**recipe** [4] - 31:1, 31:2, 31:5, 31:24
**recitation** [2] - 31:5, 70:21
**recited** [1] - 71:12
**recognition** [2] - 13:8, 117:5
**recognized** [1] - 5:12
**record** [30] - 19:3, 21:9, 22:10, 22:23, 23:10, 24:12, 24:23, 25:14, 26:16, 27:1, 33:4, 33:8, 33:11, 34:6, 34:8, 34:9, 34:11, 34:17, 35:12, 37:15, 38:12, 40:5, 44:10, 78:10, 101:12, 101:16, 109:5, 111:22, 112:3, 112:4
**recording** [1] - 89:9
**records** [1] - 34:4
**recover** [1] - 14:7
**recreate** [1] - 116:23

**recreated** [2] - 12:25, 13:25
**reduce** [1] - 37:24
**refer** [1] - 68:21
**reference** [16] - 58:13, 59:3, 76:2, 76:3, 76:24, 76:25, 77:20, 77:21, 77:22, 78:7, 79:7, 79:14, 99:23, 100:9, 100:14, 108:21
**references** [5] - 9:23, 9:24, 9:25, 10:3, 10:4
**referred** [3] - 55:16, 59:1, 112:14
**referring** [1] - 30:6
**reflected** [2] - 63:9, 63:23
**reflecting** [1] - 63:10
**refusals** [1] - 109:24
**regard** [11] - 5:5, 36:15, 47:3, 98:15, 98:17, 100:2, 100:23, 101:1, 101:14, 108:22, 110:8
**regarded** [1] - 28:10
**regarding** [5] - 95:2, 99:18, 99:19, 101:9, 101:13
**registered** [1] - 112:17
**registers** [1] - 88:16
**regular** [2] - 45:17, 77:6
**Reinhold** [21] - 77:20, 77:22, 78:2, 78:3, 78:5, 78:7, 78:15, 78:16, 78:20, 78:21, 79:9, 79:16, 107:10, 107:16, 107:17, 107:19, 107:24, 108:10, 108:20
**reject** [2] - 47:10
**rejected** [1] - 42:10
**rejection** [1] - 97:4
**relate** [1] - 57:16
**related** [3] - 9:12, 104:4, 118:22
**relates** [3] - 54:11, 57:15, 81:8
**relationships** [1] - 81:10
**released** [1] - 68:24
**releases** [1] - 15:20
**relevant** [4] - 26:20, 63:18, 82:12, 111:4
**reliable** [1] - 55:12
**reliance** [4] - 67:20, 105:8, 105:14, 105:24

**relied** [2] - 105:9, 106:4
**relief** [12] - 22:16, 22:25, 25:3, 26:5, 40:10, 80:1, 113:3, 113:11, 117:17, 118:2, 118:16, 118:20
**relies** [1] - 108:25
**rely** [2] - 44:2, 55:13
**remaining** [1] - 92:10
**remarkable** [1] - 25:24
**remarks** [1] - 103:6
**remedied** [3] - 12:23, 13:1, 23:4
**remember** [7] - 3:9, 3:10, 39:10, 39:20, 64:3, 78:15, 88:2
**remembers** [1] - 39:17
**remind** [1] - 63:25
**remotely** [1] - 34:11
**remove** [1] - 17:22
**renders** [1] - 44:10
**repeat** [1] - 87:6
**repeats** [1] - 65:9
**replaced** [1] - 71:20
**replicated** [1] - 73:5
**reply** [17] - 27:18, 35:2, 43:11, 43:15, 43:22, 51:3, 61:2, 63:2, 69:17, 72:24, 72:25, 78:1, 88:3, 89:23, 89:25, 92:23, 95:14
**report** [7] - 21:3, 26:10, 26:19, 31:6, 33:24, 34:1, 36:20
**REPORTER** [3] - 2:1, 2:1, 120:3
**reports** [1] - 48:9
**represent** [4] - 3:7, 60:16, 81:2, 117:13
**representative** [1] - 48:3
**representatives** [1] - 81:19
**represented** [2] - 83:5, 112:12
**representing** [1] - 47:1
**reputation** [1] - 34:9
**reputational** [2] - 11:18, 23:20
**request** [2] - 40:6, 80:3
**REQUESTED** [1] - 120:1
**requests** [4] - 104:3, 110:1, 119:11

**require** [2] - 31:4, 31:17
**required** [7] - 22:21, 27:15, 35:13, 35:24, 84:18, 98:23, 110:3
**requirement** [6] - 24:20, 27:5, 53:16, 53:17, 98:9
**requirements** [1] - 92:14
**requires** [8] - 4:10, 6:19, 20:20, 41:1, 61:23, 74:5, 76:19, 103:14
**requiring** [1] - 33:1
**research** [2] - 10:10, 50:12
**reserve** [1] - 106:7
**resin** [1] - 79:2
**resistance** [7] - 87:11, 88:15, 89:8, 89:9, 89:11, 89:12
**resistant** [1] - 58:2
**resistive** [5] - 58:6, 58:9, 58:15, 58:23, 58:25
**resolution** [1] - 68:12
**resolve** [2] - 14:1, 55:5
**resolved** [2] - 55:10, 84:14
**resources** [2] - 35:25, 36:2
**respect** [35] - 10:18, 16:3, 20:9, 22:10, 22:16, 23:10, 25:17, 30:8, 31:7, 32:22, 34:13, 43:25, 48:25, 49:4, 59:11, 62:20, 63:4, 69:14, 70:6, 70:11, 70:23, 79:16, 79:21, 82:23, 84:2, 92:3, 92:15, 94:4, 99:13, 101:18, 102:16, 104:25, 105:11, 117:1
**respectfully** [4] - 40:6, 45:21, 47:10, 47:13
**respiration** [1] - 56:4
**respond** [4] - 20:8, 63:16, 67:7, 95:2
**responded** [1] - 119:11
**responds** [1] - 65:20
**response** [14] - 10:10, 57:14, 61:2, 61:13, 69:17, 78:1, 86:11, 87:24, 95:9,

95:16, 97:5, 105:2, 107:14, 119:15
**responses** [2] - 109:25, 110:3
**responsible** [1] - 81:6
**rest** [2] - 47:6, 74:10
**rests** [1] - 118:21
**result** [3] - 26:11, 52:5, 119:3
**results** [1] - 8:11
**return** [2] - 51:12, 94:10
**returning** [1] - 48:6
**reversed** [1] - 62:2
**review** [1] - 38:14
**reviewed** [1] - 86:6
**reviews** [1] - 75:18
**rewrite** [1] - 43:20
**Rice** [1] - 81:25
**Rich** [1] - 81:2
**RICHARD** [2] - 1:25, 2:2
**right-hand** [1] - 68:3
**rights** [10] - 64:1, 64:25, 65:8, 65:17, 66:14, 66:24, 69:20, 69:23, 70:5, 111:9
**Rio** [1] - 39:20
**ripe** [1] - 106:7
**risk** [1] - 80:2
**road** [3] - 37:8, 116:16, 117:3
**ROBERT** [2] - 1:16, 1:17
**Robert** [1] - 34:18
**rocket** [1] - 115:9
**roll** [3] - 87:2, 88:5
**rolls** [1] - 86:22
**room** [1] - 31:11
**roughly** [2] - 91:18
**RPR** [2] - 2:1, 120:10
**rule** [11] - 18:22, 46:11, 46:16, 81:12, 92:14, 105:2, 113:7, 118:7, 118:9, 118:13, 119:9
**rules** [1] - 110:3
**ruling** [1] - 98:20
**runners** [2] - 56:20, 56:21
**running** [4] - 68:8, 99:5, 99:6, 110:22
**runs** [1] - 73:13
**RUSSELL** [1] - 2:2
**RZONCA** [1] - 1:24

---

**S**

**s/Debra** [1] - 120:10

**salaries** [1] - 15:8
**sale** [1] - 49:5
**sales** [7] - 19:5, 23:19, 25:6, 32:11, 94:6, 115:7, 117:3
**salvages** [1] - 70:6
**sample** [2] - 9:1, 88:14
**samples** [3] - 8:8, 8:24, 87:7
**sandwich** [1] - 77:14
**SARVINT** [1] - 1:3
**Sarvint** [143] - 3:4, 3:5, 3:8, 3:16, 3:18, 3:20, 3:21, 4:5, 4:8, 6:12, 7:10, 7:11, 7:12, 10:7, 10:14, 10:16, 10:22, 10:24, 11:15, 11:16, 11:17, 11:23, 11:24, 13:4, 13:6, 13:12, 13:14, 13:15, 13:20, 14:3, 14:7, 14:11, 14:13, 14:15, 14:16, 14:20, 14:21, 14:24, 15:3, 15:4, 15:5, 15:13, 15:20, 16:4, 16:6, 16:7, 17:23, 18:19, 18:20, 18:23, 19:4, 19:12, 20:8, 23:7, 23:13, 25:7, 25:20, 26:4, 26:10, 26:13, 27:2, 27:4, 27:7, 27:8, 27:11, 27:18, 27:22, 27:24, 28:23, 29:1, 29:2, 31:19, 35:2, 35:24, 36:11, 36:17, 36:22, 37:2, 37:6, 37:19, 38:1, 38:20, 39:3, 40:5, 40:15, 41:4, 41:7, 41:10, 41:12, 43:14, 44:2, 49:17, 52:17, 57:12, 58:10, 59:4, 61:2, 61:14, 67:21, 68:17, 68:18, 72:10, 82:5, 82:23, 82:24, 83:9, 83:15, 83:17, 84:23, 85:20, 85:25, 89:23, 89:25, 90:3, 90:10, 90:21, 92:20, 93:9, 93:10, 93:14, 93:25, 94:4, 99:16, 101:22, 104:3, 104:11, 105:2, 105:10, 110:2, 111:8, 114:20, 115:4, 116:6, 116:19, 116:20, 116:25, 117:5, 117:6, 118:18, 118:21, 118:24, 119:10

**Sarvint's** [23] - 10:11, 15:25, 35:1, 40:7, 43:3, 60:21, 60:24, 63:21, 71:8, 85:6, 85:9, 85:11, 85:22, 85:23, 87:24, 88:3, 90:18, 92:22, 94:5, 106:25, 111:12, 119:6, 119:15
**satisfied** [3] - 10:17, 31:5, 92:15
**satisfy** [1] - 61:23
**save** [1] - 66:5
**saw** [2] - 34:13, 85:23
**scanning** [1] - 8:9
**scares** [1] - 29:13
**schedule** [1] - 19:19
**Schoenthaler** [2] - 3:7, 94:9
**SCHOENTHALER** [18] - 1:13, 3:6, 3:10, 10:20, 10:22, 11:6, 11:14, 12:2, 12:24, 13:3, 13:22, 16:25, 17:16, 18:7, 81:16, 110:12, 117:19, 117:24
**science** [1] - 115:10
**scope** [3] - 30:24, 31:20, 71:19
**score** [1] - 56:13
**screen** [3] - 39:7, 59:18, 87:9
**scroll** [1] - 39:19
**seal** [1] - 81:15
**sealed** [2] - 80:8, 94:12
**search** [2] - 39:17, 39:19
**searched** [2] - 109:13, 109:14
**second** [14] - 4:10, 14:22, 22:5, 37:17, 38:11, 56:20, 57:11, 58:16, 64:25, 65:9, 66:1, 66:3, 73:22, 92:2
**secondly** [1] - 27:4
**Secret** [31] - 5:22, 16:1, 18:13, 81:3, 81:9, 81:19, 81:20, 81:21, 81:24, 82:12, 82:17, 82:22, 82:24, 83:16, 83:18, 83:19, 83:20, 84:4, 84:15, 85:3, 86:9, 87:4, 89:7, 90:1, 90:5, 93:20, 94:5, 103:24, 112:2
**secret** [3] - 18:11,

108:22, 108:24
**SECRET** [1] - 1:23
**Secret's** [1] - 84:25
**secretary** [3] - 63:6, 63:7, 63:10
**secretary's** [1] - 63:9
**section** [1] - 31:14
**see** [40] - 4:19, 12:13, 29:5, 29:6, 30:11, 34:3, 34:10, 34:18, 36:13, 37:19, 38:3, 43:11, 45:9, 45:19, 46:1, 50:3, 53:2, 56:10, 59:17, 59:18, 59:21, 63:4, 66:2, 67:21, 68:7, 68:11, 69:18, 72:4, 72:7, 73:9, 75:19, 84:5, 88:14, 88:22, 89:8, 96:6, 100:11, 100:12, 117:24, 119:15
**seek** [1] - 113:10
**seeking** [1] - 18:20
**seeming** [1] - 91:2
**seemingly** [1] - 118:10
**sell** [21] - 16:3, 16:12, 25:9, 25:11, 49:10, 49:18, 49:19, 50:18, 50:25, 51:1, 51:16, 51:17, 82:17, 83:19, 111:13, 112:21, 113:7, 113:11, 115:18, 115:19
**selling** [22] - 15:11, 16:8, 18:12, 18:15, 18:23, 19:1, 19:3, 19:4, 19:9, 19:13, 27:12, 37:23, 49:9, 50:8, 68:20, 112:3, 112:16, 115:1, 115:2, 115:3, 115:16
**sells** [3] - 69:1, 83:18, 89:6
**SEM** [5] - 90:4, 90:20, 101:4, 101:12, 109:8
**send** [1] - 67:11
**sends** [2] - 63:7, 111:4
**Sensatex** [15] - 25:22, 25:23, 26:1, 37:7, 63:21, 64:1, 65:7, 66:5, 66:16, 68:6, 68:8, 68:9, 105:12, 106:1, 113:15
**Sensatex's** [2] - 65:17, 67:8

**sense** [9] - 17:5, 18:23, 30:13, 30:18, 48:13, 102:17, 106:17, 110:17, 112:7
**sensed** [1] - 102:21
**senses** [2] - 65:14, 96:1
**sensing** [3] - 30:17, 41:3, 57:24
**sensitivity** [1] - 29:14
**sensor** [69] - 4:12, 4:13, 4:14, 4:15, 4:17, 4:20, 5:2, 5:24, 5:25, 6:3, 6:4, 6:5, 6:9, 6:19, 7:17, 7:21, 35:5, 35:7, 41:19, 41:22, 53:9, 54:11, 54:16, 55:18, 56:3, 59:12, 69:6, 71:24, 72:5, 72:17, 73:9, 73:12, 74:5, 74:7, 74:9, 74:11, 74:19, 74:21, 77:5, 95:25, 96:5, 96:7, 96:10, 96:13, 97:10, 97:13, 97:16, 97:19, 97:23, 98:2, 98:5, 98:7, 98:10, 98:11, 98:23, 99:3, 102:3, 102:19, 102:22, 103:2, 104:16, 104:19, 104:20, 107:6, 115:10, 115:12
**SENSORIA** [1] - 1:19
**Sensoria** [24] - 6:14, 9:10, 10:6, 16:4, 16:8, 16:9, 18:14, 18:16, 47:19, 48:3, 48:19, 49:13, 50:6, 54:8, 56:15, 60:3, 101:22, 101:24, 102:1, 103:4, 103:19, 103:21, 104:14, 112:2
**sensors** [15] - 7:24, 8:1, 17:20, 28:24, 53:23, 54:1, 54:6, 56:23, 57:5, 57:16, 59:17, 59:19, 59:20, 59:23, 107:18
**sent** [2] - 3:1, 68:7
**sentence** [3] - 65:3, 65:9, 66:17
**separate** [3] - 53:21, 59:22
**separately** [1] - 48:16
**separation** [1] - 104:18
**September** [1] -

120:10
**serious** [2] - 43:24, 64:21
**seriousness** [1] - 67:10
**serve** [1] - 49:20
**served** [4] - 16:14, 104:3, 110:2, 110:4
**serving** [1] - 109:20
**set** [4] - 28:7, 87:11, 88:15, 89:8
**setting** [1] - 82:13
**seven** [3] - 42:10, 111:17, 119:7
**several** [12] - 5:4, 5:20, 5:21, 7:23, 7:25, 33:3, 38:10, 61:8, 96:3, 96:14, 103:6, 104:7
**sewn** [5] - 31:15, 31:17, 41:23, 72:7, 100:16
**shape** [1] - 84:13
**share** [15] - 14:14, 15:15, 15:19, 23:20, 34:19, 35:18, 35:21, 36:1, 38:18, 51:25, 52:5, 52:20, 52:22, 116:11
**shareholders** [1] - 66:19
**shares** [1] - 119:1
**sheet** [3] - 108:12, 109:13, 109:14
**shelf** [2] - 83:17, 83:21
**shifted** [1] - 77:24
**ship** [5] - 18:19, 19:7, 101:24, 111:16, 113:13
**shipped** [3] - 22:6, 111:24, 113:14
**shirt** [8] - 18:15, 31:13, 41:6, 49:1, 50:2, 83:7, 114:9
**shirts** [9] - 17:15, 44:1, 50:9, 50:18, 69:5, 114:23, 115:18, 116:21
**short** [3] - 35:13, 80:7, 92:10
**short-circuited** [1] - 92:10
**shorts** [3] - 30:13, 30:15, 30:17
**shoulders** [1] - 82:9
**show** [29] - 10:14, 17:4, 24:12, 24:23, 27:7, 32:17, 46:14, 49:6, 77:24, 79:17,

82:11, 84:24, 93:16, 93:25, 98:7, 110:7, 112:4, 113:6, 114:1, 114:6, 114:7, 114:9, 116:16, 116:17, 116:18, 117:13

**showed** [3] - 25:14, 86:11, 116:9

**showing** [9] - 10:17, 14:25, 23:7, 34:3, 34:5, 34:6, 40:18, 87:8, 118:18

**shown** [16] - 4:6, 4:9, 7:6, 10:23, 16:6, 40:5, 40:15, 44:8, 46:9, 62:5, 72:1, 84:18, 98:21, 102:20, 104:22, 115:20

**shows** [9] - 14:19, 14:20, 14:21, 14:24, 42:17, 73:18, 87:17, 108:1, 116:22

**sic** [1] - 92:13

**side** [9] - 23:12, 40:20, 59:18, 68:3, 69:18, 85:3, 85:7, 92:12, 95:10

**sided** [1] - 105:22

**SIDS** [1] - 36:13

**sign** [5] - 4:22, 9:15, 9:16, 55:23, 57:13

**signal** [3] - 96:13, 97:23, 102:3

**signals** [7] - 54:17, 55:21, 56:9, 65:14, 100:17, 102:21, 102:24

**significance** [3] - 33:18, 69:9, 71:22

**significant** [1] - 51:20

**significantly** [2] - 33:7, 33:10

**signs** [25] - 4:11, 4:25, 9:11, 17:18, 17:19, 53:15, 53:21, 54:7, 54:12, 54:22, 55:15, 55:18, 55:20, 55:21, 55:22, 56:11, 56:16, 57:8, 96:2, 100:18, 102:1, 102:6, 102:12, 102:16

**silence** [3] - 62:8, 64:12, 67:17

**silent** [2] - 68:13, 70:5

**silver** [34] - 31:12, 31:16, 45:18, 71:24, 72:4, 72:8, 77:5, 77:7, 84:21, 88:8, 88:9,

88:11, 88:19, 88:20, 88:24, 89:2, 89:5, 90:12, 90:17, 90:22, 90:24, 91:8, 91:9, 91:10, 92:1, 93:23, 101:6, 101:7, 101:8, 103:7, 107:19, 109:7, 109:9, 109:10

**silvery** [1] - 84:13

**silvery-gray** [1] - 84:13

**similar** [3] - 28:12, 48:21, 71:23

**similarity** [1] - 113:1

**Simon** [1] - 39:7

**simple** [1] - 113:19

**simply** [7] - 7:17, 20:15, 27:20, 37:13, 53:7, 83:21, 91:22

**single** [5] - 73:19, 76:5, 76:13, 105:22, 108:9

**single-sided** [1] - 105:22

**sitting** [2] - 3:12, 114:14

**situation** [9] - 25:2, 28:9, 28:15, 61:10, 63:18, 67:19, 70:3, 83:22

**six** [5] - 35:2, 45:25, 72:6, 111:17, 119:7

**size** [3] - 51:10, 91:18

**sizes** [1] - 51:5

**skill** [2] - 5:13, 5:18

**skilled** [3] - 78:7, 78:16, 78:22

**skin** [2] - 4:21, 54:16

**skip** [3] - 68:1, 74:24, 85:14

**skipped** [4] - 21:11, 21:25, 42:13, 54:19

**skips** [2] - 20:18, 21:23

**sleep** [1] - 29:21

**slide** [27] - 20:2, 27:16, 34:25, 35:20, 40:3, 41:19, 48:16, 51:2, 51:15, 53:5, 53:14, 55:25, 56:14, 57:10, 58:17, 59:25, 63:19, 67:4, 68:1, 70:10, 71:23, 72:2, 72:25, 73:22, 74:14, 74:16, 82:11

**slides** [4] - 53:12, 60:10, 85:14, 92:10

**slight** [1] - 19:19

**Sloan** [1] - 38:13

**small** [2] - 47:1, 81:7

**smaller** [2] - 26:24, 91:23

**smart** [17] - 17:7, 17:18, 26:23, 28:16, 29:10, 30:10, 30:21, 35:8, 36:12, 56:16, 57:6, 57:17, 57:19, 57:21, 114:11, 114:13, 115:11

**smartphone** [2] - 29:3, 29:5

**SmartShirt** [4] - 4:23, 66:7, 83:2, 83:6

**SmartShirts** [1] - 31:13

**snap** [1] - 72:1

**snaps** [2] - 84:10, 84:12

**so-called** [2] - 24:19, 45:21

**social** [1] - 39:12

**sock** [5] - 54:5, 59:20, 102:15, 102:18, 102:24

**socks** [31] - 9:11, 9:12, 30:2, 30:12, 30:18, 48:15, 49:12, 49:17, 49:22, 49:24, 49:25, 50:2, 50:3, 50:8, 50:11, 51:17, 53:15, 56:16, 57:6, 57:17, 57:19, 57:21, 60:4, 101:23, 101:25, 103:23, 114:6, 114:24, 115:17, 116:20

**software** [1] - 82:19

**sold** [9] - 18:16, 36:6, 49:2, 49:16, 51:6, 51:7, 64:19, 111:14, 113:1

**sole** [2] - 13:5, 73:6

**solution** [2] - 66:20, 84:20

**someone** [2] - 103:24, 111:6

**sometime** [1] - 25:20

**sometimes** [3] - 11:25, 55:7, 118:10

**somewhat** [1] - 117:8

**somewhere** [2] - 3:9, 96:9

**soon** [1] - 66:20

**sorry** [1] - 47:16

**sort** [13] - 33:12, 34:8, 60:18, 61:15, 61:21, 64:22, 88:23, 93:7, 95:4, 100:23,

101:17, 105:3, 105:14

**sounds** [2] - 8:14, 29:10

**sour** [1] - 31:3

**source** [1] - 55:6

**space** [4] - 15:8, 25:8, 83:17, 83:21

**Spahr** [1] - 81:2

**spandex** [18] - 7:6, 57:22, 58:20, 86:15, 86:20, 86:21, 88:8, 88:11, 89:19, 90:5, 90:8, 90:12, 90:17, 92:8, 101:8, 103:5, 103:7, 109:10

**special** [2] - 94:5, 112:6

**specific** [7] - 27:14, 31:4, 31:23, 34:4, 40:23, 99:14, 109:15

**specifically** [4] - 4:19, 32:5, 40:9, 95:18

**specification** [14] - 7:6, 54:24, 55:5, 55:6, 55:7, 73:1, 73:20, 74:15, 75:17, 75:18, 75:19, 76:1, 77:1, 102:8

**specious** [1] - 15:14

**spectrometry** [1] - 8:10

**speculation** [4] - 15:18, 15:19, 85:7, 116:18

**speculative** [4] - 46:14, 46:23, 51:22, 52:4

**spend** [2] - 77:14, 118:7

**spending** [1] - 113:9

**spent** [3] - 66:4, 113:18, 117:8

**spikes** [1] - 109:9

**sports** [11] - 25:10, 28:15, 30:3, 30:13, 49:1, 50:18, 51:4, 51:5, 51:8, 82:15, 84:10

**SPRING** [1] - 2:2

**squarely** [2] - 67:2, 118:21

**Squire** [2] - 47:22, 47:23

**Stacey** [1] - 112:12

**stage** [6] - 12:25, 14:6, 40:17, 82:13, 87:3, 88:17

**stand** [2] - 51:7, 82:9

**standard** [2] - 61:19,

117:15

**standing** [5] - 10:7, 10:8, 10:14, 89:21, 101:18

**standpoint** [1] - 111:12

**start** [7] - 30:11, 41:10, 44:25, 48:11, 55:2, 60:18, 86:20

**start-up** [1] - 41:10

**started** [8] - 19:4, 19:9, 20:7, 34:14, 48:2, 49:9, 112:3, 113:13

**starting** [1] - 113:24

**starts** [1] - 63:24

**state** [2] - 27:20, 95:7

**statement** [6] - 27:18, 45:6, 63:13, 86:5, 93:8, 108:14

**statements** [1] - 95:3

**STATES** [3] - 1:1, 1:10, 2:1

**states** [4] - 13:23, 48:6, 67:8, 78:20

**States** [1] - 47:7

**States'** [2] - 47:7, 47:8

**stating** [1] - 71:13

**status** [19] - 12:19, 17:25, 18:2, 18:5, 18:6, 18:7, 18:8, 18:9, 18:13, 18:16, 18:17, 18:18, 19:11, 49:4, 50:4, 50:5, 50:6, 119:4, 119:5

**stay** [3] - 119:13, 119:14, 119:16

**stenographic** [1] - 120:5

**STENOTYPE/ COMPUTER** [1] - 2:5

**STENOTYPE/ COMPUTER-AIDED** [1] - 2:5

**step** [13] - 16:19, 20:20, 21:11, 21:18, 21:23, 21:25, 42:14, 45:22, 54:19, 86:20, 87:21, 88:4, 88:19

**STEPHEN** [1] - 1:18

**stepping** [1] - 116:24

**steps** [4] - 30:3, 56:19, 56:20, 105:20

**Steve** [1] - 40:12

**Steven** [2] - 47:21, 47:24

**STEVEN** [1] - 1:19

**stiff** [1] - 45:20

**still** [8] - 41:10, 88:15, 88:16, 88:17, 103:8, 104:10, 115:25, 118:12
**stitched** [1] - 59:20
**STOCKWELL** [3] - 1:21, 60:9, 60:14
**stockwell** [5] - 60:8, 98:18, 105:4, 105:11, 106:12
**Stockwell's** [1] - 96:19
**stole** [1] - 27:12
**stop** [1] - 19:13
**stopped** [1] - 97:1
**stopping** [1] - 36:17
**stores** [2] - 83:19, 83:20
**STORES** [1] - 1:23
**straight** [1] - 98:13
**strap** [2] - 75:20, 102:20
**streamline** [1] - 19:22
**Street** [2] - 36:25, 37:1
**STREET** [1] - 2:2
**stretch** [3] - 31:14, 103:7, 103:8
**stretchy** [1] - 7:16
**striking** [3] - 56:21, 56:24, 71:13
**striped** [1] - 102:17
**strong** [2] - 10:17, 64:20
**strongly** [1] - 10:16
**struck** [3] - 71:4, 71:7, 71:20
**structure** [6] - 45:4, 45:12, 45:13, 45:14, 46:6, 55:9
**structures** [1] - 97:18
**studied** [1] - 33:25
**sub** [1] - 17:16
**Subject** [1] - 4:11
**subject** [13] - 4:12, 4:20, 4:21, 4:23, 21:7, 44:24, 50:10, 53:15, 54:12, 54:16, 54:22, 68:21, 96:2
**submarket** [1] - 26:23
**submit** [16] - 11:10, 34:22, 35:12, 38:11, 40:4, 40:15, 43:1, 45:11, 45:21, 46:2, 46:8, 46:16, 67:1, 79:16, 83:9, 102:9
**submitted** [17] - 5:3,

9:23, 12:3, 19:8, 44:7, 49:7, 49:15, 51:9, 57:12, 57:14, 86:10, 89:20, 93:12, 95:9, 99:16, 99:17, 105:7
**subpoena** [3] - 49:20, 103:25, 109:20
**subpoenaed** [1] - 93:14
**subsection** [1] - 103:10
**subsequent** [2] - 64:10, 65:19
**substance** [2] - 8:2, 88:23
**substantial** [14] - 9:3, 9:19, 77:23, 77:25, 79:18, 79:24, 84:25, 98:17, 100:23, 101:14, 102:13, 108:20, 118:14, 119:3
**substantive** [2] - 104:10, 109:25
**substitute** [8] - 17:6, 17:11, 28:10, 50:2, 51:18, 114:18, 114:20, 115:3
**substitutes** [4] - 28:8, 30:14, 30:19, 83:7
**substrate** [5] - 86:15, 89:19, 90:8, 108:3, 108:5
**succeed** [5] - 12:5, 12:7, 36:23, 37:5, 85:1
**success** [19] - 3:22, 4:5, 14:6, 20:9, 23:3, 23:8, 40:16, 41:11, 56:15, 69:12, 70:9, 84:2, 94:1, 101:1, 117:7, 117:8, 117:10, 117:13, 118:19
**successful** [1] - 23:24
**successfully** [1] - 24:9
**sue** [4] - 111:6, 115:1, 115:2
**sued** [2] - 105:19, 106:4
**suffer** [3] - 11:5, 14:14, 15:20
**suffered** [3] - 11:4, 12:22, 26:13
**suffering** [5] - 11:18, 12:22, 15:15, 15:20, 27:2
**sufficient** [2] - 79:19, 89:22

**sufficiently** [1] - 117:20
**suggest** [4] - 29:1, 67:14, 69:15, 92:2
**suggested** [1] - 22:6
**suggesting** [2] - 90:25, 91:1
**suggestion** [1] - 68:18
**suing** [1] - 69:21
**suit** [9] - 10:8, 10:15, 24:9, 29:5, 62:18, 62:21, 63:1, 64:17, 70:1
**sum** [2] - 10:16, 85:24
**summarize** [1] - 5:21
**summarizes** [1] - 40:1
**summary** [9] - 42:22, 43:6, 54:14, 59:24, 62:2, 62:16, 72:15, 104:25, 105:4
**Sundaresan** [1] - 3:15
**Sungmee** [1] - 3:17
**supplied** [4] - 27:25, 49:22, 81:23, 109:2
**supplier** [5] - 50:22, 50:25, 81:8, 81:9, 109:1
**supplies** [1] - 93:11
**support** [5] - 5:5, 11:12, 101:11, 101:17, 119:2
**supported** [3] - 5:8, 5:18, 99:10
**supporting** [2] - 113:9, 117:17
**supports** [3] - 16:16, 73:1, 73:20
**suppose** [1] - 51:4
**supposed** [4] - 105:15, 107:12, 111:6, 111:7
**Supreme** [2] - 22:15, 22:19
**surprise** [1] - 21:23
**surprised** [1] - 95:15
**surprising** [1] - 33:15
**survey** [2] - 33:17, 33:20
**survive** [1] - 16:11
**suspected** [1] - 90:11
**SW** [1] - 2:2
**swore** [1] - 5:16
**Systems** [3] - 51:24, 61:5, 67:3

**T**

**t-shirt** [1] - 41:6
**T-shirts** [2] - 50:9, 50:18
**TAHERI** [1] - 1:24
**talks** [11] - 6:20, 7:8, 28:4, 28:14, 29:2, 30:10, 31:9, 32:21, 32:25, 63:5, 74:17
**teach** [1] - 76:16
**teaches** [3] - 74:15, 75:14
**teaching** [2] - 78:21, 79:14
**tech** [1] - 24:7
**Tech** [3] - 10:9, 25:21, 26:3
**Tech's** [1] - 38:1
**technical** [3] - 11:3, 15:7, 20:15
**TECHNOLOGIES** [3] - 1:3, 1:6, 1:16
**technologies** [1] - 38:9
**Technologies** [1] - 3:8
**technology** [18] - 13:5, 26:24, 27:12, 37:24, 38:2, 38:7, 41:6, 46:15, 68:23, 68:25, 69:3, 69:6, 69:7, 72:18, 112:13, 116:4, 116:25
**telephone** [1] - 39:7
**temperature** [1] - 56:4
**ten** [6] - 15:7, 15:8, 37:4, 80:6, 114:12, 117:8
**ten-minute** [1] - 80:6
**tend** [1] - 38:8
**tendered** [1] - 67:22
**tends** [1] - 38:5
**tentative** [1] - 72:20
**tentatively** [1] - 98:19
**term** [5] - 71:5, 71:11, 102:9, 103:13
**terminal** [1] - 54:18
**terminated** [2] - 50:22, 50:24
**terms** [10] - 33:19, 44:2, 53:11, 55:15, 79:13, 79:25, 95:11, 95:13, 95:16, 95:17
**test** [3] - 22:22, 87:16, 103:18
**tested** [4] - 7:19, 8:24, 107:7

**testified** [5] - 16:21, 59:15, 83:9, 90:2, 102:17
**testifies** [3] - 58:22, 86:23, 89:16
**testify** [3] - 16:23, 51:6, 51:11
**testimony** [12] - 8:20, 8:21, 11:11, 21:16, 26:15, 84:19, 85:4, 85:8, 85:11, 99:19, 101:9, 101:18
**tests** [1] - 8:12
**Texas** [1] - 46:19
**text** [1] - 63:19
**Textronics** [21] - 60:8, 60:16, 60:19, 60:22, 65:11, 65:13, 67:7, 67:11, 68:7, 68:9, 68:19, 68:23, 69:1, 69:15, 70:10, 72:18, 79:22, 96:21, 105:12, 112:16
**TEXTRONICS** [1] - 1:21
**Textronics'** [2] - 65:20, 68:8
**Textronics/Adidas** [1] - 104:24
**thankfully** [1] - 46:18
**THE** [86] - 1:1, 1:1, 1:9, 1:12, 1:15, 3:1, 3:9, 6:21, 7:1, 7:15, 8:3, 8:6, 8:14, 8:21, 9:3, 9:9, 9:21, 10:19, 10:21, 11:2, 11:13, 11:25, 12:21, 13:1, 13:18, 16:23, 17:13, 18:4, 19:15, 20:4, 20:21, 21:5, 21:8, 21:12, 21:15, 21:25, 22:11, 23:21, 24:8, 24:16, 25:4, 27:10, 29:10, 29:13, 32:24, 36:3, 37:4, 37:9, 40:11, 41:25, 42:21, 43:8, 44:13, 45:15, 47:15, 47:19, 48:4, 48:7, 49:20, 52:9, 52:19, 55:3, 56:1, 58:4, 59:13, 60:7, 60:13, 80:6, 81:14, 81:17, 82:1, 82:4, 84:6, 87:13, 92:17, 93:4, 94:7, 94:9, 100:4, 100:12, 106:9, 106:21, 110:11, 117:16, 117:23, 118:5
**themselves** [1] - 57:23

theoretically [2] - 100:19, 117:2

thereafter [4] - 26:2, 68:5, 69:21, 72:22

thereby [1] - 118:15

therefore [1] - 77:8

therein [1] - 103:12

thereto [1] - 10:13

thickness [1] - 91:19

third [5] - 14:20, 63:3, 65:1, 82:18, 86:22

thirdly [1] - 46:8

thirty [1] - 3:2

Thomas [2] - 3:14, 47:23

THOMAS [1] - 1:20

thorough [1] - 10:1

thoroughly [1] - 5:14

thousands [1] - 113:9

thread [20] - 45:17, 59:21, 73:12, 73:13, 75:8, 75:10, 75:11, 75:12, 75:15, 79:3, 98:2, 98:4, 98:8, 98:9, 98:12, 99:5, 104:15, 104:21, 108:16

threads [7] - 91:23, 98:1, 98:10, 107:5, 108:6, 108:8

threat [6] - 61:10, 64:11, 66:2, 66:25, 67:9, 67:16

threatened [2] - 62:6, 63:1

threats [1] - 64:17

three [22] - 15:25, 32:21, 38:18, 51:9, 57:14, 61:3, 61:25, 62:20, 62:23, 64:22, 65:2, 66:7, 69:25, 73:5, 73:7, 74:15, 74:18, 88:19, 96:8, 98:6, 99:8, 104:22

throughout [4] - 77:3, 89:2, 89:3, 106:2

tie [1] - 13:9

timely [1] - 104:3

TIMOTHY [1] - 1:9

tiny [1] - 46:25

tip [2] - 23:5, 72:7

tips [1] - 79:25

titled [1] - 70:10

today [19] - 3:15, 19:22, 23:15, 26:15, 31:9, 46:24, 53:17, 60:16, 68:20, 69:1, 69:7, 75:16, 83:1,

83:3, 104:13, 109:3, 114:14, 119:12

together [12] - 8:1, 41:23, 57:21, 57:25, 91:7, 91:12, 91:21, 91:24, 92:5, 107:5

took [7] - 26:1, 26:2, 40:1, 44:21, 67:11, 99:22, 107:15

top [7] - 29:22, 88:24, 96:4, 96:7, 108:3, 108:6, 108:12

topic [2] - 68:1, 77:18

torches [1] - 43:22

torso [2] - 31:14, 48:14

total [1] - 85:24

totally [2] - 57:4, 57:17

touch [4] - 39:7, 77:18, 100:17, 110:13

touched [1] - 111:10

touching [3] - 23:9, 90:22, 97:18

toward [1] - 15:4

towards [2] - 15:11, 66:8

track [2] - 30:2, 114:8

tracks [1] - 29:20

trademark [1] - 112:17

trademarks [1] - 15:10

traditional [1] - 22:21

TRANSCRIPT [1] - 120:1

transcript [2] - 81:15, 120:4

TRANSCRIPTION [1] - 2:5

transmit [1] - 102:4

transmitting [1] - 54:17

treated [1] - 92:1

Trebro [1] - 69:17

tremendous [2] - 25:16, 26:4

trial [1] - 21:6

tried [3] - 49:17, 111:15

trigger [1] - 64:13

triggering [1] - 64:12

triggers [1] - 67:24

trilogy [1] - 24:21

TRO [1] - 53:2

trouble [1] - 20:21

true [7] - 41:9, 43:21,

47:3, 69:22, 74:9, 83:18, 90:13

truly [1] - 82:12

trust [1] - 68:12

truth [2] - 59:6, 93:10

try [16] - 40:20, 45:18, 46:6, 50:2, 60:14, 68:11, 70:13, 78:11, 82:11, 89:1, 93:15, 102:7, 108:23, 109:14, 113:10

trying [16] - 26:12, 43:20, 43:23, 60:10, 63:15, 90:16, 98:4, 98:15, 100:6, 105:9, 114:1, 114:16, 114:17, 114:19, 114:20, 117:9

turn [5] - 22:12, 40:8, 47:17, 81:1, 114:12

turns [1] - 46:10

twice [3] - 44:25, 45:6, 91:18

twist [1] - 91:24

twisting [1] - 91:22

two [38] - 6:1, 6:14, 7:18, 9:22, 14:19, 20:20, 26:3, 28:3, 32:15, 35:20, 44:18, 46:25, 51:10, 62:23, 70:1, 72:4, 73:7, 73:9, 74:2, 74:18, 75:8, 82:21, 83:22, 84:10, 84:11, 87:12, 87:16, 87:21, 88:4, 88:16, 89:10, 89:12, 90:20, 95:20, 108:2, 110:22, 111:20, 119:12

two-man [1] - 46:25

two-step [2] - 20:20, 87:21

type [8] - 4:21, 7:9, 8:25, 77:14, 104:17, 106:13, 106:22, 114:8

types [2] - 35:16, 107:19

**U**

U.S [9] - 16:8, 16:13, 18:15, 49:6, 49:10, 51:1, 51:13

ultimate [2] - 20:17, 64:8

ultimately [5] - 60:24, 72:9, 72:22, 73:13, 89:6

unambiguous [1] - 56:13

unambiguously [1] -

13:24

undefined [2] - 42:15

under [4] - 8:9, 27:20, 30:20, 81:15

underbrush [1] - 48:25

underlies [1] - 69:6

underneath [1] - 70:20

understood [3] - 64:17, 67:9, 82:6

undoubtedly [1] - 102:21

unequivocally [1] - 71:8

uniform [3] - 24:8, 90:11, 92:5

uniformly [2] - 14:10, 15:23

unique [8] - 48:12, 54:7, 54:8, 58:2, 58:16, 60:15, 60:18, 70:9

unit [1] - 51:13

UNITED [3] - 1:1, 1:10, 2:1

United [3] - 47:7, 47:8

unlike [1] - 107:11

unlikely [1] - 118:16

unquestionably [1] - 21:7

unquote [1] - 114:5

unreasonably [1] - 112:5

unrelated [2] - 57:4, 57:17

unstated [1] - 91:5

unwind [1] - 26:1

up [26] - 3:22, 20:2, 26:3, 29:22, 33:13, 34:25, 38:23, 41:10, 44:21, 52:2, 55:25, 57:6, 60:11, 63:5, 63:22, 72:14, 77:6, 79:15, 83:1, 83:23, 84:4, 91:14, 93:19, 101:25, 110:21, 116:25

upper [2] - 29:19, 30:11

upshot [1] - 50:19

urgency [6] - 25:17, 26:4, 65:1, 66:21, 110:17

urgent [1] - 64:21

usage [2] - 28:9, 28:15

useless [2] - 45:11

user [3] - 28:25,

56:23, 102:25

user's [1] - 56:18

uses [3] - 26:24, 86:18, 113:25

**V**

vague [1] - 19:8

valid [4] - 12:15, 40:19, 53:7

validity [18] - 9:22, 10:2, 23:8, 40:16, 44:3, 77:23, 77:25, 78:11, 79:17, 99:13, 99:18, 100:7, 100:22, 100:24, 104:5, 108:20, 110:4, 118:15

valuable [1] - 99:4

valueless [1] - 66:12

variety [2] - 9:12, 91:21

various [5] - 9:14, 33:13, 109:4, 110:16, 112:11

vehemently [1] - 17:24

Ventures [2] - 25:22, 37:7

veracity [1] - 5:16

verified [1] - 5:17

version [2] - 14:23, 50:5

VERSUS [1] - 1:5

versus [2] - 51:24, 61:13

viable [1] - 113:10

Vice [1] - 81:5

VICTORIA'S [1] - 1:23

Victoria's [35] - 5:22, 16:1, 18:11, 18:13, 81:3, 81:9, 81:19, 81:21, 81:24, 82:12, 82:17, 82:22, 82:24, 83:16, 83:18, 83:19, 83:20, 84:3, 84:15, 84:24, 85:3, 86:8, 87:4, 89:7, 90:1, 90:4, 93:20, 94:4, 103:24, 108:22, 108:24, 112:2

view [4] - 37:25, 67:8, 73:20, 106:25

viewed [1] - 9:15

Vigano [11] - 48:3, 49:7, 50:19, 51:6, 51:11, 57:5, 58:21, 59:6, 59:15, 59:16, 59:22

Vigano's [1] - 102:14

vigorous [1] - 62:7

**vigorously** [1] - 64:20
**violate** [1] - 46:17
**violating** [1] - 118:25
**virtue** [1] - 20:12
**visiting** [1] - 32:2
**Vista** [1] - 39:17
**visual** [1] - 20:1
**vital** [30] - 4:11, 4:21, 4:25, 9:11, 9:15, 9:16, 17:18, 17:19, 53:15, 53:21, 54:7, 54:12, 54:21, 55:15, 55:18, 55:20, 55:21, 55:22, 55:23, 56:11, 56:16, 57:8, 57:13, 96:1, 100:17, 102:1, 102:6, 102:12, 102:16
**VSS** [1] - 85:22
**vulnerable** [1] - 12:22

## W

**waist** [1] - 96:12
**wait** [5] - 37:19, 38:3, 46:4, 106:16, 118:10
**wait-and-see** [1] - 37:19
**waiting** [1] - 111:17
**Wal** [1] - 25:11
**Wal-Mart** [1] - 25:11
**walk** [1] - 66:13
**walked** [1] - 48:10
**walkers** [1] - 56:21
**Wall** [2] - 36:25, 37:1
**wants** [2] - 41:12, 45:24
**Ward** [7] - 44:16, 48:20, 52:15, 53:6, 53:25, 101:17, 101:18
**WARD** [3] - 1:16, 44:15, 45:16
**Warren** [1] - 47:23
**WARREN** [1] - 1:20
**watch** [2] - 29:25, 114:7
**watches** [2] - 17:10, 17:14
**ways** [3] - 11:15, 91:21, 96:4
**wear** [1] - 100:19
**wearable** [4] - 17:17, 26:22, 30:5, 114:5
**wearable's** [1] - 35:6
**wearables** [12] - 16:22, 17:3, 17:8, 17:10, 26:21, 26:23, 28:15, 29:18, 113:25, 114:1, 114:10

**wearer** [1] - 102:5
**wearing** [1] - 17:20
**weave** [2] - 78:17, 79:15
**weaving** [12] - 7:8, 31:11, 31:18, 79:5, 79:8, 79:10, 85:18, 91:11, 107:22, 108:4, 108:5, 108:15
**website** [2] - 18:13, 109:13
**weeds** [1] - 115:15
**weeks** [1] - 119:12
**weigh** [2] - 15:24, 15:25
**weighs** [1] - 24:5
**welcome** [1] - 48:7
**well-known** [1] - 14:5
**whatsoever** [4] - 33:20, 36:5, 51:14, 107:18
**whereas** [1] - 8:16
**wherein** [1] - 74:20
**white** [2] - 25:10, 79:14
**whole** [9] - 16:11, 16:22, 26:25, 52:16, 75:9, 97:20, 102:3, 102:24, 110:16
**wide** [1] - 36:16
**widely** [1] - 5:12
**win** [1] - 43:6
**window** [1] - 39:4
**wiped** [1] - 52:16
**wire** [1] - 99:6
**wish** [1] - 32:22
**withdraw** [1] - 16:20
**withstand** [1] - 16:2
**witness** [3] - 85:8, 85:11, 92:21
**word** [6] - 24:19, 24:22, 29:10, 44:18, 56:1, 108:23
**words** [1] - 110:16
**world** [2] - 16:12, 47:6
**worn** [1] - 4:19
**worse** [2] - 48:8, 52:17
**worth** [1] - 106:6
**woven** [20] - 6:16, 8:1, 31:15, 31:16, 58:22, 58:25, 59:1, 74:22, 75:4, 78:4, 78:8, 78:23, 86:3, 93:22, 101:16, 103:10, 103:15, 107:5, 107:18, 108:9
**writing** [1] - 113:18

**written** [2] - 105:12, 118:11

## Y

**yarn** [6] - 77:7, 77:8, 90:10, 91:16, 91:22, 91:23
**yarns** [6] - 77:7, 79:1, 79:8, 79:10, 79:15
**year** [6] - 29:25, 49:13, 50:11, 50:21, 50:25, 116:19
**years** [15] - 13:14, 25:24, 25:25, 26:1, 26:3, 37:4, 38:25, 46:4, 46:6, 60:5, 60:25, 61:8, 64:12, 67:17, 70:5
**young** [1] - 41:10
**younger** [1] - 39:10

## Z

**zero** [4] - 87:14, 88:16, 89:10